Hon. James L. Robart

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ON BEHALF OF THE NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION AND THE UNITED STATES DEPARTMENT OF THE INTERIOR; THE STATE OF WASHINGTON THROUGH THE WASHINGTON DEPARTMENT OF ECOLOGY; MUCKLESHOOT INDIAN TRIBE; SUQUAMISH TRIBE, | ) ) ) ) ) ) ) ) ) ) ) |
|  | Case No. CV-16-1486 |
| Plaintiffs, | ) ) |
| v. | ) ) |
| CITY OF SEATTLE, | ) ) |
| Defendant. | ) ) |

Case No. CV-16-1486

CONSENT DECREE

CONSENT DECREE

# TABLE OF CONTENTS

I.      INTRODUCTION...................................................................1

II.     RECITALS ........................................................................2

III.    JURISDICTION AND VENUE ..............................................12

IV.     PARTIES BOUND ............................................................12

V.      DEFINITIONS .................................................................13

VI.     GENERAL PROVISIONS...................................................19

VII.    TERMS AND CONDITIONS APPLICABLE ONLY TO
        BLUEFIELD HOLDINGS INC...............................................20

VIII.   TERMS AND CONDITIONS APPLICABLE ONLY TO
        CITY OF SEATTLE ...........................................................38

IX.     FORCE MAJEURE............................................................43

X.      DISPUTE RESOLUTION ...................................................46

XI.     STIPULATED PENALTIES .................................................50

XII.    FAILURE TO MAKE TIMELY PAYMENTS ..................................54

XIII.   ACCESS TO INFORMATION AND PROJECT SITE ......................54

XIV.    COVENANT NOT TO SUE BY PLAINTIFFS ...................................56

XV.     RESERVATIONS OF RIGHTS ...........................................57

XVI.    COVENANT NOT TO SUE BY SETTLING DEFENDANT.............59

XVII.   EFFECT OF SETTLEMENT; CONTRIBUTION PROTECTION .....59

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

XVIII.    RETENTION OF RECORDS ........................................................62

XIX.    NOTICES AND SUBMISSIONS ..............................................64

XX.    RETENTION OF JURISDICTION ...........................................67

XXI.    INTEGRATION/APPENDICES ................................................67

XXII.    MODIFICATION.......................................................................68

XXIII.    ENFORCEMENT .....................................................................68

XXIV.    LODGING AND OPPORTUNITY FOR PUBLIC COMMENT ........69

XXV.    SIGNATORIES/SERVICE......................................................69

XXVI.    FINAL JUDGMENT.................................................................70

# I.   INTRODUCTION

The United States of America ("United States"), on behalf of the United States Department of Commerce, acting through the National Oceanic and Atmospheric Administration ("NOAA"), and the United States Department of the Interior; the State of Washington (the "State") through the Washington State Department of Ecology; the Suquamish Tribe; and the Muckleshoot Indian Tribe (collectively, "Plaintiffs"), have filed a complaint in this case against defendant City of Seattle ("Settling Defendant") pursuant to Section 107 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9607; the Model Toxics Control Act ("MTCA"), chapter 70.105D RCW; Section 311 of the Clean Water Act ("CWA"), 33 U.S.C. § 1321; and Section 1002(b)(2)(A) of the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2702(b)(2)(A) for Covered Natural Resource Damages (as defined below).

This Consent Decree (the "Decree") resolves the claims asserted in the Complaint against the Settling Defendant.  This Consent Decree also contains separate terms and conditions regarding restoration with Bluefield Holdings, Inc. ("Bluefield").

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

## II. RECITALS

A.     The United States Department of Commerce, acting through NOAA; the United States Department of the Interior; the Washington Department of Ecology on behalf of the State of Washington; the Suquamish Tribe, and the Muckleshoot Indian Tribe (collectively, "the Trustees" and, individually, a "Trustee"), under the authority of Section 107(f) of CERCLA, 42 U.S.C. § 9607(f), Section 1006(b) of OPA, 33 U.S.C. § 2706(b), 40 C.F.R. Part 300, subpart G, and RCW 70.105D.040(2), serve as trustees for natural resources for the assessment and recovery of damages for injury to, destruction of, or loss of natural resources under their trusteeship.

B.     Investigations conducted by the Trustees and others have detected hazardous substances in the sediments, soils and groundwater of the Lower Duwamish Waterway ("LDW"), including but not limited to arsenic, antimony, cadmium, chromium, copper, mercury, nickel, lead, zinc, bis(2 ethylhexyl) phthalate, hexachlorobenzene, hexachlorobutadiene, polychlorinated biphenyls (PCBs), and polycyclic aromatic hydrocarbons (PAHs).  Overall, the Trustees have documented the presence of over 30 hazardous substances in the marine sediments of the LDW.

CONSENT DECREE

- 2 -

C.     The Trustees began assessing damages to natural resources in the LDW in 1990 by finding that hazardous substances had been released into the LDW; that natural resources had likely been injured by the releases; that data sufficient to pursue a natural resource damage assessment were available or could likely be obtained at a reasonable cost; and that, without further action, future response activities would not adequately remedy the resource injuries.  *See, e.g.,* NOAA, Lower Duwamish Waterway Sediment Characterization Study Report (Dec. 10, 1998), Elliott Bay Trustee Council, Pre-Assessment Screen for LDR (December 2009), and Final Lower Duwamish River NRDA Restoration Plan and Programmatic Environmental Impact Statement (July 2013).

D.     Although the Trustees have initiated but not yet completed a natural resource damage assessment for the LDW, the Trustees have developed and analyzed information sufficient to support settlements that are fair, reasonable and in the public interest.

E.     As contemplated by this Consent Decree, the City of Seattle entered into an agreement with Bluefield Holdings, Inc. ("Bluefield") to develop restoration projects on the City's behalf for the purpose, *inter alia*, of resolving the City's liability to the Trustees for Covered Natural Resources Damages as further defined in this Consent Decree.

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

F.     Upon consideration of the natural resource damage assessment undertaken to date, Bluefield, on behalf of the City of Seattle and other potentially responsible parties ("PRPs"), worked collaboratively with the Trustees to formulate potential habitat restoration projects along the LDW.

G.     In cooperation with Bluefield, the Trustees created the Natural Resource Restoration and Enhancement Credit Protocol dated May 24, 2009 ("Protocol"), the purpose of which was to establish guidelines in developing and implementing such projects.  The Protocol related to Bluefield's habitat restoration projects along the LDW and was intended solely as a guideline, not as a legally binding document. The Protocol is not part of this Consent Decree, nor is the Protocol enforceable pursuant to this Consent Decree.

H.     Consistent with the Protocol, and in anticipation of this Consent Decree, Bluefield initiated work on a number of habitat restoration projects in the LDW, in cooperation with the City of Seattle.  One of those projects – Restoration Project One, as defined below – is particularly important for purposes of this Consent Decree.  Construction of Restoration Project One is now complete. Bluefield is now engaged in habitat and vegetation development and monitoring of Restoration Project One, as described further below and in Appendices A and B.

CONSENT DECREE

- 4 -

I.     In this Consent Decree, the City of Seattle is using restoration credits from Bluefield to resolve its liability for Covered Natural Resource Damages (as defined below) with Plaintiffs.  Bluefield is not a liable party, as described more specifically in Paragraphs 8 and 13, but Bluefield is a party to this Consent Decree because it has agreed to perform certain work on behalf of the City of Seattle.  The obligations of the City of Seattle and Bluefield, on behalf of the City of Seattle, with respect to Restoration Project One and other habitat restoration projects are set forth in this Consent Decree.

J.     Plaintiffs have filed a complaint (the "Complaint") pursuant to Section 107 of CERCLA, 42 U.S.C. § 9607; MTCA, chapter 70.105D RCW; CWA, 33 U.S.C. § 1251 et seq.; and OPA, 33 U.S.C. § 2701 et seq., seeking recovery from Settling Defendant of damages for injury to, destruction of, and loss of natural resources resulting from releases of hazardous substances into the LDW, including, but not limited to, the costs of assessing the damages.

K.     Plaintiffs allege that the Settling Defendant is (a) the owner and/or operator of one or more facilities; (b) a person who at the time of disposal or release of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of; (c) a person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for

CONSENT DECREE

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, or otherwise generated any hazardous substance disposed of or treated at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances; and/or (d) a person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person from which there is a release or a threatened release of a hazardous substance that causes the incurrence of response costs within the meaning of 42 U.S.C. § 9607 and RCW 70.105D.040.

L.     Plaintiffs specifically allege in the Complaint that Settling Defendant owns or in the past owned and/or operated real property, Combined Sewer Overflows (CSOs), storm drains and other facilities on, adjacent to, or near the LDW, including but not limited to the Georgetown Steam Plant, that were sources of contamination.  Plaintiffs further allege that from each of such sites identified in Appendix F, the storm water, surface water runoff, wastewater, other process discharges, and/or groundwater have flowed to the LDW.  Plaintiffs also allege that investigations have detected hazardous substances in soils, groundwater or sediments on or in those properties and/or facilities.  Some of these hazardous substances are found in the sediments of the LDW.

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

M.     Plaintiffs further allege that hazardous substances have been or are being released to the LDW from properties or facilities owned and/or operated by Settling Defendant through direct discharge or other process discharges, and that those hazardous substances have caused injury to, destruction of and loss of natural resources in the LDW under Plaintiffs' trusteeship, including fish, shellfish, invertebrates, birds, marine sediments, and resources of cultural significance.  Plaintiffs further allege that each of them and the public have suffered the loss of natural resource services (including ecological services as well as direct and passive human use losses) as a consequence of those injuries.

N.     On or around December 23, 1991, Settling Defendant entered into a Consent Decree with the Trustees resolving its liability for certain natural resource damages through the effective date of that Consent Decree as related to various sources of contamination by City-controlled facilities located along the LDW (*United States of America, et al v. City of Seattle and Municipality of Metropolitan Seattle*, Civil No. C90-395WD).  That Consent Decree was amended on October 13, 1999.  This Consent Decree addresses the City's liability for Covered Natural Resource Damages (as defined herein) not addressed by the previous consent decree, including Covered Natural Resource Damages (as

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

defined herein) that have occurred after the effective date of the previous consent decree.

O.     Based on the above findings, the Plaintiffs concluded that no further natural resource damage assessment is required to effectuate the purposes of this Consent Decree, with respect to Settling Defendant.

P.     Settling Defendant denies all or portions of the allegations of the Complaint, and all or portions of the allegations contained in Paragraphs K through M of this Section.

Q.     The Restoration Project One described in Appendix A has been constructed and is currently being implemented by Bluefield, including but not limited to, all tasks associated with operations, maintenance, monitoring, and adaptive management.  Settling Defendant and Bluefield have taken the steps necessary to permanently dedicate the Restoration Project One Site, as defined herein and as set forth in Appendix D, and in a manner consistent with the Environmental Covenant granted by the City for Restoration Project One.

R.     Under the terms of this Consent Decree, Bluefield also is responsible for implementing a vegetation plan and monitoring vegetation and habitat performance for Restoration Project One for at least ten years after completion of construction.

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

S.      In settlement of this action, Settling Defendant has agreed, in lieu of and as equivalent to monetary damages, to fund a portion of the Restoration Projects by purchasing twenty-eight (28) discounted service acre-year ("DSAY") credits from Bluefield as documented by letter dated March 30, 2011, evidencing the transfer and sale of twenty (20) DSAYs, and Certificate No. 2 dated December 12, 2013, evidencing the transfer and sale of eight (8) DSAYs.  In addition, the Settling Defendant agrees to reimburse a portion of the natural resource damage assessment costs incurred by the Trustees.  Settling Defendant shall not be responsible for costs incurred by the Trustees in their work and negotiations with Bluefield.  Plaintiffs' agreement to settle their claims against Settling Defendant for the equivalent of 28 DSAYs represents approximately 0.53% of the current total estimated DSAYs for the LDW (including DSAYs accounted for in prior settlements with other PRPs for hazardous substance contamination of the LDW as well as releases of hazardous substances by non-settling parties).  In light of on-going and anticipated restoration activities, the Trustees have estimated the cash damages equivalent of the DSAYs allocated to Settling Defendant (at an estimated cost of $140,000 per DSAY) to total $3,920,000.

T.      Settling Defendant has further agreed to utilize funds to be paid by Bluefield to fund the long term, permanent stewardship costs for any and all of the

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

Restoration Projects constructed on land owned or operated by the Settling Defendant included in the Master Lease Agreement between the City and Bluefield, and as defined in this Consent Decree.

U.     When Bluefield completes the construction, maintenance, operation, and monitoring of each Restoration Project, including any required adaptive management, Bluefield shall vacate the Restoration Project Site and relinquish control of the Project back to the Settling Defendant.  Upon such vacation and relinquishment of control of each Project by Bluefield, the Settling Defendant will assume responsibilities for the long term stewardship of each Restoration Project and Site, including maintaining vegetation and habitat performance.

V.     The Trustees have determined that the payments previously made by Settling Defendant to Bluefield for funding the construction of Restoration Projects as recited in Paragraph S and T above in this Consent Decree are appropriate and necessary to protect and restore the natural resources injured as a result of alleged actions or omissions of Settling Defendant that are addressed herein, and that such timely payments by Settling Defendant are adequate to redress Settling Defendant's responsibility for the Covered Natural Resource Damages that are the subject of this proceeding.

W.    Settling Defendant does not admit any liability to Plaintiffs arising out of the transactions or occurrences alleged in the Complaint and the matters alleged in this Consent Decree.

X.    Plaintiffs and Settling Defendant agree that this Decree addresses the resolution of Plaintiffs' claims for Covered Natural Resource Damages as defined in this Consent Decree, and that neither Plaintiffs nor Settling Defendant will use this settlement (including the terms of this Decree and the basis for the compromise contained in other documents filed in this action in support of this Decree) in any other forum, whether in litigation, administrative proceedings, formal or informal negotiations, or otherwise, to resolve, attempt to resolve, or in any way influence the resolution of, other claims between Plaintiffs and Settling Defendant in the LDW (as defined below); provided, however, that this provision does not limit Plaintiffs or Settling Defendant from using otherwise-available factual information referenced in documents filed in support of this Decree. The restriction in the preceding sentence applies to, but is not limited to, claims that the United States (on behalf of the United States Environmental Protection Agency) and the State may have against Settling Defendant under CERCLA, the Solid Waste Disposal Act (as amended by the Resource Conservation and Recovery

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

Act), 42 U.S.C. §§ 6901 *et seq.*, or MTCA in the Lower Duwamish Waterway (as defined below).

Y.     Plaintiffs, Settling Defendant, and Bluefield agree, and this Court by entering this Decree finds, that this Decree has been negotiated by the Parties in good faith; that settlement of this matter will avoid prolonged and complicated litigation between the Parties; and that this Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, it is hereby Ordered, Adjudged and Decreed:

## III.  JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345 and l367, 42 U.S.C. § 9613(b), and 33 U.S.C. § 2717(b).  The Court has personal jurisdiction over the Parties.  Solely for the purposes of this Decree and the underlying Complaint, the Parties waive all objections and defenses that they may have to jurisdiction of the Court or to venue in this District.  The Parties may not challenge the terms of this Decree or this Court's jurisdiction to enter and enforce this Decree.

## IV.  PARTIES BOUND

2.     This Decree is binding upon the United States, the State, the Suquamish Tribe, the Muckleshoot Indian Tribe, Settling Defendant and its

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

successors and assigns, and Bluefield and its successors and assigns. Any change in ownership or corporate or other legal status, including but not limited to any transfer of assets or real or personal property, will in no way alter the status or responsibilities of Settling Defendant or Bluefield under this Decree.

3. Bluefield shall provide a copy of this Consent Decree to each contractor hired by Bluefield to perform any of the work required by this Consent Decree, and to each person representing Bluefield with respect to any such work. Bluefield shall condition all future contracts with any contractor entered into by Bluefield after the Effective Date of this Consent Decree upon performance of the work in conformity with the terms of this Consent Decree. Bluefield or its contractors shall provide written notice of the Consent Decree to all subcontractors hired by Bluefield's contractors to perform any portion of the work. Bluefield shall nonetheless be responsible for ensuring that all work performed by its contractors and subcontractors is performed in accordance with this Consent Decree.

## V. DEFINITIONS

4. Unless otherwise expressly provided, terms used in this Decree that are defined in CERCLA or in regulations promulgated under CERCLA have the meanings assigned to them in CERCLA or in such regulations. Whenever the

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA 98115

terms listed below are used in this Decree or in any attached appendix, the following definitions will apply:

a.     "As-built Drawings" means the revised set of drawings that were previously submitted by Bluefield or one of its contractors upon completion of the Restoration Project One, which reflect all changes made in the specifications and working drawings during the construction process, and show the dimensions, geometry, and location of all elements of the work completed pursuant to the Appendix A.

b.     "Bluefield Holdings, Inc." or "Bluefield" is a business entity that, among other things, designs, constructs, and maintains natural resource restoration and enhancement projects on behalf of persons that are liable for natural resource damages at properties that have suffered a loss of natural resources pursuant to CERCLA.

c.     "CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601, *et seq.*

d.     "Consent Decree" or "Decree" means this Consent Decree and all attached appendices.  In the event of a conflict between this Consent Decree and any Appendix, the Consent Decree will control.

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

e.     "Covered Natural Resource Damages" means damages, including costs of damage assessment, recoverable under Section 107 of CERCLA, 42 U.S.C. § 9607; Chapter 70.105D RCW; Section 311 of the Clean Water Act ("CWA"), 33 U.S.C. § 1321; and Section 1002(b)(2)(A) of the Oil Pollution Act of 1990 ("OPA"), 33 U S.C. § 2702(b)(2)(A) and any other statutory or common law, for injury to, destruction of, or loss of natural resources resulting from releases of hazardous substances or discharges of oil to the LDW and/or Elliott Bay, or adjoining shorelines, where such release or discharge occurred on or before the Effective Date of this Consent Decree, and are subsequent to the December 23, 1991 Consent Decree at or from the locations described in Appendix F.

f.     "Day" means a calendar day. In computing any period of time under this Consent Decree, where the last day falls on a Saturday, Sunday, or federal holiday, the period of time will run until the close of business of the next working day.  "Working day" means a day other than a Saturday, Sunday, or Federal holiday.

g.     "Discounted Service-Acre Year" (DSAY) means the amount of a specific suite of ecological services determined to be produced per acre of a given type of habitat over a period of years, the total of which are discounted to a present value.

CONSENT DECREE

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

h.     "Effective Date" shall be the date on which this Consent Decree is entered by the Court, or, if the Court instead issues an order approving the Consent Decree, the date of such order.

i.     "Elliott Bay" means any portion of Elliott Bay (including the shoreline, intertidal and subtidal areas, tributaries, estuaries and bottom sediments) in the State of Washington where hazardous substances originating from the locations identified in the definition of Covered Natural Resource Damages have come to be located.

j.     "Lower Duwamish Waterway" or "LDW" means any portion of the Duwamish Waterway (including the shoreline, intertidal and subtidal areas, tributaries, estuaries and bottom sediments) in the State of Washington where hazardous substances originating from the locations identified in the definition of Covered Natural Resource Damages have come to be located.

k.     "MTCA" means the Model Toxics Control Act, Chapter 70.105D RCW.

l.     "Master Lease Agreement" means the agreement between the City of Seattle and Bluefield, effective February 23, 2009, pursuant to Ordinance Number 122729, including the letter agreement amendments dated December 17, 2012, and May 26, 2017.  The Master Lease Agreement is attached hereto in

Appendix C.

        m.      "Natural Resources" means that definition as provided in 42 U.S.C. § 9601(16).

        n.      "Parties" means the United States, the State of Washington, the Suquamish Tribe, the Muckleshoot Indian Tribe, Bluefield, and Settling Defendant.

        o.      "Performance Guarantees" mean the escrow account in Appendix E1 and the letter of credit in Appendix E2 established for operations and maintenance of Project 1 and adaptive management of Project 1, respectively.

        p.      "Plaintiffs" means the United States, the State, the Suquamish Tribe, and the Muckleshoot Indian Tribe.

        q.      "Restoration Project One" or "Project One" means the project described in Appendix A.

        r.      "Restoration Project One Site" or "Project One Site" means the areas shown and/or described in Appendix B and is the property on which Restoration Project One is situated.

        s.      "Restoration Project Sites" or "Project Sites" means the property(ies) owned or controlled by Settling Defendant as identified in the Master Lease Agreement attached as Appendix C, including Restoration Project One Site,

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

on which natural resource restoration projects are anticipated to be constructed by Bluefield on land owned by Settling Defendant and for which any ecological credits have been sold to a potentially responsible party to resolve their natural resource damages liability arising out of releases of hazardous substances to LDW.

t. "Restoration Projects" means the natural resource restoration projects, including Restoration Project One, to be developed on the Restoration Project Sites.

u. "Settling Defendant" means the City of Seattle (or "City").

v. "Stewardship" means actions intended to preserve, protect or maintain Restoration Projects and the Project Sites constructed by Bluefield under the terms of the Master Lease Agreement (Appendix C), including (a) maintaining, restoring or replacing the ecological function of the Restoration Projects; and (b) maintaining, restoring or replacing physical components of the Restoration Projects.

w. "Trustees" mean the United States Department of Commerce, acting through NOAA; the United States Department of the Interior; the Washington State Department of Ecology, on behalf of the State of Washington; the Suquamish Tribe; and the Muckleshoot Indian Tribe.

x. "United States" shall mean the United States of America and

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA 98115

each department, agency and instrumentality of the United States, including the United States Department of Commerce and the United States Department of the Interior.

## VI.  GENERAL PROVISIONS

5.      In the Master Lease Agreement, Settling Defendant agreed to allow Bluefield to construct and implement habitat restoration projects along the LDW on properties owned or controlled by Settling Defendant.  Plaintiffs to this action shall have the same rights as Bluefield under the terms and conditions of the Master Lease Agreement where such rights relate to the development and implementation of Project One.  Plaintiffs do not assume any of the obligations of Bluefield under the Master Lease Agreement.

6.      Settling Defendant and Bluefield agree that the Trustees have the sole authority and unreviewable discretion to review and approve any changes to any Restoration Project and to establish the ecological value for each Restoration Project, so long as any changes comply with all applicable laws.

7.      Settling Defendant and Bluefield agree that the Trustees have the sole and unreviewable discretion for amending or modifying the post-construction work set forth in Appendix A and for determining the ecological value of Project One, so long as any amendments or modifications comply with all applicable laws.

CONSENT DECREE

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

# VII.  TERMS AND CONDITIONS APPLICABLE ONLY TO BLUEFIELD

8.      Except as specifically provided in this Section VII, the Terms and Conditions set forth in this Section VII of the Consent Decree are applicable to and enforceable against Bluefield only (including Bluefield's successors and assigns), and Bluefield's insurers and sureties where specifically provided.  Neither Bluefield's status as a Party to this Consent Decree, nor any provision of this Consent Decree, shall impose liability on Bluefield, or alter or affect Bluefield's liability (or absence of liability), pursuant to CERCLA, OPA, MTCA, or the CWA. Nothing in this Consent Decree shall shield or relieve Bluefield from liability pursuant to CERCLA, OPA, MTCA, or the CWA for Bluefield's acts that otherwise would result in liability under those statutes absent this Consent Decree.

9.      All activities undertaken by Bluefield to develop and implement Project One shall be performed in accordance with the requirements of all applicable laws and permits.

10.      Bluefield shall ensure that all work performed under this Consent Decree shall be conducted as set forth in Appendix A attached hereto.  If the Trustees determine that Bluefield is not complying with the requirements set forth in the Decree and Appendix A, the Trustees shall provide prompt written notice to Bluefield specifying the basis for their determination of noncompliance.  Bluefield

CONSENT DECREE

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

may correct the noncompliance or invoke the Dispute Resolution procedures set forth in Section X below and to the extent allowed under this Decree. The Trustees may require Bluefield to take actions, to alter, suspend or cease ongoing activities, and to alter, postpone or refrain from taking proposed actions, as are necessary to ensure compliance with the terms of this Consent Decree and any plans or proposals adopted hereunder.

11.     This Consent Decree is not, and shall not be construed to be, a permit issued pursuant to any law.

12.     Where any portion of the activities undertaken pursuant to this Consent Decree requires a federal, state or local permit or approval, Bluefield shall submit timely and complete applications and take all other actions necessary to obtain such permits or approvals. Bluefield may seek relief under the provisions of Section IX (Force Majeure) for any delay in or prevention of the performance of the obligations of this Section resulting from a failure to obtain, or a delay in obtaining, any federal or state permit or approval required for such performance, provided that it has submitted timely and complete applications and taken all other actions reasonably necessary to obtain all such permits or approvals.

13.     Plaintiffs do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Bluefield's compliance with this Consent

CONSENT DECREE

- 21 -

Decree will result in compliance with CERCLA or any other law.  Compliance with this Consent Decree does not diminish or affect Bluefield's responsibility to comply with any applicable federal, state or local law or regulation.  The Parties agree that Bluefield is responsible for achieving and maintaining complete compliance with all applicable federal, state and local laws, regulations and permits.

**A.  Project Implementation**

14.    Bluefield shall develop and implement Project One, and shall perform the required post-construction operations and maintenance, monitoring, and adaptive management activities in accordance with the terms set out in Appendix A.

15.    The Parties agree that Bluefield completed construction of Project One and submitted a written Notice of Completion to the Trustees.  The Trustees have reviewed Project One and on September 4, 2014, sent a written notice of the Trustees' determination that the Project has been so completed (Notice of Approval of Completion).  September 4, 2014, shall constitute the "Construction Completion Date."

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

**B. Development and Monitoring of Vegetation and Habitat**

16.     As more fully described in Appendix A, Bluefield shall develop and monitor vegetation and habitat until September 4, 2024 (ten years from the Construction Completion Date of Project One).  Upon completion of the ten-year period, Bluefield shall provide written Notice of Completion of Vegetation and Habitat Development and Monitoring Obligations to the Trustees in accordance with Section XIX (Notices and Submissions).  Within forty-five (45) days after receiving the Notice of Completion of Vegetation and Habitat Development and Monitoring Obligations, the Trustees shall submit to Bluefield either (a) a written notice identifying specific deficiencies the Trustees determine must be corrected for the vegetation and habitat development and monitoring obligations to be completed in accordance with Appendix A (Notice of Deficiencies); or (b) a written notice of the Trustees' determination that the vegetation and habitat development and monitoring obligations are completed (Approval of Completion of Vegetation and Habitat Development and Monitoring Obligations).  The date of the Trustees' Approval of Completion of Vegetation and Habitat Development and Monitoring Obligations for Project One shall constitute the "Vegetation and Habitat Development and Monitoring Completion Date."

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

17.    In the event the Trustees identify, in a Notice of Deficiencies, specific deficiencies with Bluefield's compliance with its obligations in Paragraph 16, Bluefield shall correct the identified deficiencies and complete Project One in accordance with Appendix A.  Within sixty (60) days of Bluefield's receipt of a Notice of Deficiencies from the Trustees, or as otherwise allowed by the Trustees, Bluefield shall submit to the Trustees an amended Notice of Completion of Vegetation and Habitat Development and Monitoring Obligations for review and response in accordance with this Paragraph.

18.  To the extent there are any deficiencies identified by the Trustees regarding Project One, the Settling Defendant agrees to allow Bluefield access to the Project One Site to complete Trustee-required actions even if such work requires Bluefield to conduct activities beyond the 10-year period contemplated under the Master Lease Agreement, so long as any required actions comply with all applicable laws.

19.    During the ten-year period described in Paragraphs 16-18, Bluefield shall be responsible for undertaking corrective actions for any perturbation that affects the ecological integrity or function of Project One.  Perturbations include events with a foreseeable probability of occurrence (such as, for example, the beaching of an abandoned barge) but do not include "force majeure" events.

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

20.     Bluefield shall provide for continued maintenance and corrective actions in accordance with this Section until the Vegetation and Habitat Development and Monitoring Completion Date, regardless of ownership of the Project One Site.  The Trustees recognize that the Project One Site may include property that is owned by other parties.  Bluefield recognizes that it is solely responsible for securing the cooperation of other property owners in order to successfully complete and maintain Project One in accordance with Appendix A. Any failure by Bluefield to successfully complete or maintain Project One in accordance with Appendix A resulting from disputes with other property owners shall not constitute a "force majeure" event.

**C. Restoration Project Credits**

21.     Restoration Project One's ecological value on the Construction Completion Date was 46.9 DSAYs.  Since that date, events at the Restoration Project One Site have moderately diminished the ecological value of that project. The Trustees have revised the ecological value of the project, under the terms of the Protocol, to its current ecological value of 43.95 DSAYs.

22.     The City of Seattle purchased from Bluefield twenty-eight (28) DSAYs credited by the Trustees in order to resolve the liability of the City of Seattle as set forth in this Consent Decree.  To the extent that any of the remaining

CONSENT DECREE

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

DSAY credits (those in excess of the 28 credits) have not already been sold by Bluefield to other potentially responsible parties, Bluefield may use such remaining DSAY credits credited by the Trustees to Project One and other Restoration Projects to resolve the liability of other potentially responsible parties in other settlements with the Trustees, subject to the limitations in Paragraph 24 below.

23.   All funds to be paid pursuant to this Section shall be paid in accordance with the procedure set forth in Section XI (Stipulated Penalties).

24.   At any time until the Vegetation and Habitat Development and Monitoring Completion Date, the Trustees may re-evaluate the ecological valuation of Restoration Project One and adjust any ecological values previously determined by the Trustees.  The ecological valuation by the Trustees is to be made at the unreviewable discretion of the Trustees and is not subject to Section X (Dispute Resolution).  The Trustees' exercise of their discretion to re-evaluate the ecological value of Project One shall have no effect on the quantity or value of DSAYs previously purchased by Settling Defendant.

25.   Bluefield agrees that it will not enter into any agreement with any other potentially responsible party(ies) that provides ecological credits in an amount that exceeds the remaining total ecological value of Restoration Project One set forth in

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

Paragraph 21, and as adjusted according to the provisions of Paragraph 24. The ecological value of Restoration Project One will be determined in the sole and unreviewable discretion of the Trustees.

26.     Bluefield will maintain a registry that will set forth the transfer of the ecological credits of Restoration Project One in a manner to ensure that Bluefield does not transfer ecological credits that exceed, at the time of the transfer, the available ecological credits assigned by the Trustees for Project One. Bluefield will provide Plaintiffs with an updated version of the registry every quarter commencing the first quarter subsequent to the Effective Date.

**D.  Reimbursement of Restoration Implementation Costs**

27.     Bluefield agrees to reimburse the Trustees' costs incurred in implementing and overseeing Restoration Project One. Settling Defendant shall not be responsible for costs incurred by the Trustees in the Trustees' work and negotiations with Bluefield. Each year, beginning on the Effective Date of this Decree, the Trustees shall provide Bluefield with an invoice detailing their unreimbursed costs through the prior calendar year of implementing and overseeing Restoration Project One. Within sixty (60) days of receipt of the Trustees' invoice, Bluefield shall reimburse the Trustees for those costs. If Bluefield believes that any of the Trustees' invoiced costs were not incurred in

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

implementing and overseeing Restoration Project One, Bluefield may invoke the Dispute Resolution provisions of Section X within sixty (60) days of receipt of the Trustees' invoice as to the disputed costs only; any costs for which Bluefield does not invoke Dispute Resolution shall be paid within sixty (60) days of receipt of the Trustees' invoice. The last year for which the Trustees' costs incurred in implementing and overseeing the Project shall be reimbursed by Bluefield shall be the calendar year following the Vegetation and Habitat Development and Monitoring Completion Date.

**E. General Project Development Provisions**

28. Bluefield shall avoid taking any action that is inconsistent with this Consent Decree and/or that would adversely affect Restoration Project One.

29. Bluefield shall undertake all activities required to address cultural resource issues associated with Restoration Project One, including, as applicable, consultation with tribes and the Washington State Department of Archaeology and Historic Preservation, conducting a background and project review by an archaeologist who meets the U.S. Department of the Interior's professional qualification standards at 36 C.F.R. Part 61, and conducting cultural resource surveys or monitoring activities.

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA 98115

30.    To the extent there are any deficiencies at any Restoration Project as identified by the Trustees, Settling Defendant agrees to allow Bluefield access to any Project and/or Project Site to complete Trustee-required actions even if such work requires Bluefield to conduct activities beyond the 10-year period contemplated under the Master Lease Agreement, so long as the Trustee-required activities comply with all applicable laws.

31.    For the time frame during which Bluefield is conducting activity related to Project One on the Project One Site, Bluefield will take the steps necessary to ensure the Trustees' access to the Project One Site.

32.    The Trustees may conduct additional work, as they may deem appropriate, at their own expense, on any of the Restoration Project Sites, so long as any additional work complies with all applicable laws. Bluefield shall provide the Trustees with access to the Restoration Project Sites to conduct such work and to monitor the condition of the Restoration Project Sites. If such work is conducted prior to completion of initial construction by Bluefield, the Trustees will conduct any such work in a manner that does not hinder Bluefield's timely completion of the Restoration Projects. The provisions of this Paragraph are applicable to, and enforceable against, both Bluefield and the City of Seattle.

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

33. In no event shall the Trustees perform any additional work that will interfere with Bluefield's obligations under this Consent Decree, the construction, maintenance, operation, or monitoring of the Restoration Projects, Settling Defendant's use of its properties, or that otherwise affects the performance criteria of this Consent Decree.

**F. Selection of Contractors**

34. The selection of any contractor hereafter retained by Bluefield to perform any of the work required under this Consent Decree shall be subject to Trustee approval. Bluefield shall notify the Trustees in writing of the name, title and qualifications of any contractor Bluefield proposes to retain, and of any proposed changes in the selection of a contractor. The Trustees will notify Bluefield in writing of the approval or disapproval of a proposed contractor. The Trustees' assent to the proposed selection or change of a contractor may be presumed unless the Trustees notify Bluefield in writing of their objection to the proposed selection or change within thirty (30) days of Bluefield's written selection notice.

**G. Performance Guarantee**

35. <u>Performance Guarantees</u>. Bluefield shall maintain a Performance Guarantee for operation and maintenance of Restoration Project One in the amount

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

of $208,442.63 as set forth in Appendix E1, beginning on or before the Effective Date of this Consent Decree and continuing until released as set forth in this sub-Section, such that the Performance Guarantee is legally binding and fully effective. Bluefield shall maintain a Performance Guarantee for adaptive management of Restoration Project One in the amount of $46,000 as set forth in Appendix E2, beginning on or before the Effective Date of this Consent Decree and continuing until released as set forth in this sub-Section, such that the Performance Guarantee is legally binding and fully effective.

36. <u>Release of Performance Guarantee</u>. Bluefield shall not release, cancel, or discontinue any Performance Guarantee provided for the Restoration Project One except as provided pursuant to this sub-Section and as set forth in Appendices E1 and E2. If the Trustees issue the Approval of Completion of Vegetation and Habitat Development And Monitoring Obligations in accordance with Paragraph 16, or if the Trustees otherwise so notify Bluefield in writing, Bluefield may thereafter release, cancel, or discontinue the Performance Guarantees for Restoration Project One provided pursuant to this sub-Section and as described in Appendices E1 and E2. In the event of a dispute, Bluefield may release, cancel, or discontinue the Performance Guarantee(s) required hereunder only in accordance with the terms and conditions of the Performance Guarantee(s) or the final

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA 98115

administrative or judicial decision resolving such dispute pursuant to Section X (Dispute Resolution).

37. <u>Cancellation of Performance Guarantee</u>. If at any time the Trustees are notified by the Escrow Agent appointed pursuant to Appendix E1 that the Escrow Agent intends to resign, then, unless Bluefield provides a substitute performance guarantee mechanism that is acceptable to the Trustees no later than twenty (20) days prior to the impending resignation date, the Trustees shall be entitled (as of and after the date that is twenty (20) days prior to the impending resignation) to immediately draw fully on the funds in the Escrow Account established pursuant to the Performance Guarantee in Appendix E1 without any further notice to Bluefield. If at any time the Trustees are notified by the financial institution that issues the letter of credit in Appendix E2 that the financial institution elects not to extend the letter of credit beyond the current expiration date, then, unless Bluefield provides a substitute performance guarantee mechanism that is acceptable to the Trustees no later than twenty (20) days prior to the impending expiration date, the Trustees shall be entitled (as of and after the date that is twenty (20) days prior to the impending expiration) to immediately draw fully on any or all funds authorized in the letter of credit in Appendix E2 without any further notice to Bluefield.

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

38. <u>Exercise of Performance Guarantees</u>.  In the event the Trustees determine that Bluefield has failed to conduct operation and maintenance of Restoration Project One in accordance with Appendix A, then the Trustees may issue a written notice ("Exercise of Performance Guarantee Notice") to Bluefield as set forth in Appendix E1.  In the event the Trustees determine that Bluefield has failed to conduct adaptive management of Restoration Project One in accordance with Appendix A or any Adaptive Management Plan, then the Trustees may issue a written notice ("Exercise of Performance Guarantee Notice") to Bluefield.  Any Exercise of Performance Guarantee Notice issued by the Trustees will specify the grounds upon which such notice was issued and will provide Bluefield an opportunity to remedy the deficiencies specified in the Exercise of Performance Guarantee Notice, which notice will be provided as set forth in Section XIX (Notices and Submissions) and Appendix E1.

39. Bluefield shall remedy, to the Trustees' satisfaction, the deficiencies set forth in the Exercise of Performance Guarantee Notice within fifteen (15) working days of receipt of such notice.  If Bluefield has not remedied to the Trustees' satisfaction the deficiencies set forth in the Exercise of Performance Guarantee Notice within fifteen (15) working days of Bluefield's receipt of such notice, the Trustees may at any time thereafter exercise the Performance Guarantee

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

established pursuant to this Section as the Trustees deem necessary ("Exercise of Performance Guarantee") to complete the operation and maintenance or the adaptive management, as applicable, of Restoration Project One. The Trustees will notify Bluefield in writing (which writing may be electronic) if the Trustees determine that an Exercise of Performance Guarantee is warranted under this Paragraph.

40. Except as specifically provided elsewhere in this Consent Decree, Bluefield may invoke the procedures set forth in Section X (Dispute Resolution), to dispute the Trustees' Exercise of Performance Guarantee under Paragraph 38. However, notwithstanding Bluefield's invocation of such dispute resolution procedures, and during the pendency of any such dispute, the Trustees may in their sole discretion commence and continue an Exercise of Performance Guarantee under Paragraphs 38 and 39 until the earlier of (1) the date that Bluefield remedies, to the Trustees' satisfaction, the circumstances giving rise to the Trustees' issuance of the Exercise of Performance Guarantee Notice, or (2) the date that a final decision is rendered in accordance with Section X (Dispute Resolution) requiring the Trustees to terminate such Exercise of Performance Guarantee. Following either event, the Trustees shall cease obligating any further funds from the

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA 98115

Performance Guarantee but shall not be required to repay any funds already obligated or spent by the Trustees.

**H. Bluefield Indemnification; Insurance**

41.     Plaintiffs do not assume any liability by entering into this Consent Decree.  Bluefield shall indemnify and hold harmless each of the Plaintiffs and/or their agents, employees and representatives from any and all damage claims or causes of action arising from negligent or other wrongful acts or omissions of Bluefield and/or its officers, employees, agents, contractors, subcontractors, representatives and any persons acting on its behalf or under its control in carrying out activities pursuant to this Consent Decree.  Further, Bluefield agrees to pay Plaintiffs all reasonable costs Plaintiffs incur, including but not limited to attorneys' fees and other expenses of litigation and settlement, arising from or on account of claims made against  Plaintiffs based on negligent or other wrongful acts or omissions of Bluefield or its officers, employees, agents, contractors, subcontractors, representatives and any persons acting on its behalf or under its control, in carrying out activities pursuant to this Consent Decree.  None of the Plaintiffs shall be held out as a party to any contract entered into by or on behalf of Bluefield in carrying out activities pursuant to this Consent Decree.  Neither Bluefield nor any contractor or representative of Bluefield shall be considered an

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

agent of any Plaintiff, and Bluefield shall require any contractor hereafter retained by Bluefield who performs work for Bluefield in carrying out activities pursuant to this Consent Decree to affirmatively acknowledge that it is not acting as an agent of any Plaintiff.

42.    Plaintiffs shall give Bluefield written notice of any claim for which one or more Plaintiff plans to seek indemnification pursuant to Paragraph 41, and shall consult with Bluefield (including, but not limited to, responding to Bluefield's reasonable requests for information regarding any proposed settlement of that claim) prior to settling such claim.

43.    Bluefield waives all claims against Plaintiffs for damages or reimbursement or for set-off of any payments made or to be made to Plaintiffs, arising from or on account of any contract, agreement, or arrangement between Bluefield and any person for performance of activities pursuant to this Consent Decree, including, but not limited to, claims on account of construction delays.  In addition, Bluefield shall indemnify and hold harmless Plaintiffs with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between Bluefield and any person for performance of activities pursuant to this Consent Decree, including, but not limited to, claims on account of construction delays.

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

44.     No later than fifteen (15) days before commencing any work on the Project Sites, Bluefield shall cause to be maintained comprehensive general liability insurance and automobile liability insurance with limits of five million dollars ($5,000,000), combined single limit.  The Trustees shall be named additional insureds on any such policies with respect to all liability arising out of the activities performed by or on behalf of Bluefield pursuant to this Consent Decree.  In addition, for the duration of this Consent Decree Bluefield shall satisfy, or shall ensure that their contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing any work involved in implementing this Consent Decree.  No later than fifteen (15) days before commencing any work involved in implementing this Consent Decree, Bluefield shall provide to the Trustees certificates of such insurance and copies of such insurance policies.  Bluefield shall resubmit such certificates and copies of policies each year on the anniversary of the Effective Date of this Consent Decree.  If Bluefield demonstrates by evidence satisfactory to the Trustees that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, Bluefield need provide only

CONSENT DECREE

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

that portion of the insurance described above that is not maintained by the contractor or subcontractor.

**I. Stewardship**

45.     Pursuant to the Appendix C (Master Lease Agreement), at least six (6) months prior to the expiration of the Project Term (as defined in the Master Lease Agreement), Bluefield agrees to pay Settling Defendant a one-time payment for the post-Project Term long term maintenance of each Restoration Project.  Such long-term maintenance payment shall be calculated in accordance with the provisions of the Master Lease Agreement.

**VIII.  TERMS AND CONDITIONS APPLICABLE ONLY TO CITY OF SEATTLE**

46.     The terms and conditions set forth in this Section VIII are applicable and enforceable against Settling Defendant only.

47.     The Complaint states claims against Settling Defendant upon which relief may be granted.

48.     Nothing in this Consent Decree shall be construed as an admission of liability by Settling Defendant for any claims or allegations made in the Complaint or in this Consent Decree.

49.     This Consent Decree shall not be used as evidence of Settling Defendant's alleged liability in any action or proceeding other than an action or

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

proceeding to enforce the terms of this Consent Decree.

50. Settling Defendant and Bluefield entered into the Master Lease Agreement. Under the Master Lease Agreement, one or more Restoration Projects shall be developed on the Restoration Project Sites identified in the Master Lease Agreement. Settling Defendant has funded a portion of the Restoration Projects by purchasing twenty-eight (28) discounted service acre-year ("DSAY") credits from Bluefield.

51. Settling Defendant will take the steps necessary to ensure the permanency of all Restoration Projects and Project Sites, and to ensure the Trustees permanent access to all Restoration Project Sites.

**A. Settling Defendant's Stewardship Obligations**

52. The Parties intend for the ecological functions provided by Project One to be maintained in perpetuity. After the Vegetation and Habitat Development and Monitoring Completion Date, Bluefield's responsibility for Project One shall cease, and Settling Defendant shall be solely responsible for the Stewardship of Project One and for maintaining its ecological function.

53. As part of the permanent Stewardship obligation, Settling Defendant will grant an environmental covenant in the form set forth in Appendix D for each Restoration Project to ensure all ecological functions provided by all Restoration

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA 98115

Projects will be maintained in perpetuity.  Moreover, Settling Defendant will utilize all funds provided by Bluefield for Stewardship of the Restoration Projects, as that term is defined, solely for the purpose of the Stewardship of the Restoration Projects.

54.  Settling Defendant shall avoid taking any action that is inconsistent with this Consent Decree or that would adversely affect Project One.

**B.  Settling Defendant's Impact on Restoration Projects**

55.  In the event Settling Defendant's use of or failure to maintain a Restoration Project Site adversely affects the ecological function of a Restoration Project, Settling Defendant shall, within one hundred eighty (180) days of receipt of written notification by the Trustees, restore or replace such ecological function of the Restoration Project.  In the event that Settling Defendant fails to do so within one hundred eighty (180) days of such notification, Settling Defendant will provide an equal number of DSAYs that were lost as a consequence of Settling Defendant's actions or omissions.  The determination as to the number of DSAYs lost will be at the unreviewable discretion of the Trustees.  Settling Defendant may use credits derived from other Restoration Projects to provide the lost DSAYs.  In the alternative to providing lost DSAYs through habitat restoration along the LDW or purchasing credits from a Restoration Project, Settling Defendant may provide

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

funds to the Trustees in the amount of $125,000 for each lost DSAY. The decision whether to allow the Settling Defendant to provide habitat restoration along the LDW, purchase Bluefield credits from a Restoration Project or to assess $125,000 for each unrealized DSAY will remain in the sole and unreviewable discretion of the Trustees; PROVIDED that if Settling Defendant's cost of performing habitat restoration along the LDW would exceed $125,000 per DSAY, then the Trustees shall direct Settling Defendant to compensate for the lost DSAYs by either purchasing the quantity of DSAYs lost, or paying to the Trustees $125,000 for each lost DSAY.

**C. Settling Defendant: Past Cost Reimbursement**

56.     Within forty-five (45) days of the Effective Date, Settling Defendant will pay to the Trustees sums totaling $91,339.04 in damage assessment costs through the Effective Date. These sums shall be paid in the following amounts and particulars:

Trustee:     National Oceanic and Atmospheric Administration
Amount:     $73,997.74

Trustee:     U.S. Department of the Interior
Amount:     $12,045.71

Payments to NOAA and the U.S. Department of the Interior shall be made by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice

account in accordance with current EFT procedures.  Payment shall be made in accordance with instructions provided to Settling Defendant by the Financial Litigation Unit of the U S. Attorney's Office of the Western District of Washington.  Any payments received by the Department of Justice after 4:00 p.m. Eastern Standard Time shall be credited on the next business day.  Settling Defendant shall provide at least five days' notice to the Financial Litigation Unit before making the transfer.  Payments to the other Trustees shall be made by certified checks, bearing the notation "City of Seattle – Lower Duwamish Waterway Assessment" in the amounts indicated and made payable and addressed as follows:

Trustee:     State of Washington
Amount:     $3,404.04
Payee:      State of Washington/Department of Ecology
Address:    State of Washington/Department of Ecology
            Attention: Fiscal Office
            P.O. Box 47611
            Lacey, WA 98504-7611

Trustee:     Suquamish Tribe
Amount:     $1,891.55
Payee:      Suquamish Tribe
Address:    Melody Allen
            Suquamish Tribe
            Legal Department
            P.O. Box 498
            Suquamish, WA 98392-0498

CONSENT DECREE

- 42 -

57.     At the time of each payment Settling Defendant will send notice that payment has been made to the Trustees and DOJ in accordance with Section XIX (Notices and Submissions).  Such notice will reference Lower Duwamish Waterway NRDA, DOJ case number 90-11-3-07227/2, and the civil action number.

## IX.  FORCE MAJEURE

58.     "Force majeure," for purposes of Settling Defendant's and Bluefield's obligations under this Consent Decree, is defined as any event arising from causes beyond the control of the Party claiming Force Majeure ("Claiming Party")  (including Claiming Party's contractors and sub-contractors, and any other entity controlled by Bluefield or the City of Seattle) that delays or prevents the performance of any obligation under this Consent Decree despite the Claiming Party's best efforts to fulfill the obligation.  The requirement that the Claiming Party exercises "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and use best efforts to address the effects of any potential force majeure event (1) as it is occurring and (2) following the potential force majeure event, such that the delay is minimized to the greatest extent possible.  "Force majeure" does not include financial inability to fulfill the obligation.  The requirement that the Claiming Party exercises "best efforts to

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

fulfill the obligation" also includes, where necessary, the filing of legal actions to compel contract performance in accordance with the design and schedule approved by the Trustees herein.

a.       If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, the Claiming Party shall notify the Trustees within fourteen (14) days of when the Claiming Party first knew that the event might cause a delay.  Within thirty (30) days after notifying the Trustees, the Claiming Party shall provide a written explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; and the rationale for attributing such delay to a force majeure event (if the Claiming Party intends to assert such a claim).  The Claiming Party shall include with any notice all available documentation supporting its claim that the delay was attributable to a force majeure event.  Failure to comply with the above requirements will preclude the Claiming Party from asserting any claim of force majeure for that event.

b.       If the Trustees agree that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

under this Consent Decree that are affected by the force majeure event will be extended by the Trustees for such time as is necessary. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation. If the Trustees do not agree that the delay or anticipated delay has been or will be caused by a force majeure event, the Trustees will notify the Claiming Party in writing of their decision.

c. If the Claiming Party elects to invoke the Dispute Resolution procedures set forth in Section X regarding a claimed force majeure event, it shall do so no later than thirty (30) days after receipt of the Trustees' notice of disagreement. In any such proceeding the Claiming Party shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will likely be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that the Claiming Party exercised best efforts to fulfill the obligation in question, that best efforts were exercised to avoid and mitigate the effects of the delay, and that the Claiming Party complied with the requirements of this Paragraph. If the Claiming Party carries this burden, the delay at issue shall be

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA 98115

deemed not to be a violation by the Claiming Party of the affected obligation of this Consent Decree.

## X.  DISPUTE RESOLUTION

59.     Unless otherwise expressly provided for in this Consent Decree, the Dispute Resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.

60.     Any dispute which arises under or with respect to this Consent Decree shall in the first instance be the subject of informal negotiations between the Trustees and Settling Defendant and/or Bluefield.  The period for informal negotiations shall not exceed twenty-one (21) days from the time the dispute arises, unless the parties to the dispute agree otherwise in writing.  The dispute shall be considered to have arisen when the Trustees send Settling Defendant or Bluefield a written notice specifying the nature of the dispute and requested relief ("Notice of Dispute"), or Settling Defendant or Bluefield sends the Trustees a written Notice of Dispute.

61.    a.      If the Parties cannot resolve a dispute by informal negotiations within twenty-one (21) days as set forth under the preceding Paragraph, then the position advanced by the Trustees shall be considered binding unless, within twenty-one (21) days after the conclusion of the  twenty-one (21) day informal

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

negotiation period (i.e. forty-two (42) days after the date of the Notice of Dispute), Settling Defendant or Bluefield invokes the formal dispute resolution procedures of this Section by serving on the Trustees a written Statement of Position on the matter in dispute, including, but not necessarily limited to, any factual data, analysis or opinion supporting that position and any supporting documentation relied upon by Settling Defendant or Bluefield.

b.      Within twenty-one (21) days after receipt of Settling Defendant's or Bluefield's Statement of Position, the Trustees shall serve on Settling Defendant or Bluefield their written Statement of Position, including, but not necessarily limited to, any factual data, analysis or opinion supporting that position and all supporting documentation relied upon by the Trustees.  Within twenty-one (21) days after receipt of the Trustees' Statement of Position, Settling Defendants or Bluefield may submit a Reply.

c.      An administrative record of the dispute shall be maintained by the Trustees and shall contain all Statements of Position and rebuttal(s), including supporting documentation, submitted pursuant to this Section.

d.      The Trustees' Statement of Position shall be binding upon Settling Defendant and Bluefield unless, within twenty-one (21) days after receipt of the Trustees' Statement of Position, Settling Defendant or Bluefield file with the

CONSENT DECREE — 47 —

Court and serve on the parties in accordance with Section XIX (Notices and Submissions) a motion for judicial review of the decision setting forth the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of the Consent Decree. The motion shall also include any supporting factual data, analysis, opinion, or documentation. The Trustees may file a response to Settling Defendant's or Bluefield's motion, and Settling Defendant or Bluefield may file a reply, in accordance with the schedule set forth in the Local Rules for the Western District of Washington. The foregoing sentence notwithstanding, the Parties acknowledge that disputes may arise that require judicial resolution on an expedited basis. In such cases, the Parties shall agree on an expedited schedule or, absent prompt agreement, any Party to the dispute may petition the Court for the imposition of an expedited schedule.

e.     The Court may rule based on the administrative record (including the Trustees' Statement of Position), with or without oral argument, and shall review the Trustees' Statements of Position or its resolution of the dispute under the standards of the Administrative Procedures Act.

f.     Except as expressly stated elsewhere in this Consent Decree, any matter in dispute shall be reviewable by this Court.

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

62. The invocation of formal Dispute Resolution procedures under this Section shall not extend, postpone, or affect in any way any obligation of Settling Defendant or Bluefield under this Consent Decree, not directly in dispute, unless the Trustees or the Court agree otherwise. Stipulated Penalties with respect to the disputed matter shall continue to accrue, but payment otherwise required under Section XI shall be stayed pending resolution of the dispute. Notwithstanding the stay of payment, Stipulated Penalties shall continue to accrue from the first day of noncompliance with any applicable provision of this Consent Decree. In the event that the Settling Defendant or Bluefield does not prevail on the disputed issue, Stipulated Penalties shall be assessed and paid as provided in Sections XI. In the event that Bluefield does not prevail on the disputed issue, the Trustees may, at their discretion and in lieu of Stipulated Penalties, request disbursement from the Escrow Agent of the Performance Guarantee attached to this Consent Decree as Appendix E1 or from the financial institution providing the Performance Guarantees attached to this Consent Decree as Appendix E2, as applicable, provided that the subject dispute relates to Bluefield's failure to perform the operation and maintenance or adaptive management of Restoration Project One in accordance with Appendix A.

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA 98115

# XI. STIPULATED PENALTIES

63.     Settling Defendant and Bluefield shall be liable for stipulated penalties for failure to comply with the requirements of this Consent Decree as specified below, unless excused under Section IX (Force Majeure).  In the event that Settling Defendant or Bluefield fails to meet a requirement in this Decree (subject to any modifications agreed to under Section XXII) and any delay is not excused through operation of the provisions of Section IX (Force Majeure), then Settling Defendant or Bluefield ("non-compliant Party") shall pay stipulated penalties per violation per day as follows:

| Period of Noncompliance | Penalty per Violation per Day |
| --- | --- |
| 1st through 14th day | $500 |
| 15th through 30th day | $750 |
| 31st day and beyond | $1,000 |

Nothing in this Decree prevents the simultaneous accrual of separate penalties for separate violations of this Decree.

b.     All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs, and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity.  Following the Trustees' determination that a Party has failed to comply

CONSENT DECREE

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

with a requirement of this Consent Decree, the Trustees may give the non-compliant Party written notification of the same and describe the noncompliance. The Trustees may send the non-compliant Party a written demand for the payment of the penalties. However, penalties shall accrue as provided in the preceding Paragraph regardless of whether the Trustees have notified the non-compliant Party of the violation.

c. Payments under this Section shall be made as follows: 40% of the total to the United States; 20% of the total to the State; 20% of the total to the Suquamish Tribe; and 20% of the total to the Muckleshoot Indian Tribe. Payments under this Section shall be made using the procedures for Past Cost Reimbursement in Paragraphs 56 and 57.

d. All penalties accruing under this Section shall be due and payable within thirty (30) days of the non-compliant Party's receipt from the Trustees of a demand for payment of the penalties, unless the non-compliant Party invokes the Dispute Resolution procedures under Section X (Dispute Resolution).

e. The non-compliant Party may dispute the Trustees' right to the penalties identified under Subparagraph a above by invoking the procedures of Section X (Dispute Resolution). The payment of penalties shall not alter in any way the non-compliant Party's other obligations under this Consent Decree

CONSENT DECREE

64.  Penalties shall continue to accrue as provided in Paragraph 63 during any dispute resolution period, but need not be paid until the following:

a.　　If the dispute is resolved by agreement or by a decision of the Trustees that is not appealed to this Court, accrued penalties determined to be owing shall be paid to the Trustees within  fifteen (15) days of the agreement or the receipt of the Trustees' decision or order;

b.　　If the dispute is appealed to this Court and the Trustees prevail in whole or in part, the non-compliant Party shall pay all accrued penalties determined by the Court to be owed to the Trustees within sixty (60) days of receipt of the Court's decision or order, except as provided in Subparagraph c below;

c.　　If the District Court's decision is appealed by any Party, the non-compliant Party shall pay all accrued penalties determined by the District Court to be owing to the Trustees into an interest-bearing escrow account within sixty (60) days of receipt of the Court's decision or order.  Penalties shall be paid into this account as they continue to accrue, at least every sixty (60) days.  Within fifteen (15) days of receipt of the final appellate court decision, the escrow agent shall pay the balance of the account to the Trustees as described in Paragraph 63, or to Settling Defendant or Bluefield to the extent that they prevail.

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

65.     If the non-compliant Party fails to pay stipulated penalties when due, Plaintiffs may institute proceedings to collect the penalties, as well as interest.  The non-compliant Party shall pay Interest on the unpaid balance as provided in Paragraph 69, which shall begin to accrue on the date of demand made pursuant to Paragraph 63.

66.     If the Plaintiffs bring a motion or a separate action in court to enforce this Decree and prevail, Plaintiffs shall be entitled to recover from the non-compliant Party their reasonable costs of such motion or action, including but not limited to costs of attorney time.

67.  Payments made under this Section are in addition to any other remedies or sanctions available to Plaintiffs by virtue of the non-compliant Party's failure to comply with the requirements of this Decree, except in the event that Trustees elect to exercise a Performance Guarantee pursuant to Section VII.  If the Trustees elect to exercise a Performance Guarantee, the Trustees will not enforce the stipulated penalties to the extent the stipulated penalties are assessed on the same basis as the Performance Guarantee is exercised.

68.     Notwithstanding any other provision of this Section, Plaintiffs may, in their unreviewable discretion, waive payment of any portion of the stipulated penalties that have accrued pursuant to this Decree.  Payment of stipulated

CONSENT DECREE

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

penalties does not excuse Settling Defendant or Bluefield from payment as required by Sections VII and VIII or from performance of any other requirement of this Consent Decree.

## XII.  FAILURE TO MAKE TIMELY PAYMENTS

69.     If Bluefield or Settling Defendant fails to make any payment pursuant to this Consent Decree by the required due date, interest shall be assessed at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year in accordance with 42 U S.C. § 9607(a).  The applicable rate of interest is the rate in effect at the time the interest accrues.  The rate of interest is subject to change on October 1 of each year.  Interest on late payments shall accrue beginning on the date of entry of the Consent Decree through the date on which the payment is made.

## XIII.  ACCESS TO INFORMATION AND PROJECT SITE

70.     To facilitate the Trustees' oversight responsibilities, Settling Defendant and Bluefield will provide the Trustees full access to the Restoration Projects for purposes of inspecting or observing Bluefield's progress in implementing the Projects.

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

71.     Commencing upon the date of lodging of this Consent Decree, Settling Defendant and Bluefield agree to provide the Trustees and their contractors' access at all reasonable times to the Restoration Project Sites and to any property under the control of Settling Defendant and Bluefield to which access is required for the oversight or implementation of any Restoration Project.  Each Trustee shall have the authority to enter any Restoration Project Site at any reasonable time, and move about such properties in a reasonable manner, including compliance with all safety requirements, for the purposes of overseeing the requirements of the Restoration Projects, including, but not limited to:

a.      Monitoring and assessing progress on the planning, development, maintenance and monitoring of the Projects;

b.      Verifying any data or information submitted to the Trustees;

c.      Inspecting and copying records, operation logs, contracts or other documents maintained or generated by Bluefield or its contractors hereafter retained to perform work undertaken pursuant to any Restoration Project; and

d.      Conducting such tests, investigations or sample collections as deemed necessary to monitor compliance with any Restoration Project, investigate or assess contamination at or near the Restoration Project Sites, or to assist in further identifying and quantifying natural resource injuries requiring restoration

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

actions and in planning and carrying out further restoration actions.   Settling

Defendant shall be provided with copies of all data, sampling results and

reports/documentation of any tests, investigations or sampling conducted under

this Paragraph provided it is not otherwise privileged.

72.    Plaintiffs may direct that Bluefield use a camera, sound recording

device or other type of equipment to record the work done on any Restoration

Project or injury to natural resources and provide copies of any such recordings to

the Trustees and Settling Defendant provided it is not otherwise privileged.

Bluefield may retain a copy of any such photographs or video recordings.  Trustees

may also use their own camera, sound recording device, or other type of equipment

to record the work done for any Restoration Project or injury to natural resources.

Settling Defendant shall be provided with a copy of any such recordings made by

the Trustees provided it is not otherwise privileged.

## XIV.  COVENANT NOT TO SUE BY PLAINTIFFS

73.    Except as specifically provided in Section XV (Reservations of

Rights) below, Plaintiffs covenant not to sue or to take administrative action

against Settling Defendant pursuant to Section 107(a) of CERCLA, 42 U.S.C. §

9607(a); Chapter 70.l05D RCW; Section 311 of the Clean Water Act (CWA), 33

U.S.C. § 1321; Section 1002(a) of the Oil Pollution Act of 1990 (OPA), 33 U.S.C.

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

§ 2702(a); or any applicable tribal law, to recover Covered Natural Resource Damages. This Covenant Not to Sue will take effect upon Settling Defendant's complete payment of costs pursuant to Section VIII.C (Settling Defendant: Past Cost Reimbursement) and continue in effect conditioned upon the satisfactory performance by Settling Defendant of its obligations under this Consent Decree. This covenant not to sue extends only to Settling Defendant and its successors and assigns, and does not extend to any other person.

## XV. RESERVATIONS OF RIGHTS

74. Plaintiffs reserve, and this Consent Decree is without prejudice to, all rights against Settling Defendant with respect to all matters not expressly included within the Covenant Not to Sue by Plaintiffs in Section XIV. Notwithstanding any other provision of this Consent Decree, Plaintiffs reserve all rights against Settling Defendant with respect to:

a. liability for costs of response incurred or to be incurred by Plaintiffs under any federal or State statute;

b. liability for damages to natural resources (including assessment costs) as in defined 42 U.S.C. §§ 9601(6 ) & (16) that are not expressly included within the Covenant Not to Sue by Plaintiffs in Section XIV;

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA 98115

c. liability for damages to natural resources (including assessment costs) as in defined 42 U.S.C. §§ 9601(6) & (16) within the Lower Duwamish Waterway or Elliott Bay resulting from new releases of hazardous substances or pollutants from Settling Defendant's operations after the Effective Date of this Consent Decree, or resulting from the Settling Defendant's transportation, treatment, storage, or disposal, or the arrangement for the transportation, treatment, storage, or disposal of hazardous substances or pollutants at or in connection with the Lower Duwamish Waterway, after signature of this Consent Decree;

d. liability for injunctive relief or administrative order enforcement under any federal or State statute;

e. liability for costs incurred or to be incurred by the Agency for Toxic Substances and Disease Registry in or regarding the Lower Duwamish Waterway or Elliott Bay;

f. additional claims for Covered Natural Resource Damages if conditions, factors or information in the Lower Duwamish Waterway or Elliott Bay, not known to the Trustees as of the Effective Date, are discovered that, together with any other relevant information, indicate that there is a threat to the environment, or injury to, destruction of, or loss of natural resources of a type unknown, or of a magnitude significantly greater than was known, as of the

CONSENT DECREE

- 58 -

Effective Date (for purposes of this Subparagraph, information known to the Trustees shall consist of any information in the files of, or otherwise in the possession of any one of the individual Trustees, or their contractors or consultants who worked on the Trustees' natural resource damages assessment and liability allocation projects);

g.      criminal liability to the United States or State; and

h.      claims in this action or in a new action based on a failure of Settling Defendant to satisfy the requirements of this Consent Decree.

## XVI.  COVENANT NOT TO SUE BY SETTLING DEFENDANT

75.      Settling Defendant covenants not to sue and agrees not to assert any claims or causes of action against the United States, the State, the Suquamish Tribe, and the Muckleshoot Indian Tribe, or their contractors or employees, relating to Covered Natural Resource Damages.  Settling Defendant reserves, and this Consent Decree is without prejudice to, all rights with respect to all matters not expressly included within this Covenant Not to Sue, including all rights with respect to all matters reserved in Section XV (Reservation of Rights).

## XVII.  EFFECT OF SETTLEMENT; CONTRIBUTION PROTECTION

76.      Nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Consent Decree.

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

The preceding sentence shall not be construed to waive or nullify any rights that any person not a signatory to this decree may have under applicable law. Each of the Parties expressly reserves any and all rights (including, but not limited to, any right to contribution), defenses, claims, demands, and causes of action they each may have with respect to any matter, transaction, or occurrence relating in any way to the Lower Duwamish Waterway against any person not a Party hereto. Nothing in this Consent Decree diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to pursue any such persons to obtain additional relief (including response action, response costs, and natural resource damages) and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

77. The Parties agree, and by entering this Consent Decree this Court finds, that this settlement constitutes a judicially-approved settlement for purposes of Section 113(f)(2), and that Settling Defendant is entitled, as of the Effective Date of this Consent Decree, to protection from contribution actions or claims as provided by CERCLA Section 1l3(f)(2), 42 U.S.C. § 96l3(f)(2), and RCW 70.105D.040(4)(d), or as may be otherwise provided by law, for Covered Natural Resource Damages; provided, however, that if Plaintiffs exercise their rights under the reservations in Section XV, other than in Paragraphs 74(g) (criminal liability)

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA 98115

and 74(h) (failure to satisfy a requirement of this Consent Decree), the contribution

protection afforded by this Consent Decree will no longer include those matters

that are within the scope of the exercised reservation.

78.     Settling Defendant agrees that it will notify the Trustees and the

United States in writing no later than sixty (60) days before bringing a suit or claim

for contribution for Covered Natural Resource Damages.  Settling Defendant also

will notify the Trustees of any settlement of its claims (regardless of whether the

claim is filed or unfiled) for contribution for Covered Natural Resource Damages.

Settling Defendant also agrees that it will notify the Trustees and the United States

in writing within ten (10) days of service of a complaint or claim upon Settling

Defendant relating to a suit or claim for contribution for Covered Natural Resource

Damages.  In addition, Settling Defendant will notify the Trustees and the United

States within ten (10) days of service or receipt of any Motion for Summary

Judgment and within ten (10) days of receipt of any order from a court setting a

case for trial for matters related to this Decree.

79.     In any subsequent administrative or judicial proceeding initiated by

Plaintiffs for injunctive relief, recovery of response costs, or other appropriate

relief other than Covered Natural Resource Damages, Settling Defendant shall not

assert, nor may it maintain, any defense or claim based upon the principles of

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other

defenses based upon any contention that the claims raised by Plaintiffs in the

subsequent proceeding were or should have been brought in the instant case;

provided, however, that nothing in this Paragraph affects the enforceability of the

Covenants Not to Sue set forth in Sections XIV and XVI.

## XVIII.  RETENTION OF RECORDS

80.     Until ten (10) years after Settling Defendant's and Bluefield's receipt

of the Trustees' notification pursuant to Paragraph 16 (Approval of Completion of

Vegetation and Habitat Development And Monitoring Obligations), Settling

Defendant and Bluefield shall preserve and retain all non-identical copies of

records and documents (including records or documents in electronic form) now in

their possession or control or which come into its possession or control that relate

in any manner to its liability under CERCLA with respect to the Lower Duwamish

Waterway.  Settling Defendant and Bluefield must also retain, and instruct their

respective contractors and agents to preserve, for the same period of time specified

above all non-identical copies of the last draft or final version of any documents or

records (including documents or records in electronic form) now in their

possession or control or which come into their possession or control that relate in

any manner to the performance of the Project, provided, however, that Settling

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

Defendant and Bluefield (and their contractors and agents) must respectively retain, in addition, copies of all data generated during the performance of the Work and not contained in the aforementioned documents required to be retained. Each of the above record retention requirements shall apply respectively and individually to Settling Defendant and Bluefield, regardless of any corporate retention policy to the contrary.

81. At the conclusion of this document retention period, Settling Defendant and Bluefield shall each respectively notify the Trustees at least ninety (90) days prior to the destruction of any such records or documents, and, upon written request by the Trustees, Settling Defendant and Bluefield shall deliver any such non-privileged records or documents to the Trustees. Settling Defendant and Bluefield may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If Settling Defendant or Bluefield asserts such a privilege, it shall provide Plaintiffs with the following: (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of the author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the subject of the document, record, or information; and (6) the privilege asserted by Settling Defendant or

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA 98115

Bluefield.  However, no documents, reports or other information created or generated pursuant to the requirements of the Consent Decree shall be withheld on the grounds that they are privileged.

82.     Settling Defendant hereby certifies individually that, to the best of its knowledge and belief, after a reasonable inquiry that fully complies with the Federal Rules of Civil Procedure, it has not altered, mutilated, discarded, destroyed or otherwise disposed of any records, documents or other information (other than identical copies) relating to its potential liability regarding the Site since notification of potential liability by any Trustee.

## XIX.  NOTICES AND SUBMISSIONS

83.     Whenever notice is required to be given or a document is required to be sent by one Party to another under the terms of this Decree, it will be directed to the individuals at the addresses specified below, unless those individuals or their successors give notice of a change to the other Parties in writing.  Written notice as specified constitutes complete satisfaction of any written notice requirement of the Decree for Plaintiffs, Settling Defendant, and Bluefield.

As to the United States and as to DOJ:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611

CONSENT DECREE

- 64 -

Washington, D.C. 20044-7611
(DJ #90-11-3-07227/2)

Michael J. Zevenbergen
U.S. Department of Justice
c/o NOAA/Damage Assessment
7600 Sand Point Way, NE
Seattle, WA  98115

<u>As to NOAA</u>:

Laurie Lee
NOAA Office of General Counsel
501 W. Ocean Blvd., Suite 4470
Long Beach, CA.  90802

<u>As to the United States Department of the Interior</u>:

Deirdre Donahue
U.S. Department of the Interior
Office of the Solicitor
601 SW 2nd Avenue, Suite 1950
Portland, OR  97204

Jeff Krausmann
U.S. Fish & Wildlife Service
510 Desmond Dr. SE, Suite 102
Lacey, WA 98503-1263

<u>As to the State</u>:

Donna Podger
Toxics Cleanup Program
State of Washington
P.O. Box 47600
Olympia, WA 98504-7600

As to the Suquamish Tribe:

Melody Allen
Suquamish Tribe
Legal Department
P.O. Box 498
Suquamish, WA 98392-0498

As to the Muckleshoot Indian Tribe:

Mr. Robert L Otsea, Jr.
Office of the Tribal Attorney
Muckleshoot Indian Tribe
39015 172nd Avenue S.E.
Auburn, WA 98002

As to Settling Defendant:

Pete Rude
PO Box 34018
Seattle, WA 98124-4018
pete.rude@seattle.gov

Laura Wishik, Assistant City Attorney
City of Seattle
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
laura.wishik@seattle.gov

As to Bluefield:

Kevin P. Tierney
General Counsel
EarthCon Consultants, Inc. (on behalf of Bluefield Holdings, Inc.)
1880 West Oak Parkway, Suite 106
Marietta, GA 30062

# XX. RETENTION OF JURISDICTION

84.     This Court retains jurisdiction over both the subject matter of this Consent Decree and the Parties for the duration of the performance of the terms and provisions of this Consent Decree for the purpose of enabling any of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or modification of this Consent Decree, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with Section X (Dispute Resolution) hereof.

# XXI. INTEGRATION/APPENDICES

85.     This Decree and its appendices constitute the final, complete, and exclusive agreement and understanding with respect to the settlement embodied in this Decree.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Decree.  The terms "Consent Decree" and "Decree" as used herein include the appendices to this Consent Decree, unless expressly indicated to the contrary.  The following appendices are attached to and incorporated into this Consent Decree:

Appendix A = Project Scope of Work

Appendix B = Legal Description of Restoration Project One

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

Appendix C = Master Lease Agreement

Appendix D = Environmental Covenants

Appendix E1 = Maintenance Performance Guarantee (Escrow Agreement)

Appendix E2 = Adaptive Management Performance Guarantee (Letter of Credit)

Appendix F = Legal Description and/or Identification of Released Facilities

## XXII. MODIFICATION

86.    No material modifications shall be made to any requirement under this Consent Decree without written notification to and written approval of the United States Department of Justice and the Trustees, Settling Defendant, Bluefield, and the Court.  Modifications to this Consent Decree exclusive of the appendices incorporated within that do not materially alter the terms of this Consent Decree may be made by written agreement between the United States Department of Justice, the Trustees, Settling Defendant, and/or Bluefield. Modifications to any of the appendices to this Consent Decree that do not materially alter any of the terms of this Consent Decree may be made by written agreement between the Trustees, Settling Defendant, and/or Bluefield.

## XXIII. ENFORCEMENT

87.    The requirements of this Consent Decree, including but not limited to deadlines, schedules and Project designs, are independently enforceable.  Any

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

delay or failure of the Trustees to enforce any requirement will not preclude or prejudice the subsequent enforcement of the same or another requirement.

## XXIV.  LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

88.    This Decree will be lodged with the Court for a period of not less than thirty (30) days for public notice and comment.  Plaintiffs each reserve the right to withdraw or withhold their consent if the comments regarding the Decree disclose facts or considerations that indicate this Decree is inappropriate, improper, or inadequate.  Settling Defendant and Bluefield consent to the entry of this Decree without further notice.

89.    If for any reason this Court does not approve this Decree in the form presented, this Decree may be voided at the sole discretion of any Party, and the terms of the agreement may not be used as evidence in any litigation among the Parties.

## XXV.  SIGNATORIES/SERVICE

91.    The Assistant Attorney General for the Environment and Natural Resources Division of the United States Department of Justice and each undersigned representative of the State, the Suquamish Tribe, the Muckleshoot Indian Tribe, Settling Defendant, and Bluefield certifies that he or she is authorized to enter into the terms and conditions of this Decree and to execute and bind

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

legally the Party that he or she represents to this document.

92.     Settling Defendant and Bluefield agree not to oppose entry of this Decree by this Court or to challenge any provision of this Decree unless any Plaintiff has notified Settling Defendant and Bluefield in writing that it no longer supports entry of the Decree.

93.     Settling Defendant and Bluefield will identify on the attached signature page the name and address of an agent who is authorized to accept service of process by mail on behalf of each of them with respect to all matters relating to this Decree.  Settling Defendant and Bluefield agree to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including but not limited to service of a summons.  Settling Defendant need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this Decree.

## XXVI.  FINAL JUDGMENT

94.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment between and among the United States, the State, the Suquamish Tribe, the Muckleshoot Indian Tribe, Settling Defendant, and Bluefield.  The Court finds that there is no just reason for delay and

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58. SO ORDERED THIS 7th DAY OF May, 2021.

_____

JAMES L. ROBART
UNITED STATES DISTRICT JUDGE

CONSENT DECREE

\- 71 -

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA 98115

Signature Page for Consent Decree regarding the Lower Duwamish Waterway

**FOR THE UNITED STATES OF AMERICA:**

ASSISTANT ATTORNEY GENERAL
Environment & Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20530

Date: 11/12/20

ERIKA M. WELLS
Senior Counsel
Environmental Enforcement Section
Environment & Natural Resources
Division U.S. Department of Justice
c/o NOAA Damage Assessment
7600 Sand Point Way, NE
Seattle, Washington 98115

Date: nov. 12, 2020

MICHAEL J. ZEVENBERGEN
Senior Counsel
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice
c/o NOAA Damage Assessment
7600 Sand Point Way, NE
Seattle, Washington 98115

CONSENT DECREE

- 72 -

Signature Page for Consent Decree regarding the Lower Duwamish Waterway

**FOR THE STATE OF WASHINGTON:**

Date: 8/11/2020 _____ ~Rebecca S. Lawson~ E-Signature

Rebecca S. Lawson, P.E., LHG
Acting Program Manager
Department of Ecology

Date: 8/13/2020 _____ E-Signature

NELS JOHNSON
Assistant Attorney General
State of Washington

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

Signature Page for Consent Decree regarding the Lower Duwamish Waterway

**FOR THE SUQUAMISH TRIBE:**

Date: 10/1/2020

LEONARD FORSMAN
Chairman
Suquamish Tribe
Post Office Box 498
Suquamish, Washington 98392

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA  98115

Signature Page for Consent Decree regarding the Lower Duwamish Waterway

**FOR THE MUCKLESHOOT INDIAN TRIBE:**

Date: 5/21/20

JAISON ELKINS
Chairman
Muckleshoot Indian Tribe
39015 172nd Ave. S.E.
Auburn, WA 98092-9763

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA 98115

Signature Page for Consent Decree regarding the Lower Duwamish Waterway

**FOR THE SETTLING DEFENDANT:**

**CITY OF SEATTLE**

Date: ___5/15/20___ _Jenny A. Durkan_ _____
JENNY DURKAN
Mayor

**SEATTLE CITY ATTORNEY**

Date: __05/14/2020__ _Peter S Holmes_ _____
PETER S. HOLMES

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA 98115

Signature Page for Consent Decree regarding the Lower Duwamish Waterway

**FOR BLUEFIELD HOLDINGS LLC:**

Date: May 14, 2020

SHAWN RT SEVERN, PhD
President
Bluefield Holdings, Inc.
Shawns@bluefieldholdings.com

U. S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
7600 Sand Point Way NE
Seattle, WA 98115

**APPENDIX A**

# Statement of Work
# Duwamish River Habitat Restoration Program
# West Side West Waterway - Site 01
# Seattle, Washington





Prepared by:
**Bluefield Holdings, Inc.**
**2505 Second Avenue, Suite 602**
**Seattle, WA 98121**

**March 24, 2011**

# TABLE OF CONTENTS

**Page**

ABBREVIATIONS ........................................................................................................viii

1.0 INTRODUCTION ..........................................................................................................1

2.0 PROJECT DESCRIPTION ...........................................................................................4

3.0 PERMITTING ................................................................................................................5
    3.1 JOINT AQUATIC RESOURCE PERMIT APPLICATION .............................................5
        3.1.1 Federal Permits ......................................................................................5
        3.1.2 SEPA Review .........................................................................................5
        3.1.2 State Permits and Approvals ..................................................................5
        3.1.2 Local (City or County) Permits .............................................................6
    3.2 APPLICATION FOR STREAMLINED PROCESSING OF FISH HABITAT ENHANCEMENT PROJECTS ........................................................................................................................6
    3.3 UNITED STATES ARMY CORPS OF ENGINEERS ..................................................6
    3.4 CITY OF SEATTLE PERMITS ...............................................................................6

4.0 DESIGN PROCESS .......................................................................................................7
    4.1 DESIGN CRITERIA ..............................................................................................7
    4.2 GEOTECHNICAL AND GEOMORPOLOGICAL CRITERIA .......................................9
    4.3 ENVIRONMENTAL CRITERIA ............................................................................10

5.0 CONSTRUCTION & HABITAT CREATION ............................................................13

6.0 MAINTENANCE & MONITORING ..........................................................................15
    6.1 MAINTENANCE ................................................................................................15
    6.2 MONITORING ...................................................................................................17
        6.2.1 Physical Success Criteria .....................................................................17
        6.2.2 Biological Success Criteria ..................................................................18
        6.2.3 Additional Monitoring Requirements ..................................................18
        6.2.4 Monitoring Status Report .....................................................................19

7.0 PLANS AND DOCUMENTATION .............................................................................20
    7.1 PERMIT APPLICATION PACKAGE .......................................................................20
        7.1.1 Soil Management Plan ..........................................................................20
        7.1.2 Planting Plan ........................................................................................22
        7.1.3 Operations and Maintenance ...............................................................22
        7.1.4 Monitoring Plan ...................................................................................22
    7.2 FINAL DESIGN PACKAGE ..................................................................................25
    7.3 AS-BUILT DRAWINGS ......................................................................................26
    7.4 ADAPTIVE MANAGEMENT PLAN ......................................................................26

8.0 SCHEDULE .................................................................................................................28

# TABLE OF CONTENTS
(Continued)

## FIGURES

Figure 1        Vicinity Map
Figure 2        Existing Conditions
Figure 3        Existing Utilities
Figure 4        Post-construction Habitat Zones
Figure 5        Draft Design Cross-Sections

## TABLES

Table 1        Physical Success Criteria
Table 2        Biological Success Criteria
Table 3        Monitoring Requirements

# ABBREVIATIONS

| | |
|---|---|
| AMP | Adaptive Management Plan |
| Bluefield | Bluefield Holdings, Inc. |
| COC | chemical of concern |
| DSAY | Discounted Service Acre-Years |
| Ecology | Washington Department of Ecology |
| ESA | Endangered Species Act |
| JARPA | Joint Aquatic Resource Permit Application |
| MLLW | Mean Lower Low Water |
| NOAA | National Oceanic and Atmospheric Administration |
| NRD | Natural Resource Damages |
| OHW | Ordinary High Water |
| Project | Bluefield Holdings Habitat Project – Site 01 in Seattle, WA |
| SEPA | State Environmental Policy Act (SEPA) |
| Site | Bluefield Holdings Habitat Project – Site 01 in Seattle, WA |
| SPIF | Special Project Information Form |
| Trustees | Elliot Bay Trustee Council |
| USACE | U.S. Army Corps of Engineers |

# STATEMENT OF WORK
# BLUEFIELD HOLDINGS HABITAT PROJECT - SITE 01
# DUWAMISH WATERWAY, SEATTLE, WA

## 1.0    INTRODUCTION

This Statement of Work for Duwamish River Habitat Restoration Program, West Side West Waterway - Site 01 in Seattle, Washington (the "Project" or "Site"), is the result of an effort between the Elliot Bay Trustee Council (Trustees) and Bluefield Holdings, Inc. (Bluefield). This document describes the work that will be carried out for the development of new habitat on leased City of Seattle property along the Lower Duwamish Waterway.

Industrial development along the Lower Duwamish Waterway has largely eliminated off-channel habitat used by estuarine species, resulting in limited rearing and refuge habitat in the existing channel.  The restoration Project described in this Statement of Work will create a new off-channel inlet which will provide refuge and feeding opportunities for out-migrating salmonids, juvenile English sole, shorebirds and waders.  The restored uplands adjacent to the created inlet will provide food and refuge for a broad range of bird groups.  The Project is located on property that has been secured through a Master Lease with the City of Seattle.  The existing intertidal portion of the Project site includes rubble, riprap, debris and derelict creosote piling beneath the Spokane Street Bridge (Figure 1).  Consequently, aquatic habitat in the area is very poor.

The restoration Project at Site 01 will create or restore approximately 1.07 acres of habitat from lands currently occupied by riprap and un-vegetated upland. The habitat will be configured as an off-channel inlet with adjacent riparian habitat to provide refuge and feeding opportunities for out-migrating salmonids, juvenile English sole, as well as shorebirds and other bird groups.

The target acreages of the different habitat types are:

- 0.26 acre of forested upland,
- 0.27 acre of vegetated buffer,
- 0.32 acre of intertidal marsh, and
- 0.03acre of intertidal mudflat.
- 0.08 acre of shallow subtidal mudflat
- 0.11 acre of habitat mix over rip rap (HMRR)

Following construction of the new habitat and off-channel inlet, operations, maintenance and monitoring activities will be conducted by Bluefields for an initial 10-year period. Following completion of the initial 10-year period, the City of Seattle will continue stewardship activities in accordance with the Master Lease.

Success criteria for the proposed habitat will include measures of physical stability and biological integrity, as described in Tables 1 - 3. Physical criteria will include the stability of the site over time compared to the as-built designated habitat areas. Monitoring parameters for physical stability will include:

- Area of intertidal habitat (subdivided by mudflat, marsh and HMRR),
- Area of upland habitat,
- Slope and channel profiles, slope and channel stability,
- Tidal circulation.

Biological monitoring will be performed after vegetation planting to assess:

- Success, as measured by survival and species composition,
- Aerial coverage, as measured by percent cover,
- Species diversity, as measured by species composition,
- Status and maintenance of herbivory protection devices/measures, and
- Presence and the percent cover of noxious weeds.

The Site is secured through the Master Agreement with the City of Seattle.  A long-term stewardship fund will be established to continue all appropriate maintenance of the Project to ensure the longevity of the fully functioning habitat.

The purpose of this document is to describe:

- The conceptual design of the Project,
- The process for finalizing the design of the Project, including the opportunities for Trustee input,
- The investigations that will be conducted for the Project, and
- The conceptual Operations and Maintenance Plan and Monitoring Plan that will be implemented for the near term (10 years).

## 2.0 PROJECT DESCRIPTION

The habitat restoration project for Site 01 will consist of constructing an off-channel inlet on the west side of the West Waterway, under and adjacent to the Spokane Street Bridge, at approximate Duwamish River mile 0.5 (Figure 1).

Construction activities will include removal of existing rubble, debris and derelict creosote piling from the shoreline, excavation of upland soils to create new intertidal area, and replacing riprap where possible with fish-friendly materials including sediment, fish mix gravels, and large woody debris. The new off-channel inlet will maximize the length and width of intertidal habitat within the confines of the existing utilities and infrastructure at the Site (Figures 2 and 3). The current face of the property running parallel with the Duwamish River will be sloped back and the riprap face of the shoreline will be replaced with larger natural boulders, cobble material, and large woody debris to the extent practicable within slope any hydrodynamic limitations. For the purposes of hydraulic stability during high flow storm events, some rock (rip rap or quarry spalls) may be installed under more fish friendly materials as appropriate. The Site will be finished with additional soil cover, the planting of upland vegetation, and planting and seeding of a tidal marsh. The project will involve coordination with the Muckleshoot Indian Tribe to establish goals for the number, location, and structure of net attachments at the site, subject to permit approval and approval by the Natural Resource Trustees. A schematic design of the post-construction Habitat zones based on elevations is shown in Figure 4. Three-dimensional renderings based on the schematic concept are provided as Figure 5. Additional draft design drawings, including profiles and cross sections, are included as Attachment A.

## 3.0     PERMITTING

All appropriate and applicable permits will be obtained prior to construction of the Project. The Trustees will be provided with a copy of the permit application package for their review and written approval prior to submittal to the regulatory agencies. The level of detail is anticipated to be a 30% design level.

Upon receiving written approval of this Statement of Work for the Project by the Trustees, the required design drawings and permit applications will be prepared and submitted to the appropriate regulatory agencies.

The following list of permits is based on a preliminary review of the regulatory framework surrounding the Project.  After consultation with the regulatory agencies, a revised list of required permits will be developed.

### 3.1     JOINT AQUATIC RESOURCE PERMIT APPLICATION

The Joint Aquatic Resource Permit Application (JARPA) process may be used to apply jointly for any or all of the permits below:

#### 3.1.1     Federal Permits

- U.S. Army Corps of Engineers (USACE),

- Endangered Species Act (ESA) compliance.

- National Historic Preservation Act, Section 106 compliance.

#### 3.1.2     SEPA Review

- State Environmental Policy Act (SEPA) Checklist.

#### 3.1.2     State Permits and Approvals

- Washington Department of Ecology: Section 401 Water Quality Certifications,

- Washington Department of Fish and Wildlife: Hydraulic Project Approvals,

- Washington Department of Natural Resources: Use Authorizations for State-Owned Aquatic Lands.

### 3.1.2    Local (City or County) Permits

- Shoreline Compliance.

## 3.2    APPLICATION FOR STREAMLINED PROCESSING OF FISH HABITAT ENHANCEMENT PROJECTS

This permit form can be completed in addition to the regular JARPA, to request streamlined processing if the Project meets certain conditions.

## 3.3    UNITED STATES ARMY CORPS OF ENGINEERS

The Section 404 Permit Process will be initiated with the submittal of the JARPA to the U. S. Army Corps of Engineers.  The Corps will review the JARPA and authorize the project under Nationwide Permit #27, which authorizes minor work in Waters of the United States for stream and wetland restoration activities.

## 3.4    CITY OF SEATTLE PERMITS

- Shoreline Master Use Permit,

- City Street Use Permit

- Construction Permits.

## 4.0      DESIGN PROCESS

The design process is subject to obtaining various permits and regulatory approval. As described in Section 3.0, the Trustees will review and provide written approval for the 30% design prior to the submittal of permit documents. After the permits have been issued, the 90% design will be developed. The 90% design will be submitted to the Trustees for review and written approval prior to finalizing the 100% design and construction. The following sections summarize the criteria for completing the design process.

## 4.1      DESIGN CRITERIA

The Project will be constructed from an uplands site currently at elevation +17 feet Mean Lower Low Water (MLLW) (Figure 2). The intertidal habitat will extend approximately 165 feet (50 meters) perpendicular (roughly east-west) to the river, traveling northwest from the inlet and turning south and under the bridge, for a total channel length of approximately 190 feet. The existing intertidal slope will be modified by the placement of habitat mix (gravels) over the existing rip rap from elevation -4 ft MMLW to +8. The excavation for the entrance to the inlet channel will begin at approximately +10 ft MLLW ft MLLW. The site will be over-excavated approximately three feet, and then appropriate topsoil will be imported and spread over the intertidal and riparian portions of the site to finished grade. The bottom of the inlet channel will gradually slope up to approximately +10 ft MLLW. The inlet channel will be contoured with flattened side-slopes up to approximately +12 ft MLLW, and will support high marsh vegetation between +10 ft and +12 ft MLLW. From there, the habitat will transition to riparian habitat up to between approximately +15 ft to +18 ft MLLW. Beyond the riparian habitat, the remainder of the site (excluding utility features and access) will be preserved and planted as upland habitat area.

The total footprint of the off-channel inlet is constrained by limitations posed by existing underground utilities and structures onsite (Figure 3).

The alignment of the inlet and post-construction habitat types and zones are shown in Figure 4. The proposed Project will create approximately 1.07 acre of habitat from lands currently covered by riprap and un-vegetated upland, including approximate acreages of the following habitat types:

- 0.26 acre of forested upland,
- 0.27 acre of vegetated buffer,
- 0.32 acre of intertidal marsh, and
- 0.03acre of intertidal mudflat.
- 0.08 acre of shallow subtidal mudflat
- 0.11 acre of Habitat Mix covered Rip Rap

The Project will include the removal of rubble, debris and derelict creosote piling from the bank and mudflat, replacing riprap with fish-friendly cobble material and large woody debris to the extent practicable. The alignment maximizes the length and width of intertidal habitat, within the confines of the existing utilities and infrastructure on the Project site.

A portion of the site will include a new category of habitat, "habitat mix covered riprap" (RRHM). This is a pilot category specific to this site. Trustees will determine if this habitat category is of value and it will be subject to the following conditions (See Table 1 for monitoring requirements):

- Two layers of material must be placed for the creation of RRHM. The first layer is intended to fill the interstices of the riprap and can be any type of clean fill material available. The second layer shall be composed of clean ¾ minus rounded gravel (smaller material is acceptable if conditions are such that it is expected to remain in place).
- The second layer shall be at least 1 foot thick over the entire area to be classified as RRHM. RRHM is intended to be a permanent habitat type and monitoring is required to ensure that the material remains in place at the minimum thickness (1 ft). Any portion of the covering that is displaced must be replaced, or the value assigned to the RRHM portion of the project will be reduced by the percentage of the area that no longer meets the conditions describing the habitat. It is, therefore, recommended that the initial placement of habitat mix exceed the 1 ft minimum thickness as some settling and redistribution is expected.

The marsh vegetation will be planted within the habitat elevations specified by trustees. Bluefield Holdings will plant appropriate species within this zone and maintain them as set forth in this SOW. In the event Trustees determine that the marsh does not meet its success criteria, an Adaptive Management Plan will be developed and implemented in an attempt to meet those success criteria (See section 7.4). The project will involve coordination with the Muckleshoot Indian Tribe to establish goals for the number, location, and structure of net attachments at the site, subject to permit approval and approval by the Natural Resource Trustees.

## 4.2      GEOTECHNICAL AND GEOMORPOLOGICAL CRITERIA

Project site slopes are known to be stable, high unstable banks are absent, there are no bedrock outcroppings present, and none of the habitat will be load bearing.  In addition, much of the Project site is off-channel and subject to much lower erosional stress than the main channel. The overall design will also protect critical infrastructure (i.e., utilities, roads, and bridges) from erosion using standard and accepted industry practices in the selection and placement of materials.   Once constructed, the habitat features will be allowed to settle, and stabilize naturally.  A limited geotechnical investigation will be performed (as described below), to gain additional information on the depth of the native soil horizon and to collect information for soil disposal options.

During the design phase, test pits will be excavated at the Site to obtain geotechnical information on subsurface conditions.  A minimum of two test pits (potholes) will be excavated at the Site using a backhoe or small excavator.  Test pits will be advanced to approximately two feet below subgrade elevation.  This will allow observation and sampling as necessary of *in situ* material that will remain onsite as well as material that will be excavated and sent offsite.

Samples of the final subgrade surface will be collected and analyzed for grain size and chemical analysis for comparison to the Trustees' Injury Thresholds (Chart 1).  Representative

samples will also be collected from material that will be excavated for geotechnical testing and chemical analysis to determine potential reuse or disposal options.

## 4.3    ENVIRONMENTAL CRITERIA

No chemical data exists regarding the potential presence of contaminants in the immediate area of the Project. However, Bluefield conducted due diligence activities in the area, including review of environmental databases, Sanborn Maps, property ownership records, and informal interviews with City of Seattle personnel familiar with historical operations. The due diligence activities completed by Bluefield did not indicate any industrial activities, environmental releases, or recognized environmental conditions at, or immediately adjacent to the Site. Therefore impacts from historical operations are not likely to be present.

During the geotechnical investigation described in Section 4.2, opportunities exist to examine soils at the final subgrade surface. At each test pit excavated as part of the geotechnical investigation, a composite soil sample will be collected from the elevation of the final subgrade surface (to 2-feet below that surface) and submitted for laboratory analysis. The goal of this sampling is to ensure that the soils at the final subgrade surface (including the depth interval 1-2 feet below the subgrade surface) meet the Trustees' Injury Thresholds (Chart 1). Laboratory analysis will include the standard analytes listed in the Lower Duwamish Chemicals of Concern (COC) list. During excavation of the test pits, additional samples may be collected at discrete intervals for archiving at the laboratory and analyzed for COCs if composite sample results shows concentrations above regulatory standards. A sampling and analysis plan will be prepared prior to initiating field activities, and included as part of the Soil Management Plan (See Section 7.1.1). Chart 1 shows the Duwamish Chemicals of Concern and the Injury Thresholds.

**Chart 1**
**Duwamish Chemicals of Concern and Trustees' Injury Thresholds**

| Substances of Concern | Symbol | Units | Injury Threshold |
|---|---|---|---|
| Total PAH | | ppm dw | 1 |
| Total PCB | | ppm dw | 0.128 |

| Metals | | | |
|---|---|---|---|
| Arsenic | As | ppm dw | 57 |
| Cadmium | Cd | ppm dw | 2.7 |
| Chromium | Cr | ppm dw | 63.5 |
| Copper | Cu | ppm dw | 270 |
| Lead | Pb | ppm dw | 360 |
| Mercury | Hg | ppm dw | 0.41 |
| Silver | Ag | ppm dw | 3.0 |
| Zinc | Zn | ppm dw | 410 |
| Tributyltin | TBT | ppm dw | 0.102 |
| Chlorobenzenes | | | |
| 1,2-dichlorobenzene | oDCB | ppb dw | 35 |
| 1,4-dichlorobenzene | pDCB | ppb dw | 110 |
| 1,2,4-trichlorobenzene | TCB | ppb dw | 31 |
| Hexachlorobenzene | HCB | ppb dw | 22 |
| Phthalates | | | |
| Bis (2-Ethylhexyl) phthalate | bEPH | ppb dw | 1300 |
| Butylbenzyl phthalate | BBPH | ppb dw | 63 |
| Di-n-butyl phthalate | DnBPH | ppb dw | 1400 |
| Di-n-octyl phthalate | DOPH | ppb dw | 61 |
| dimethylphthalate | DMPH | ppb dw | 71 |
| Phenols | | | |
| 4-methyl phenol | MP4 | ppb dw | 110 |
| 2,4-dimethyl phenol | DMP | ppb dw | 29 |
| Phenol | Phenol | ppb dw | 180 |
| Hexachlorobutadiene | HCBD | ppb dw | 11 |
| DDTs | | | |
| | p,p'DDD | ppb dw | 16 |
| | p,p'DDE | ppb dw | 9 |
| | p,p'DDT | ppb dw | 12 |
| ppm- parts per million ppb- parts per billion dw- dry weight | | | |

During final construction, soils at the final subgrade surface above Sediment Quality Standards will be removed and replaced with clean soil, or a 1-2 foot layer of clean soil (that meets the Sediment Quality Standards) will be placed over the top of the affected soil.  Results of the geotechnical investigation will be incorporated into the final design and Soil Management Plan.

Material excavated during construction of the habitat will be loaded into trucks and transported to an upland staging area and temporarily stockpiled on plastic sheeting (or other appropriate material). Clean material will be segregated and evaluated (including analytical testing for comparison to the Model Toxics Control Act ,Chapter 173-340 revised January 2003, published Method A Soil Cleanup Levels for Unrestricted Land Uses) for beneficial reuse at the Project site or at another offsite location. Potentially contaminated material will be stockpiled separately and tested using the appropriate analytical methods. If excavated material has chemical concentrations above the Trustees' injury thresholds, that material will not be used as the upper 1 – 2 foot final surface for any portion of the habitat. If excavated material has chemical concentrations below MTCA Unrestricted Land Uses levels, that material will be used in the creation of the forested upland portion of the site. Any excavated material that exceeds the MTCA Unrestricted Land Use levels will be transported offsite for proper disposal in accordance with all applicable regulations.

## 5.0    CONSTRUCTION & HABITAT CREATION

On receipt of the appropriate permits and written authorization from the Trustees, Bluefield will initiate construction activities in accordance with the approved plans and specifications summarized in the following sections. The construction phase of the Project includes initial habitat development that will be designed to meet the physical and biological success criteria developed as part of this document.  In order to allow construction in the dry during periods of daytime low tide, as long as permits are approved, construction work will take place during the June – October time frame.

Public Informational Meeting

Once permits are finalized and construction is scheduled, Bluefield will hold an informational public meeting to inform the community of the upcoming restoration project, and to answer any questions. Bluefield will provide Trustees written notice of the meeting 30 days in advance.

A trackhoe (excavator) will likely be used to excavate the onsite materials and a small bulldozer may assist in the fine grading of the site.  Other construction equipment such as loaders and dump trucks will be used to transport material.  Initially, site access will be established and erosion and sediment control measures installed.  The trackhoe will excavate the inlet, leaving a berm of approximately 10 feet in width at the outlet to prevent the tidal ebb from entering the Project site during construction.

During excavation, soils will be evaluated for contamination and suitability for re-use (see Section 7.1.1 – Soil Management Plan).  If over-excavation is warranted, extra material will be removed from the site and clean material that meets Trustees' Injury Thresholds will be placed to prepare the rough grading for the site.  Select materials will then be imported and final grades established.

Any excavated material which exceeds Model Toxics Control Act (Chapter 173-340 revised January 2003) published Method A Soil Cleanup Levels for Unrestricted Land Uses shall be considered contaminated soil and shall be disposed of offsite, at an approved facility in accordance with all appropriate federal, state and local regulations regarding the handling, transporting and disposal of contaminated material.  Excess materials that are below this standard will be retained onsite for the creation of an elevated "mound".  This material will be covered with a minimum of 12" of topsoil at final grading.

Planting and site stabilization (i.e., mulching) will be conducted after the final grades are established.  During planting and stabilization, access for a trackhoe will be retained so that the berm can be removed and the inlet fine graded during low tide.

Upon final stabilization and planting of the inlet area, an as-built survey will be prepared and monitoring baselines will be established.

**Corrective Action Plan**:

In the event that there is a significant problem that would prevent this Project from being constructed as designed, Bluefield and the Trustees will discuss and formulate a corrective management strategy that will allow the Trustees to determine what attributes are not on target for Project success and what actions need to be taken to achieve Project success.  Within 60 days of the Trustees' written notification to Bluefield that a corrective management strategy is necessary, a Corrective Action Plan shall be drafted by Bluefield and presented to the Trustees for their written approval.

**Notice of Construction Completion:**
Within 60 days upon completion of construction, or other such period of time as agreed to by the Parties, Bluefield shall submit a written notice of completion to the Trustees.

## 6.0 OPERATIONS, MAINTENANCE & MONITORING

Following initial construction of the Project, operations, maintenance and monitoring activities will be conducted to enhance the survivability of newly established plants, as well as to evaluate the performance of the newly created habitat.  The goal of the Project is to create a self-sustaining habitat(s) that will complement any existing natural resources and further enhance the natural ecosystem and support native estuarine species.  The Monitoring Plan will be developed and followed to determine if the goals and objectives of the habitat project is being achieved (See section 7.1.4).  Implementation of the monitoring plan will determine if restoration objectives are being met, the operations and maintenance plan is sufficient, contingency measures need to be taken, adaptive management strategies need to be implemented, and contingency measures and adaptive management strategies are successful.

Operations and maintenance activities will be conducted relatively frequently during the first year after planting, then will decrease in frequency over the 10-year monitoring program (see Tables 1-3).  Maintenance and Stewardship activities will transfer to the City of Seattle after the initial 10-year monitoring program, in accordance with the Master Lease.

The following sections and attached tables 1-3 outline the general operations, maintenance and monitoring activities to be performed during the ten years following construction of the habitat.  Additional details will be provided in the Maintenance Plan and Monitoring Plan that will be available for Trustee review and approval with the 30% design.

## 6.1 OPERATIONS AND MAINTENANCE

Maintenance will be required to ensure success of the newly created habitat.  During the first ten years Operations and Maintenance will include the following activities:

- **Watering**:  watering of upland plants may be necessary depending on weather conditions and the time of planting.  Watering, if needed, will be conducted using a watering truck or temporary irrigation system until upland plants become established.

This activity is expected to be necessary for only a portion of the ten-year maintenance period.

- **Mulching**:  Mulching may be required following initial plant installation and during weeding activities.

- **Weeding**: Weeding around shrubs may be required during the first summer to facilitate plant establishment and reduced competition.  Weeding will be accomplished by hand with simple tools, and will be performed as necessary based on periodic site inspections. A complete list of noxious weeds that will be removed from the site will be presented for review with the 30% design.

- **Dead Plant Removal**: Dead plant removal will be performed as necessary after scheduled monitoring activities.  Plants will be replaced as necessary to maintain diversity in accordance with the approved Planting Plan and success criteria.

- **Debris Removal**: Material that adversely affects the habitat area will be removed as needed.

- **Goose Exclusion System**. Grazing by Canada geese and other animals will be minimized by using an adaptive and variable range of physical restraints or barriers. Several types of physical restraints and barriers have been used at similar sites. Installation of the barriers or restraints will take place before, or simultaneous with, planting of intertidal vegetation.  Physical restraints or barriers will be maintained for five years unless agreed to be unnecessary by the Trustees.  Periodic monitoring should confirm adequate site maintenance of devices.

The Monitoring Plan will include a description of activities that will be conducted to maintain the ecological function of the projects (**i**.e., invasive species control and removal of anthropogenic material). These activities will be conducted on an as-needed basis. The plan

will not cover "force majeure" events. "Force majeure," in the context of this discussion, includes all physical events (e.g., flood flows or seismic events) that exceed the design criteria for the projects that will be developed using accepted professional engineering standards.

## 6.2     MONITORING

Project monitoring will be conducted to evaluate the performance of the newly created habitat. The proposed monitoring activities are developed around both physical and biological success criteria, as listed below and summarized in Tables 1-3.  Additional details on specific field methods will be provided in the Monitoring Plan that will be submitted as part of the 30% design.

### 6.2.1     Re-contamination Monitoring

If the chemical analysis of soils excavated during the geotechnical investigation identifies the presence of contamination at levels above the Washington Department of Ecology's Sediment Quality Standards, Trustees must be notified within seven days. A sediment recontamination monitoring plan will then be developed to monitor for potential recontamination of the completed restoration project with the specific constituent(s) identified. The sediment recontamination monitoring plan will be submitted to the Trustees for review and written approval. Sediment recontamination monitoring will be conducted in years 3, 5, and 10 of the project. Trustees will be notified within 7 days if any areas of the site exceed SQS values. This will trigger discussions with the Trustees over possible causes and appropriate responses. If an investigation indicated that recontamination above the SQS of the habitat substrate is due to on-site migration from upland sources, action to address the recontamination will be required by the Trustees at their discretion.

**6.2.2    Physical Success Criteria**

The physical success criteria for the Project include the following elements, within the parameters described in Table 1:

- Maintaining intertidal areas,
- Slope stability (intertidal),
- Tidal circulation,
- Sediment/soil structure,
- Salinity, and
- Channel morphology.

Although these parameters have been established as success criteria, the goal of the Project is 'a self-sustaining habitat'.   The project will be allowed to settle naturally.  Monitoring tasks will include periodic surveys using traditional mapping techniques using Global Positioning System (GPS)-referenced information, aerial photographs, visual observations, and the collection of soil samples for analysis, as appropriate.

**6.2.2    Biological Success Criteria**

Biological success criteria monitoring includes maintaining the appropriate marsh and riparian vegetation coverage within the parameters outlined in Table 2, minimizing the intrusion of non-native or invasive plant species.  Monitoring tasks will include periodic surveys based on traditional mapping techniques, aerial photographs, and visual observations, as appropriate.

**6.2.3    Additional Monitoring Requirements**

In addition to monitoring the physical and biological criteria, the presence of fish and invertebrate prey resources will be monitored in accordance with the criteria presented in Table 3.  Fish presence will be observed periodically during March, May and June, as specified in 7.1.4 and in Table 3. Invertebrate prey (epibenthic) resources will be assessed using a suction sampler.  Since the creation of a suitable habitat cannot guarantee that the habitat will be populated by estuarine species, there are no success criteria for the presence or absence of fish

or invertebrate species. The purpose of the presence/absence monitoring is for scientific evaluation purposes, in accordance with requests by the Trustees.  Fish or invertebrate presence is not success criteria for the Project, although they are certainly an intended result of the restoration.  If the monitoring indicates that fish or invertebrate species are not present at the Site, discussions with the Trustees will be initiated to determine potential reasons for the absence and whether adaptive management actions are warranted.

### 6.2.4    Monitoring Status Report

The Trustees will be provided with Monitoring Status Reports during the initial 10-year monitoring period.  The Monitoring Status Reports will include a description of monitoring and Operations and Maintenance activities completed during specific monitoring years, a summary of any data collected during the year (including survey maps and tabular data), and activities/results of any newly implemented adaptive management plans (if needed).  The Monitoring Status Report will be prepared and submitted to the Trustees by April 1 of the year following any monitoring activities.

## 7.0      PLANS AND DOCUMENTATION

As part of the design and permitting process, a variety of plans and documents will be developed and submitted to the appropriate agencies for review and comment.  Following completion of the permitting process, and prior to initiating construction of the habitat, a final design package will be prepared.  Following construction of the habitat, as-built drawings will be prepared and submitted to the Trustees (See section 7.3).

A summary of the additional plans and documentation that will be prepared is provided below.

## 7.1      PERMIT APPLICATION PACKAGE

Prior to submitting applications for permits that will be required for construction of the restoration Project, Bluefield will prepare a Permit Application Package for review by the appropriate permitting agencies.  The Trustees will be provided a copy of the Permit Application Package for review and written approval prior to submittal to the permitting agencies. Subsequent to the Trustee's review of the Permit Application Package, the Trustees will be provided with more detailed documentation for their review and written approval, for the following documents:

- Soil Management Plan,
- Planting Plan,
- Operations and Maintenance Plan, and
- Monitoring Plan.

### 7.1.1    Soil Management Plan

No chemical data exists regarding the potential presence of contaminants in material that will be excavated during construction of the Project.   Some of the soils may contain contaminants at concentrations above levels of regulatory concern, and will need to be appropriately managed.  As such, a Soil Management Plan will be prepared prior to initiating construction activities.

The Soil Management Plan will include detailed descriptions of all pertinent procedures related to soil excavation, removal, and placement, including, but not limited to the following:

- **Soil Handling**: the Soil Management Plan will include a description of the types of equipment that will be used at the Site; dewatering procedures (if needed); procedures for installation of plastic liners beneath soil piles, silt fences; and stormwater management.

- **Sampling and Analysis**: including procedures for installation of test pits; management of soil excavated from the test pits; sample collection and sample handling methodology; chain of custody procedures and laboratory analyses; and data evaluation and reporting.

- **Soil Management**: including a description of criteria for determination of soil disposition (i.e., reuse or offsite disposal); and procedures for transporting and disposal of soil to offsite facilities (if needed).

- **Health and Safety**: a site-specific health and safety plan will be developed in accordance with federal standards to provide information on potential hazards; mitigation any potential Site-related risks; training for Site personnel; and the location of emergency medical facilities.

Excavated soils and debris will be placed directly into trucks and transported to a designated uplands site for temporary stockpiling. As the excavation activities are planned during periods of the summer and low tide, significant dewatering of the material should not be required. Excavated soils will be placed directly in steel bins or on plastic sheeting material, and segregated as appropriate at the Project site or at an offsite location. Obvious debris will be transported directly to a landfill. Representative samples from excavated soil will be collected and submitted for laboratory analysis to determine the proper methods for disposal. Excavated soil that is free of contamination may be evaluated for beneficial reuse.

Any excavated material which exceeds Model Toxics Control Act (Chapter 173-340 revised January 2003) published Method A Soil Cleanup Levels for Unrestricted Land Uses shall be considered contaminated soil and shall be disposed of offsite, at an approved facility in accordance with all appropriate federal, state and local regulations regarding the handling, transporting and disposal of contaminated material.

### 7.1.2 Planting Plan

A Planting Plan will be developed as part of the Permit Application Package. The Planting Plan will provide details of the types and density of native plants that will be installed at the Project site. Upland plantings will be designed to provide an appropriate variety of ground shrub, herbaceous, understory, and canopy layers that will provide structural and habitat diversity. The plan will also present detailed information on the tidal marsh including:

- Species by elevations zone,

- Planting densities for rooted and bareroot stock by species, and

- Seeding densities by species.

### 7.1.3 Operations and Maintenance Plan

- The Operations & Maintenance Plan will include detailed descriptions on the methodology, frequency, and duration of activities designed to maintain the suitability of the Project, as described in Section 6. In addition, this plan will describe the long-term stewardship of the Site that will be conducted by the City of Seattle after the initial 10-year monitoring period. The Operations and Maintenance Plan will be comprised of two sections: Initial operations and maintenance during the 10 year performance monitoring period;

- Stewardship will be conducted after the initial 10-year monitoring period, so the project continues to meet specified performance criteria. The plan will include a description of activities that will be conducted to maintain the ecological function of the projects (i.e.

invasive species control and removal of anthropogenic material). These activities will be conducted on an as-needed basis. The plan will not cover "force majeure" events. "Force majeure" in the context of this discussion, includes all physical events (e.g., flood flows or seismic events) that exceed the design criteria for the projects that will be developed using accepted professional engineering standards.

The Operations and Maintenance Plan will provide details for the required monitoring activities, including but not limited to:

**Watering**:  the Operations and Maintenance Plan will include a schedule for watering of upland plants, depending on weather conditions and the time of planting,

- **Mulching**:  The Operations and Maintenance Plan will include a description for the type and approximate quantities of mulch that will be applied following initial plant installation, as well as supplemental mulching during weeding activities,

- **Weeding**:  Weeding will be required around shrubs during the first summer to facilitate plant establishment and reduced competition. A complete list of noxious weeds that will be removed from the site will be included in the Operations and Maintenance Plan,

- **Dead Plant Removal**: Dead plant removal will be performed as necessary after scheduled monitoring activities.  The Maintenance Plan will provide criteria for replacement and re-establishment of the plants as necessary.

- **Debris Removal**: Material that adversely affects the habitat area will be removed as needed – an initial schedule will be provided in the plan, and debris removal will be performed as necessary.

- **Goose Exclusion System**. The monitoring Plan will include descriptions of various physical restraints and barriers to minimize grazing, along with a plan to adaptively manage the exclusion system.

### 7.1.4    Monitoring Plan

As described in Section 5, the goals of the Project are to create a self-sustaining habitat(s) that will complement and enhance existing habitats in this part of the Duwamish River.  To evaluate the effectiveness of this Project, physical and biological success criteria have been developed and are outlined in Table 1 and Table 2.   Other monitoring requirements, such as documenting fish presence and invertebrate prey resources are listed in Table 3.  A brief description of monitoring activities is provided below, and summarized in Table 1 through Table 3.  The Monitoring Plan will include detailed procedures for each activity listed below:

- **Intertidal Area**: provide calculations of total intertidal area within 3-months of completion, and visual inspections after flood events.  Methodologies will include aerial photography, GPS-referenced traditional mapping techniques, and photo documentation at pre-determined stations. Monitoring will be conducted in years 1, 3, 5, and 10.

- **Intertidal Stability/Slope Erosion:** provide as-built plan drawings within 3-months of completion, and visual inspections after flood events.  Methodologies will include aerial photography, GPS-referenced traditional mapping techniques, and photo documentation at pre-determined stations. Monitoring will be conducted in years 1, 3, 5, and 10.

- **Tidal Circulation:** conduct visual inspections of the Project area for impeded tidal flow twice per year during May and June. Monitoring will be conducted in years 1, 3, 5, and 10.

- **Sediment/Soil Structure:** conduct periodic testing of soils for grain size distribution, total organic carbon, and total Kjeldahl nitrogen (if needed).  Random samples will be

collected from predetermined areas in proportion to different soil types. Monitoring will be conducted in Year 0 as needed.

- **Salinity:** the salinity of soil, intertidal sediment, and surface water will be periodically tested at the Site. Sample collection methods will include soil cores and standard laboratory procedures, and hand-held salinity probes, as applicable. Monitoring will be conducted in Year 0 as needed.

- **Marsh Vegetation Areal Coverage:** provide as-built plan drawings within 3-months of completion. Methodologies will include aerial photography, GPS-referenced traditional mapping techniques, and photo documentation at pre-determined stations. Monitoring will be conducted in years 1, 2, 3, 5, 7, and 10.

- **Marsh Vegetation Survival:** Quantitative sampling for vascular plant species and visual cover estimates will be conducted using standardized sampling transects relative to the shoreline and in proportion to the extent of each habitat type. Methodologies for cover estimates will include aerial photography, GPS-referenced traditional mapping techniques, and photo documentation at pre-determined stations, in reference to the initial as-built drawings. Monitoring will be conducted in years 1, 2, 3, 5, 7, and 10.

- **Riparian Vegetation Areal Coverage:** provide as-built plan drawings within 3-months of completion. Methodologies will include aerial photography, GPS-referenced traditional mapping techniques, photo documentation at pre-determined stations, and ground truthing. Monitoring will be conducted in years 1, 3, 5, and 10.

- **Riparian Vegetation Survival:** determine percent survival based on aerial photography, GPS-referenced traditional mapping techniques, photo documentation at pre-determined stations, and ground truthing. Monitoring will be conducted in years 1, 2, 3, and 4.

- **Fish Presence:** monitor and record fish presence in the area three times per year from the shore during peak of juvenile salmonid outmigration (May or June) for three hours at a time. Monitoring will be conducted in years 1, 3, 5 and 10.

- **Invertebrate Prey Resources:** monitor epibenthic invertebrate presence in each of two elevation strata (marsh and mudflat). Samples will be collected using a suction sampler located near fish sampling observation sites at high tides concurring with juvenile salmon outmigration. Monitoring will be conducted in years 1, 3, 5 and 10.

## 7.2    FINAL DESIGN PACKAGE

The Final Design Package will incorporate any revisions required as part of the permitting process, all plans referenced above, any additional specifications required for construction, along with copies of all permits required to construct the habitat.   The 90% Design Package will be provided to the Trustees for review and written approval prior to initiation of construction activities. Following Trustee review, the 100% design will be prepared to support construction.

## 7.3    AS-BUILT DRAWINGS

A set of 'as-built' drawings will be submitted post-construction, documenting the final dimensions of the inlet and areas within each elevation (habitat) zone.  These will include a set of drawings indicating the species and density of plants installed in each re-vegetated habitat zone. The As-Built Drawings will be submitted to the Trustees within 90 days of acceptance of the construction contract as complete.

## 7.4    ADAPTIVE MANAGEMENT PLAN

In the event that the prescribed actions are not successful at achieving one or more of the performance criteria, or unforeseen external circumstances interfere with success, an adaptive management process will be implemented. An Adaptive Management Plan will be developed to evaluate a Habitat Restoration Project's original goals after a Project's construction, and when

the monitoring results indicate that such project will not meet its original goals.  The Adaptive Management Plan will provide for additional actions to achieve a Habitat Restoration Project's original goals or will provide modified goals should the original goals prove infeasible. The Plan will be approved in writing by the Trustees. .  Data acquired from monitoring and maintenance will be used to determine if the Adaptive Management Plan is successful in achieving the desired performance standard.

An Adaptive Management Plan (AMP) will be prepared in response to biological or physical parameters that are not meeting the success criteria summarized in Tables 1 and 2.  For example, if specific noxious weeds do not respond to hand or mechanical treatment methods, the AMP will consider the use of herbicides to achieve the physical success criteria (Table 1). Development of the AMP will be done in consultation with the Trustees and Trustees will provide written approval prior to implementation. Upon approval of the AMP by the Trustees, the plan will be implemented and monitored to ensure success of the functioning habitat.

## 8.0 SCHEDULE

All construction drawings will be finalized upon obtaining all required permits and approvals. Construction of the site is expected to begin in the summer of 2011. Intertidal construction will be performed during summer low tides to take advantage of lower, daylight low tides that only occur during the summer months. Most of the excavation and material placement would take place "in the dry" during the low tide periods, significantly reducing the actual amount of in water work that is required. A detailed construction and monitoring schedule will be provided in the Final Design Package.

Within 90 days of approving a Project's scope of work, Bluefield shall commence permitting of the Conditional Project. Within 30 days of receiving all permits, Bluefield will submit a construction schedule to the Trustees for their review and written approval.

# TABLE 1

# PHYSICAL SUCCESS CRITERIA

| | Intertidal Area | Intertidal Stability/ Slope Erosion | Tidal Circulation | Sediment/ Soil Structure | Site Salinity | Sediment Quality/Recontamination |
|---|---|---|---|---|---|---|
| **Description:** | The total restored area between an elevation of +12 ft NOS MLLW and -4 ft MLLW will be at least 90% of the target intertidal acreage. | The "as-built" elevations in the area planned for marsh will be +/- 0.5 ft of the elevations specified in the construction plan. The low gradients necessary for marsh development should be stable over time. The site should be allowed to evolve naturally, barring extreme erosion events. 75% of the target elevations will be maintained through year 5.<br><br>"As-built" elevations for the habitat classified as "habitat mix covered riprap" (RRHM), which will be determined after a 1 ft minimum thickness of appropriate material has been placed over the riprap (per description in Section 4.1 of the SOW), will be maintained. This habitat type is a pilot project specific to this site is expected to persist as a permanent habitat without the need for continuous addition of covering material. | The tidal amplitude, as determined by both timing and elevation of high and low tide events, is equivalent inside and outside of the project area. | Over time, sites may accumulate fine-grained materials and organic matter. This would involve a decrease in mean grain size and in increase in organic carbon in the surface sediments and site soils. | Salinity is suitable for emergent plant propagation, colonization and growth. Salinity affects seed germination and plant establishment. | No evidence of contamination due to On-site migration of upland or subsurface contaminants to groundwater or aquatic area. |
| **Monitoring Tasks:** | Calculate the total intertidal acreage below +12 ft MLLW of the project and provide "as-built" plan drawings within 3 months of completion.<br><br>Visually inspect after extreme flood events to determine erosional impacts. | Provide "as-built" plan drawings within 3 months of completion to document<br>Visually inspect after extreme flood events to determine erosional impacts. Measure elevations along set transect line to detect changes over time.<br>Visually inspect RRHM to monitor slope stability and ensure that habitat mix is remaining at 1 ft minimum thickness. | Visual inspections of the project area for impeded tidal flow, or potential fish stranding twice a year during May and June period. | Grain size distribution and organic carbon determination by collecting core samples in vegetated (>+10 ft MLLW) and unvegetated (<+9 ft MLLW) areas.<br>Test for total nitrogen after Kjeldahl digestion or directly with CNH analyzer (if warranted). | Sample soil and intertidal sediment surface and/or core using standard sampling methods and accredited soils testing laboratory. Note areas void of vegetation. Determine surface water salinity at multiple locations in the intertidal area to the nearest ppt. Measure dissolved oxygen as appropriate. | If the chemical analysis of soils excavated during the geotechnical investigation identifies the presence of contamination at levels above the Washington Department of Ecology's Sediment Quality Standards, then the restoration site will be monitored to determine if the habitat substrate (sediment) becomes recontaminated over time with the specific constituents identified. The compliance criteria that will be used to assess potential recontamination will be the Washington State Sediment Quality Standards. |
| **Monitoring Methods:** | Aerial photography, or traditional mapping survey techniques, and photo documentation at pre-determined photo stations. | Aerial photography, underwater photography, or traditional mapping survey techniques, and photo documentation at pre-determined photo stations. | Visual inspections to verify non-impeded tidal circulation. Tidal gauges, data loggers, if appropriate. | Random sampling within predetermined areas and in proportion to different soil types. Hydrometer and sieve to determine particle size. Replicate samples taken under similar tidal regime. | Hand-held salinity probe or refractometer, and data logger at multiple locations, as needed. | A sediment monitoring scope of work will be submitted for review and approval of the Trustees. |
| **Schedule:** | Years: 1, 3, 5, and 10. | Years: 1, 3, 5, and 10. | Years: 1, 3, 5, and 10. | Year 0 and as needed if the marsh fails to meet success criteria and replanting or reseeding is unsuccessful. | Year 0 and as needed if the marsh fails to meet success criteria and replanting or reseeding is unsuccessful. | Sediment monitoring will be conducted in years 3, 5, and 10 of the project. |
| **Contingency Measures:** | In the event that established success criteria are not being met, an adaptive management plan will be prepared with input from the Trustees. The adaptive management plan will be implemented as appropriate for the project conditions and goals. | Excessive erosion will be stabilized by non-structural approaches such as vegetation, fiber mats, or other "soft" engineered approaches. In the event that established success criteria are not being met, an adaptive management plan will be prepared with input from the Trustees. The adaptive management plan will be implemented as appropriate for the project conditions and goals.<br>In the event RRHM is not meeting the success criteria, an adaptive management plan, which may include addition of more habitat mix to maintain the minimum 1 ft depth, will be developed. However, if continuous maintenance is required, then the habitat classification RRHM will be judged to be unsuccessful, and the DSAY value of the area will be subtracted from the total project value. | In the event that established success criteria are not being met, an adaptive management plan will be prepared with input from the Trustees. The adaptive management plan will be implemented as appropriate for the project conditions and goals. | If the intertidal sediments or upland soils do not support the biological production anticipated, amendments can be considered to augment nutrient deficiencies. In the event that established success criteria are not being met, an adaptive management plan will be prepared with input from the Trustees. The adaptive management plan will be implemented as appropriate for the project conditions and goals. | If salinity is a limiting factor for plant growth and propagation, more appropriate plantings of species will be considered. In the event that established success criteria are not being met, an adaptive management plan will be prepared with input from the Trustees. The adaptive management plan will be implemented as appropriate for the project conditions and goals. | Any areas of the site exceeding SQS values will trigger discussions with the Trustees over possible causes and appropriate responses. If an investigation indicated that recontamination above the SQS of the habitat substrate is due to on-site migration from upland sources, action to address the recontamination may be required by the Trustees. |

**TABLE 2**

**BIOLOGICAL SUCCESS CRITERIA**

| | Marsh Vegetation Areal Coverage | Marsh Vegetation Survival/Species Composition | Marsh and Riparian Vegetation Herbivory Avoidance | Riparian Vegetation Areal Coverage | Riparian Vegetation Survival |
|---|---|---|---|---|---|
| **Description** | Percent cover of vegetation should be stable or increasing within portions of the project where elevations are suitable to marsh establishment. | Percent cover of native marsh species should be stable or increasing over time, with 25% cover of clonal dominants (e.g. pickleweed/saltgrass, bullrush, sedge) at 3 years, 50% at 5 years, and not less than 75% after 10 years. The project should not contain more than 5% cover by area of non-native or invasive plant species. | Confirm the success of stopping physical herbivory by Canada geese using physical barriers of wire, rope, rebar, posts, string, netting, or another acceptable exclusion system that is adequate to meet the vegetation coverage requirements. | Percent cover of native riparian vegetation should be stable or increasing over time, with 15% cover at year 3, 75% cover at year 5, and cover not less than 90% of the upland vegetated area of the project after 10 years (percent coverage will be based on 'plan view' habitat maps). Invasive and non-native plant coverage should be less than 5%. A minimum of 5% cover of at least six species should be maintained (at least four species other than willow and alder). Evaluation of success will be assessed at Years, 3, 5, and 10. The goal will be an appropriate variety of ground shrub, herbaceous, understory, and canopy layers that will provide structural and habitat diversity. | Riparian trees and shrubs should maintain not less than 75% survival over the first three years following initial planting. |
| **Monitoring Tasks** | An as-planted survey will be mapped following initial planting(s). Areal extent of vegetation will be measured from aerial photographs, if available. Record as-planted counts of species by elevation. | Standardized sampling transects will be established relative to the shoreline in proportion to the extent of each habitat type. The transects will encompass portions of the project area suitable for intertidal vegetation establishment. Data analysis will include an estimate of areal extent of marsh vegetation cover and any observations in changes over time. Permanent sampling locations (quadrats along transects) will be established and marked for elevation. | There are several exclusion device designs that have proven successful in studies conducted in the Duwamish River and Commencement Bay. Such a design will be employed and monitored at all newly planted NRDA restoration project sites. Installation of devices must take place before or simultaneous with planting of intertidal vegetation. Periodic, and initially frequent, visual inspections of herbivore exclusion systems and immediate repair to reduce herbivory until the plant root systems have established themselves. | Prepare "as-planted" maps with photo documentation following initial plantings to serve as a baseline. Record as-planted counts of species by location. | Conduct an "as-planted" survey following initial plantings to serve as baseline using fixed, color photo points. |
| | Use GPS-referenced traditional survey techniques to map the patch perimeter. Photo points will be established. Color photographs will adequately cover the site and will be collected at each sampling period. | Quantitative sampling for vascular plant species composition to record species presence (for frequency of occurrence data), and visual cover estimates for all species. Species composition of marsh vegetation and the occurrence of invasive species that exceeds 1% will be reported. | Devices must be maintained for 4 years post planting (initial planting or replanting). Periodic monitoring should confirm adequate site maintenance of devices. Observations will be logged for 5 years post planting (or replanting). | Determine percent coverage for each vegetation layer (tree, shrub, and groundcover) using aerial photography and field ground-truthing. | Determine percent survival for each vegetation layer (trees, ground cover, and shrubs using aerial photography and ground-truthing. |

| | Marsh Vegetation Areal Coverage | Marsh Vegetation Survival/Species Composition | Marsh and Riparian Vegetation Herbivory Avoidance | Riparian Vegetation Areal Coverage | Riparian Vegetation Survival |
|---|---|---|---|---|---|
| **Monitoring Methods** | Aerial photography, or traditional mapping survey techniques, and photo documentation. | Aerial photography, or traditional mapping survey techniques, and photo documentation. | Periodic visual inspections. | Randomly distributed survey quadrants. | Direct counts of a subset of planted material. |
| **Schedule** | Years: 1, 2, 3, 5, 7, and 10. | Years: 1, 2, 3, 5, 7, and 10. | Years 1 through 5 post planting (or replanting). | Years: 1, 3, 5, and 10. | Years: 1, 2, 3, and 4. |
| **Contingency** | Evidence of plant failure or if recruitment rates fail to meet expectations will trigger appropriate actions including determining cause of failure and making needed project adjustments and/or replanting. In the event that established success criteria are not being met, an adaptive management plan will be prepared with input from the Trustees. The adaptive management plan will be implemented as appropriate for the project conditions and goals. | Any occurrence of an individual invasive species that exceeds the threshold of 1 percent by vegetated area, or total non-native and invasive species exceeding 5 percent by vegetated area, will be controlled primarily by physical means (pulling, mowing, burning). *Spartina* spp. that is found to colonize any portion of the site (irrespective of the areal coverage) will be immediately controlled. Physical removal will occur as soon as invasive plants are identified and definitely prior to seed set. Chemical treatment (herbicides) will only be considered if physical removal fails. Evidence of plant failure, or if natural recruitment rates fail to meet expectations, will trigger consideration of contingency measures. Depending on the hypothesized reason for failure, responses could include additional planting, soil amendments, herbivore exclusions, and/or focused stewardship efforts. Assumptions about appropriate plant species, elevation, salinity, and other design factors will be reexamined and the project goals readjusted if new information suggests this path. | Immediately repair of any damage to the herbivore exclusion devices caused by logs, trampling, or geese. | Excessive failure rates (25% loss annually) for plant survival addressed by secondary planting if appropriate, and if causal factors of failure can be determined and corrected. In the event that established success criteria are not being met, an adaptive management plan will be prepared with input from the Trustees. The adaptive management plan will be implemented as appropriate for the project conditions and goals. | Excessive failure rates (25% loss annually) for plant survival addressed by secondary planting if appropriate, and if causal factors of failure can be determined and corrected. In the event that established success criteria are not being met, an adaptive management plan will be prepared with input from the Trustees. The adaptive management plan will be implemented as appropriate for the project conditions and goals. |

# TABLE 3

# ADDITIONAL MONITORING REQUIREMENTS

| | Fish Presence | Invertebrate Prey Resources |
|---|---|---|
| **Description** | Estuarine fish should access the project area. Juvenile salmonids are anticipated to occur. | Invertebrate prey taxa known to be important to juvenile salmonids are anticipated within the project area. |
| **Monitoring Tasks** | Monitor fish use of the project area.<br><br>Record fish presence (species if possible) and relative abundance. | Monitor epibenthic invertebrate community development in project area.<br><br>Three samples will be collected once each year in each of two elevation strata (i.e., marsh, and mudflat) . In each sample invertebrates known to be important salmonid prey items will be identified to the lowest practical taxonomic level and enumerated. |
| **Monitoring Methods** | Observe via snorkeling three times (early, mid, late) during peak of juvenile salmonid outmigration (March, May and June). All fish species observed will be recorded. | Epibenthic invertebrates sampled using a suction sampler. Sample stations located near fish sampling sites at high tide and concurrent with juvenile salmon outmigration. Samples will be collected during the juvenile salmonid outmigration (May or June). |
| **Schedule** | Years: 1, 3, 5 and 10. | Years: 1, 3, 5 and 10. |
| **Contingency Measures** | The purpose of this monitoring activity is to provide data as requested by the Trustees. There are no success criteria, contingency measures or adaptive management activities associated with this monitoring requirement. Failure of fish to use the areas could indicate that a basic restoration goal is not being met, and will trigger discussions regarding possible causes. | The purpose of this monitoring activity is to provide data as requested by the Trustees. There are no success criteria, contingency measures or adaptive management activities associated with this monitoring requirement. Failure of the epibenthic community to develop could indicate that a basic restoration goal is not being met, and will trigger discussions regarding possible causes. |



# Figure - 1
# Vicinity Map

KJR-AM
(Seattle)

SW FLORIDA ST

Pier 11

Berth 3

Pier 10

Berth 2

Peir 28

SW LANDER ST

Berth 4

Berth 3

Terminal
Number 5

Berth 3

Pier 9

Berth 5

Pier 27

Berth 4

West Waterway

Harbor
Island

East Waterway

Berth 6

KBLE-AM
(Seattle)

Berth 5

16TH AVE SW

13TH AVE SW

11TH AVE SW

SW HANFORD ST

Terminal 25

Berth 6

Pier 8

Berth 1

Terminal
Number 20

S HANFORD ST

Berth 2

Pier 7

S HORTON ST

Berth 5

COLORADO AVE S

S HINDS ST

Pier 23

**Site 01**

TERMINAL 4 ROAD

SW SPOKANE ST

SW KLICKITAT AVE SW

SW KLICKITAT WAY

S SPOKANE ST

DUWAMISH AVE S

EAST MARGINAL WAY S

1ST AVE S

WEST SEATTLE BR

①

②

③

Seattle City
Fire Station
Number 36

WEST SEATTLE BR

Pigeon
Point

SW MANNING ST

SW AVALON WAY SW

SW LANDER ST

16TH AVE SW

DELRIDGE WAY SW

99

Riverside

99

Seattle

Harbor
Is.

Lake
Wa.

Kellog
Is.

Duwamish

River

S NEVADA ST

Terminal
106

S IDAHO ST

S OREGON ST

DIAGONAL AVE S

OHIO AVE S

COLORADO AVE S

UTAH AVE S

S ALASKA ST

**Overview**

16TH AVE SW

13TH AVE SW

Duwamish   River

## LEGEND

⬤ Project Sites

▢ Tax Parcels

— Streets

▢ Water

▨ Buildings

Date:  Jul 14, 2010
1 inch = 1,000 feet
Sheet Size: 11x17
Produced by:

⬆ N

Feet
0    500   1,000

*Bluefield*



OLE'S & CHARLIE'S DRYDOCK

PORT

PORT

SDOT

SDOT

CITY OF SEATTLE

Riverside Mill/United Motor Freight

Figure - 2
Existing Conditions

Date: Aug 03, 2010

1 inch = 40 feet

Sheet Size: 11x17

Produced by:

LEGEND

Existing Conditions

Navigation Channel

Project Area

Parcel Boundry

Unvegetated Upland

Riprap

Intertidal (BA)

Shallow Sub-Tidal

Deep Sub-Tidal

Feet
0    40    80

Bluefield

West Seattle    Harbor Is.    Seattle    Lake Wa.

Kellogg    Duwamish River



Figure - 3
Existing Utilities

OLE'S & CHARLIE'S DRYDOCK

PORT

PORT

SDOT

SDOT

CITY OF SEATTLE

Riverside Mill/United Motor Freight

LEGEND

Utility Features

| | |
|---|---|
| — — — Navigation Channel | |
| - - - Project Area | |
| ☐ Parcel Boundry | |

| | |
|---|---|
| ——— Electricity | ——— Storm |
| ——— Gas | ——— Telephone |
| ——— Sanitary Sewer | ——— Water |
| | ——— Misc Land Features |

Date: Aug 03, 2010
1 inch = 40 feet
Sheet Size: 11x17
Produced by:

Bluefield

Feet
0    40    80

West Seattle | Harbor Is. | Seattle | Lake Wa.
Kellogg | Duwamish River



**FIGURE 4 - West Side West Waterway**
Post-Construction Habitat Zones

**LEGEND**

Project Area
Parcel Boundry

**Proposed Habitat**
- Forested Upland
- VB
- IT(High Marsh)
- IT(Mudflat)
- RRHM
- Shallow Sub-Tidal

Date: March 7, 2011
1 inch = 30 feet
Sheet Size: 11x17
Produced by:

**Bluefield**

0   30   60   Feet

Labels on map: Port, West Waterway, Utility Access, Transmission Tower, Parking, Parking, Spokane Street Bridge, City of Seattle, City of Seattle, Bridge Operator Access, Riverside Mill, West Seattle Bridge

FIGURE 5 - West Side West Waterway
Draft Design Cross-Sections
Cross-Section A
ELEVATION IN FEET MLLW (NOS)
DISTANCE IN FEET FROM BASELINE
EXISTING SURFACE
REQUIRED FINAL GRADE
A
A'
RRHM
Mudflat
High Marsh
High Marsh
Mudflat/Channel
High Marsh
Vegetated Buffer
Cross-Section B
B
B'
Vegetated Buffer
EXISTING SURFACE
High Marsh
High Marsh
REQUIRED FINAL GRADE
Mudflat
RRHM
Cross-Section C
C
C'
EXISTING SURFACE
EXISTING CURB
EXISTING COLUMN
EXISTING CENTER DRIVE LANE
EXISTING FENCE
EXISTING CURB
PROPOSED 12' DRIVE LANE
Vegetated Buffer
High Marsh
Vegetated Buffer
1' WIDE VERTICAL CONCRETE WALL
1' WIDE VERTICAL CONCRETE WALL
1' WIDE VERTICAL CONCRETE WALL
West Waterway
Utility Access
Transmission Tower
Parking
Parking
Bridge Operator Access
Proposed Habitat
Forested Upland
VB
IT(High Marsh)
IT(Mudflat)
RRHM
Shallow Sub-Tidal
March 7, 2011
Produced by:
Bluefield

**APPENDIX B**

**Site 01 – Legal Description**

<u>West Side West Waterway: Spokane Street Bridge</u>

PID:                     7666703295

Address:                 SW KLICKITAT WY & S SPOKANE ST

Lat/Long:                47° 34.295'N, 122° 21.347'W

Legal Description:       POR OF SD LOTS DAF - BEG AT NXN OF S MGN OF SW SPOKANE ST WITH SWLY
                         MGN OF DUWAMISH W WATERWAY TH S 41-06-02 E ALG SD SWLY MGN 83.93
                         FT TH S 01-08-43 W 27.80 FT TH N 88-51-17 W 53 FT TH N 59-03-00 W 167.91 FT
                         TH N 89-29-14 W 40 FT TH N 00-30-46 E 6.91 FT TO S MGN OF SW SPOKANE ST
                         TH ELY ALG SD S MGN 182.35 FT TO TPOB

<u>Southwest Spokane Street:</u>

                         THAT PORTION OF SOUTHWEST SPOKANE STREET BETWEEN THE WEST MARGIN
                         OF THE WEST DUWAMISH WATERWAY AND A LINE EXTENDING BETWEEN
                         NORTHWEST CORNER OF KING COUNTY PARCEL 7666703290 AND NORTHWEST
                         CORNER OF LOT 11, BLOCK 424 SEATTLE TIDELANDS EX 01 B 377-491.

**APPENDIX C**

## Duwamish River Corridor Master Agreement
## Relating to a Lease and Permits for Habitat Construction and Maintenance

This Master Lease for Habitat Construction and Maintenance for the construction and maintenance of habitat along the Duwamish River in Seattle, Washington (the "Master Lease"), is made and entered into as of the Effective Date below by and between a Washington LLC formed by Bluefield Holdings Inc. ("Bluefield") and the City of Seattle (the "City") (sometimes referred to collectively as the "Parties" and individually as a "Party").

RECITALS

The Duwamish River is a vital economic and natural resource to the City and its citizens.

The Duwamish River has been the site of more than 150 years of industrial development.

The Duwamish River is habitat for threatened and endangered species, including salmon, and other species of environmental, economic, and cultural importance.

The Duwamish River is an important natural and cultural resource for Tribal nations and other public trustees in the south Seattle area.

The Lower Duwamish River is a federal Superfund site and is being assessed by Tribal nations and other public trustees for damages to natural resources.

Resolution of claims for natural resource damages will enhance habitat restoration, increase certainty for continued commerce and economic development along the Duwamish and enhance public access to the Lower Duwamish River.

The City manages Street Right-of-way and owns Property along the Duwamish River in Seattle, Washington, that is operated by various City agencies including the Department of Parks and Recreation, Seattle City Light, and the Department of Transportation. Bluefield is in the business of designing, building, and maintaining natural resource damage restoration projects that generate Natural Resource Damage Restoration Credits (defined below). Bluefield is also in the business of selling Natural Resource Damage Restoration Credits to parties that desire to settle their potential liability to Trustee Agencies (defined below).

The City wishes to lease certain properties to Bluefield for the purpose of design, construction and maintenance of natural resource habitat restoration projects.

The City wishes to consider term permits issued by the City Council for the use of for certain street rights-of-way as described in the Attachments, subject to providing for

transportation and utility needs, for the purpose of design, construction and maintenance of natural resource habitat restoration projects.

The City wishes that Bluefield's restoration on City land serves as a starting point for further habitat restoration by Bluefield on private lands in the Duwamish Superfund site.

Bluefield wishes to design, construct, and maintain natural resource habitat restoration projects on the City's properties in order to generate Natural Resource Damage Restoration Credits that it may sell to third parties.

In consideration of the mutual promises and covenants set forth below, the adequacy of which is hereby acknowledged, the Parties agree as follows:

## 1. DEFINITIONS.

As used herein the following capitalized terms have the respective meanings ascribed to them below. Additional definitions are also contained within the text of this Master Lease.

"Approved Project" means a Project for which the City, in its sole discretion, has approved the Conceptual Design or for which Bluefield, in its sole discretion, has accepted the Requested Modifications thereto.

"Candidate Parcel" means parcels of real property owned and operated by the City, located along or near the Duwamish River, and listed on Exhibit A attached.

"Conceptual Design" means a preliminary design that Bluefield may, in its sole discretion prepare for a project

"Deductions" means any reductions in the Project Payment that Bluefield may, at its sole discretion, propose to cover costs not related to habitat restoration on a Candidate Parcel, including (without limitation) cleanup of environmental contamination, removal of structures, capital improvements, etc.

"Effective Date" means the latest date this Master Lease has been executed by both Parties as set forth on the signature page hereto.

"Independent Appraiser" means a licensed real estate appraiser agreed upon by both Parties. The Parties have agreed that Greenleaf shall be the initial Independent Appraiser.

"Legal Requirements" means any and all covenants, conditions, restrictions, easements and rights-of way on, against or otherwise encumbering a Project Area and all applicable laws, orders, permits, ordinances, statutes, rules, requirements and regulations of federal, state, county and municipal authorities now or hereafter in effect and applicable to a Project Area.

2

"Long Term Maintenance Payment" means the one-time payment Bluefield will make to the City for the post-Project Term long term maintenance of each Approved Project and will be calculated as follows: Bluefield, at its sole cost and expense, shall have an independent consultant prepare a scope of work and cost estimate for long term maintenance of each Project Area. A discount rate of five percent (5.00%) shall be applied to the cost estimate to determine the amount of the one-time payment.

"NRD Restoration Credits" means the metric used by Trustee Agencies to measure the value of the Project in terms of restoration of natural resources. NRD Restoration Credits may consist of discounted service acre years using habitat equivalency analysis or resource equivalency analysis, or any other metric used by Trustee Agencies to value the natural resource damage restoration potential of an Approved Project.

"Project" means the natural resource habitat restoration project designed to obtain NRD Restoration Credits that Bluefield may propose to construct at a Candidate Parcel

"Project Approval Date" means the date a Conceptual Design or Requested Modifications thereto is approved.

"Project Area" means that certain portion of a Candidate Parcel where Bluefield may propose to locate a Project.

"Project Payment" means the annual payments Bluefield will make to the City for a particular Approved Project and shall be calculated as follows: Bluefield, at its sole cost and expense, shall have the Independent Appraiser conduct an appraisal to determine the fair market value of the Project Area as defined in the legal description included with the Conceptual Design. An annual percentage rate of return of ten percent (10.00%) shall be applied to the appraised value of each Project Area that is located on a street end to determine the annual payment amount. An annual percentage rate of eight (8.00%) shall be applied to the appraised value of all other Project Areas to determine the annual payment amount.

"Project Term" means the time period commencing on the Project Approval Date and continuing for twenty-four (24) months or completion of construction of each Approved Project, whichever is sooner, and then continuing for a period of ten (10) years after completion of construction of each Approved Project, unless sooner terminated as provided herein. Construction shall be deemed to be complete when the habitat improvements have been installed according to the Conceptual Design approved by the City, including any changes to that Conceptual Design that have been approved by the City.

"Requested Modifications" means the modifications, if any, that the City, in its sole discretion, may request to a Conceptual Design, a Project Payment and/or proposed Deductions.

"Trustee Agencies" means any one or more of federal, state, tribal and/or local agencies designated as trustees for natural resources pursuant to the federal Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9622, the federal Oil Pollution Act, 33 U.S.C. 2701, the Washington Model Toxics Control Act, RCW 70.105D, and/or other similar laws, and shall include without limitation agencies such as the U.S. Department of Interior, the National Oceanic and Atmospheric Administration, the Washington State Department of

Ecology, the Washington State Department of Fish and Wildlife, the Washington State Department of Natural Resources and federally recognized Tribal Nations.

"Work" means all activities of Bluefield, its employees, agents and subcontractors to design, construct, operate, monitor, repair, maintain and otherwise complete a particular Approved Project.

## 2. PROJECT REVIEW AND DEVELOPMENT.

2.1 Candidate Parcel Review. No more than thirty (30) days after the Effective Date, the City will make the Candidate Parcels available for inspection during normal business hours by Bluefield and its agents and subcontractors at Bluefield's sole risk and expense. Bluefield shall make such inspections and reviews as it deems appropriate to determine if any or all of the Candidate Parcels or portions thereof are suitable for natural resource habitat restoration. Bluefield may make requests of the City for documents and other information regarding the Candidate Parcels and the City shall not unreasonably refuse such requests and shall provide the documents and information promptly, provided that, Bluefield shall reimburse the City for the costs, if any, incurred by the City for identification, collection, reproduction, or provision of the documents and information. The City shall also make available City personnel familiar with the Candidate Parcels to assist with Bluefield's inspections and reviews as reasonably requested by Bluefield.

2.2 Project Proposal. No more than one hundred and eighty (180) days after the Effective Date (or such longer period as may be agreed upon in writing by the Parties), Bluefield shall determine in its sole discretion whether or not natural resource habitat restoration sufficient to gain NRD Restoration Credit appears to be feasible on a Candidate Parcel or portion thereof. If Bluefield determines in its sole discretion that natural resource habitat restoration is not feasible on a particular Candidate Parcel, then Bluefield shall notify the City in writing of its determination and Bluefield shall have no further obligations under this Master Lease for such Candidate Parcel. If Bluefield determines that natural resource habitat restoration is feasible, then, no more than two hundred and ten (210) days after the Effective Date (or such longer period as may be agreed upon in writing by the Parties), Bluefield may in its sole discretion provide to the City for its review a Conceptual Design for a Project on the Candidate Parcel. The Conceptual Design shall include a legal description prepared by a licensed surveyor of the boundaries of the proposed Project Area, a statement of the amount of the calculated Project Payment and a statement of the amount of the Long Term Maintenance Payment.

2.3 Project Approval.

A. Upon receipt of a Conceptual Design including the legal description, the proposed amount of the Project Payment and the proposed amount of the Long Term Maintenance Payment, less any Proposed Deductions, the City shall have sixty (60) days (or such longer period as may be agreed upon in writing by the Parties) to approve in writing the Conceptual Design and the Project Payment less any Proposed Deductions or provide written Requested Modifications to Bluefield.

B.     Before approval of a conceptual design, the City department responsible for the Candidate Parcel will conduct public outreach to inform the community and take input on the design. Public input from that outreach will be incorporated into the project approval decision. At least ten (10) business days before approval of a conceptual design, the responsible City department will provide the City Council with a written summary of the design, the public comments received and how public comments were addressed in the approved project.

C.     If the City approves in writing the Conceptual Design, the amount of the Project Payment and the amount of the Long Term Maintenance Payment, less any proposed Deductions or Bluefield approves in writing the Requested Modifications, the Project shall become an Approved Project subject to the remaining terms of this Master Lease. If the City does not approve the Conceptual Design, the amount of the Project Payment and/or the amount of the Long Term Maintenance Payment, or if Bluefield does not approve any Requested Modifications, Bluefield shall have no further obligation under this Master Lease for such Candidate Parcel.

## 3. BLUEFIELD'S OBLIGATIONS.

3.1. Payment. Within thirty (30) days of each Project Approval Date, Bluefield shall make the first annual payment to the City of the Project Payment for the Approved Project less any proposed Deductions.

3.2. Performance. No more than eighteen (18) months after the Project Approval Date, Bluefield shall design and complete construction of the Approved Project. Bluefield shall provide the City with written notice when construction is complete. Bluefield shall monitor and maintain the habitat on each Project Area for ten (10) years from the date construction is completed on each Approved Project.

3.3. Long Term Maintenance Fund. At least six months prior to the expiration of the Project Term for each Approved Project, Bluefield shall make the Long term Maintenance Payment to the City. The City shall place the Longterm Maintenance Payment in a dedicated account to provide for the post-Project Term long term maintenance of each Approved Project.

## 4. THE CITY'S OBLIGATIONS.

4.1. Transfer of NRD Restoration Credits. The City hereby sells and assigns free and clear to Bluefield all rights, credits, and interests in the NRD Restoration Credits that are or may be generated by each Approved Project. The City acknowledges that Bluefield intends to attempt to sell these NRD Restoration Credits to third parties.

4.2. Leases. The City hereby grants to Bluefield leases for the Project Term of each Approved Project for access, ingress, egress, construction staging and lay-down, construction, operation, monitoring, repair, maintenance, and all other activities reasonably necessary for Bluefield to complete the Work.

## 5. LIMITATIONS ON LEASES.

5.1. Leases Limited to Work. Bluefield's leases do not extend to any activities other than the Work.

5.2. Compliance. In conducting the Work, Bluefield shall exercise due care and diligence, shall perform all aspects of the Work in a proper and workmanlike manner and shall comply with all Legal Requirements. Bluefield shall cause its employees, agents and subcontractors to comply with all Legal Requirements while performing the Work.

## 6. COORDINATION.

6.1 Non-Interference. The City and Bluefield hereby acknowledge the important purposes that the other Party will conduct at or from each Project Area. Each of the Parties agrees that its employees, agents and subcontractors shall coordinate with the management of the other Party to avoid, to the maximum extent feasible, interfering with the activities of the other Party at each Project Area.

6.2. Cooperation. The City shall cooperate with Bluefield's efforts to obtain approval of each Approved Project from the Trustee Agencies, Bluefield's efforts to obtain the maximum NRD Restoration Credits from each Approved Project, Bluefield's efforts to market and sell NRD Restoration Credits to potential purchasers, and Bluefield efforts to obtain federal, state, or local permits necessary for each Approved Project. The City shall sign any reasonable applications or requests which are required to be signed or recorded by the land owner in order to obtain necessary approvals.

6.3. Construction Timing. Bluefield shall give the City a minimum of five (5) business days notice prior to any activity on a Project Area that could cause temporary interruption of the City's business and business activities. Bluefield agrees to limit construction and maintenance of each Approved Project to times during normal business hours when it will least affect the activities and business at such Project Area.

## 7. CONSTRUCTION.

7.1. Construction Work Performed by Bluefield. All construction work conducted by Bluefield shall be performed by a licensed contractor in a proper and workmanlike manner. All construction work shall be performed in compliance with all applicable Legal Requirements. Bluefield shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Bluefield for the Work at each Project Area, which claims are or may be secured by any mechanic's liens. Upon completion of the Work for a particular Approved Project, Bluefield shall immediately deliver to the City "as-built" plans and specifications for the Approved Project.

7.2. Notice. Bluefield shall give the City notice of the date of commencement of the Work on each Project Area not less than ten (10) business days prior thereto.

## 8. INSURANCE.

8.1. Builder's Risk Insurance. Bluefield shall obtain and keep in force during the period of construction of each Approved Project, until completion of construction of each Approved Project, a policy of builder's completed value risk insurance against all risks of physical loss to any physical improvements on each Project Area in the amount of the guaranteed replacement cost of such physical improvements.

8.2. Bluefield's Liability Insurance. Bluefield shall obtain prior to commencement of construction of each Approved Project and keep in force thereafter throughout the remainder of the Project Term a policy of commercial general liability insurance on an occurrence policy form covering liability for personal injury occurring in, on or about such Project Area, with limits in the amount of at least One Million Dollars ($1,000,000) per occurrence combined single limit for injuries to or death of persons, and with a contractual liability endorsement insuring Bluefield's performance of Bluefield's obligation to indemnify the City contained in Paragraph 11.1. Bluefield also shall, at Bluefield's sole cost, obtain prior to commencement of construction of each Approved Project and keep in force thereafter throughout the remainder of each Project Term pollution legal liability and contractor's pollution legal liability insurance (as appropriate) on a claims made policy form covering Project Area damage and other pollution-related loss claims occurring in, on or about each Project Area, with limits in the amount of at least One Million Dollars ($1,000,000) on a claims made basis for a period of five to ten years (depending on availability) for Project Area damage and other pollution-related losses, and make commercially reasonable efforts to include a contractual liability endorsement insuring Bluefield's performance of Bluefield's obligation to indemnify the City contained in this Master Lease. Bluefield may provide such insurance coverage under blanket policies of insurance

8.3. Project Area Insurance. Bluefield shall obtain prior to commencement of construction of each Approved Project and keep in force thereafter throughout the remainder of the Project Term a policy or policies of insurance for the benefit of The City and Bluefield covering loss or damage to such Approved Project, in the amount of the full replacement value thereof, providing protection against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, special extended perils (all risk) and an inflation endorsement, but excluding earthquake coverage. Throughout the Project Term, Bluefield shall be responsible for paying any and all insurance deductibles and premiums. Bluefield may provide such insurance under blanket policies of insurance provided that such insurance is on an occurrence basis.

8.4. Workers' Compensation, Employer's Liability and Automobile Liability Insurance. Bluefield shall obtain and keep in force during the Project Term policies of insurance as follows:

A.    Workers' Compensation Insurance in an amount not less than that prescribed by law and covering employees of Bluefield engaged in the performance of activities under this Master Lease;

B.    Employers' Liability Insurance protecting Bluefield against common law liability in the absence of statutory liability, for employee bodily injury arising out of the master-servant relationship with a limit of not less than One Million Dollars ($1,000,000);

C. Automobile Liability Insurance (owned, non-owned and hired), including personal injury and Project Area damage, with a limit of One Million Dollars ($1,000,000) combined single limit.

D. Statutory United States Longshore & Harbor Workers Insurance. In the event that the placement is subject to a deductible, the amount and terms of the program will be detailed to the City.

8.5. Form, Additional Insureds and Certificates. Each policy of insurance required to be carried by Bluefield pursuant to this Master Lease shall be with a company rated A:IX or better in "Best's Insurance Guide" and shall name the City as an additional insured. Bluefield's insurance policies shall also be primary insurance, without right of contribution from any policy carried by the City, and shall contain a cross-liability and severability endorsement. A certificate of insurance (ACCORD form) and a copy of each policy shall be provided to the City, which indicates that the coverage required hereunder is in effect.

8.6. Payment. Bluefield shall pay all of the premiums and deductibles for any insurance obtained pursuant to this Master Lease.

8.7. Waiver of Subrogation. Bluefield and The City each hereby waives any and all rights of recovery against the other, and against the officers, employees, agents and representatives of the other, for loss of or damage to each Project Area of the waiving Party or each Project Area of others under its control, to the extent such loss or damage is covered by proceeds received under any insurance policy carried by the City or Bluefield and in force at the time of such loss or damage. Each of Bluefield and the City shall, upon obtaining the policies of insurance required hereunder or otherwise carried by such Party, give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Master Lease.

8.8. No Limitation of Liability. The City makes no representation that the limits of liability specified to be carried by Bluefield under the terms of this Master Lease are adequate to protect any Party. If Bluefield believes that the insurance coverage required under this Master Lease is insufficient to adequately protect Bluefield, Bluefield shall provide such additional insurance as Bluefield deems adequate.

8.9. Liability for Contamination. The City acknowledges that Bluefield is in no way liable or responsible for environmental contamination that may be present or discovered on each Project Area, except and only to the extent such contamination is exacerbated by the misconduct or negligence of Bluefield. If, during the course of the Work, Bluefield discovers evidence of environmental contamination that threatens human health or the environment, Bluefield will promptly notify the City so that the City may comply with Legal Requirements applicable to the discovery of such contamination. The City waives any argument that Bluefield is a potentially responsible or potentially liable party under Legal Requirements as an owner or operator of a Project Area or Approved Project.

9. UTILITIES. The City shall provide power and water to each Project Area as reasonably needed by Bluefield for completion of the Work. Bluefield shall pay the City for the cost of any such services it uses as reasonably determined by the City.

## 10.  MAINTENANCE AND REPAIRS.

10.1.  Bluefield's Obligations.  Following Bluefield's construction of each Approved Project, Bluefield shall keep such Approved Project in good and safe condition, order and repair for the remaining Project Term.

10.2.  No Obligations or Liability for The City.  The City shall not be obligated to make any repairs or replacements of any kind, nature or description whatsoever to each Approved Project or any portion thereof.  The City shall not be liable for any loss, damage or injury of any kind, nature or character to any person or Project Area arising from Bluefield's Work, or caused by any defect in an Approved Project, or caused by or arising from any act or omission of Bluefield or any of its agents, employees, or subcontractors, or by or from any accident on each Project Area, or any fire or other casualty thereon, or occasioned by the failure of Bluefield to maintain each Approved Project in a safe condition, unless such loss, damage or injury is caused by the City's intentional misconduct, negligence or violation of law.

## 11.  INDEMNIFICATION.

11.1.  Indemnification by Bluefield.  Bluefield shall indemnify, defend and hold harmless the City, its officers, directors, partners, employees, agents, representatives, affiliates, successors, assigns, and attorneys (collectively, "the City Indemnified Parties") from and against any and all claims, damages, demands, liens, claims of lien, losses, fines, penalties, judgments, actions, suits, injuries, costs, expenses or liability of any kind or nature which may be imposed on them, including, without limitation, reasonable attorney fees, expert fees and consultant fees, and other costs of legal defense actually incurred (collectively, "Liabilities"), whether direct or indirect, that the City Indemnified Parties, or any of them, may sustain or incur, or that may be imposed on or directed against any of them, arising out of or resulting from Bluefield's or its officers', directors', partners', employees', agents', representatives', affiliates', successors', assigns', and attorneys' negligence or violation of law during the Project Term.

11.2.  Indemnification by The City.  The City shall indemnify, defend and hold harmless Bluefield, its officers, directors, partners, employees, agents, representatives, affiliates, successors, assigns, and attorneys (collectively, the "Bluefield Indemnified Parties") from and against any and all claims, damages, demands, liens, claims of lien, losses, fines, penalties, judgments, actions, suits, injuries, costs, expenses or liability of any kind or nature which may be imposed on them , including, without limitation, reasonable attorney fees, expert fees and consultant fees, and other costs of legal defense actually incurred (collectively, "Liabilities"), whether direct or indirect, that the Bluefield Indemnified Parties, or any of them, may sustain or incur, or that may be imposed on or directed against any of them, to the extent arising out of or resulting from the city's or its officers', directors', partners', employees', agents', representatives', affiliates', successors', assigns', and attorneys' negligence or violation of law during the Project Term.

11.3.  Limitation.  Neither the City nor Bluefield shall be liable to each other for any consequential, exemplary, or punitive damages of any kind.

12.  LIENS.  Bluefield shall keep each Project Area free from any liens arising out of any work performed, materials furnished or obligations incurred by Bluefield.  In the event that Bluefield

shall not, within ten (10) days following notice of the imposition of any such lien, cause the same to be released of record, the City shall have, in addition to all other remedies provided herein and by law, the right, but not the obligation, to cause the same to be released by such means as it shall deem proper, including payment of the claim giving rise to such lien or the posting of a bond. All sums paid by the City for such purpose, and all expenses incurred by it in connection therewith, shall be payable to the City by Bluefield on demand.

13. ASSIGNMENT. Bluefield may assign this Master Lease and its rights hereunder to an LLC or corporation formed to perform the obligations under this Master Lease without the prior consent of the City, but with notice to the City. Bluefield may not otherwise assign this Master Lease without the prior written consent of the City, which consent shall not be unreasonably withheld. Any purported assignment not in accordance with the terms hereof shall at the City's option, to be exercised at any time after the City becomes aware of any such purported assignment, be void, and may at the City's option be treated as an Event of Default hereunder.

14. TERMINATION AND DEFAULT. A Party shall not be in default unless it fails to perform obligations required of it within the time set forth in this agreement, unless such time is extended by mutual written agreement of the parties, or, if no time frame is specified in this agreement, within a reasonable time, but in no event earlier than (30) days after written notice by the other Party, specifying wherein the Party has failed to perform such obligations; provided, however, that if the nature of Party's obligations is such that more than thirty (30) days is required for performance, then the Party shall not be in default if it commences performance within such thirty (30) day period and thereafter diligently prosecutes the same to completion.

15. CONDEMNATION. Should title to or possession of the whole of a Project Area be taken by a duly constituted authority in condemnation proceedings or should a partial taking render the remaining portions of a Project Area unfit for the Project, then either Party may at its election terminate such Approved Project by notice to the other Party given within sixty (60) days from the date of such taking. All damages for condemnation of all or part of each Project Area shall be equitably divided, *pro rata*, between the City and Bluefield in accordance with their respective interests at the time of such condemnation based upon the findings of the condemnation court.

16. DAMAGE AND DESTRUCTION. This Master Lease shall continue in full force and effect in the event of any damage to or destruction of a Project or a Project Area that is caused by an entity unrelated to Bluefield or an event unrelated to the Work, unless Bluefield elects, in its sole discretion, to terminate the Approved Project prior to completion of construction. If Bluefield does elect to terminate an Approved Project prior to completion of construction, Bluefield shall make commercially reasonable efforts to restore the Project Area, if possible, to a condition that is as good or better than it had before Project construction began. The insurance proceeds relating to any damage or destruction to such Project shall be equitably divided, *pro rata*, between the City and Bluefield in accordance with their respective interests at the time of damage or destruction to the Project based upon the findings of a consultant mutually agreed upon by the City and Bluefield.

17. SALE OR CONVEYANCE BY THE CITY. In the event of a sale or conveyance of a Project Area or any interest therein by the City, upon written assumption by the successor in interest of the City's obligations and liabilities under this Master Lease, the City shall thereby be released from any then current and any further liability upon any of the terms, covenants or

10

conditions (express or implied) herein contained in favor of Bluefield, and in such event, insofar as such transfer is concerned, Bluefield agrees to look solely to the responsibility of the successor in interest of the City in and to each Project Area and this Master Lease. This Master Lease shall not be affected by any such sale or conveyance, and Bluefield agrees to attorn to the successor in interest of such transferor.

18. COSTS, ATTORNEYS' FEES. In the event that either the City or Bluefield should bring suit for the recovery of any sum due under this Master Lease, or because of the breach of any provision of this Master Lease, or for any other relief against the other Party hereunder, then all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing Party therein shall be paid by the other Party, which obligation on the part of the other Party shall be deemed to have accrued on the date of the commencement of such action and shall be enforceable whether or not the action is prosecuted to judgment.

19. NOTICES. All notices herein required or permitted to be given or furnished under this Master Lease given by either Party to the other shall be in writing, and shall be deemed sufficiently given and served upon the other Party if sent by confirmed facsimile, hand delivery, reputable overnight courier or certified or registered mail, return receipt requested, postage prepaid. Notices shall be deemed delivered upon actual receipt by the addressee (or upon failure of the addressee to accept delivery). Notices shall be sent to the following addresses:

| If to Bluefield: | Scott Lockert |
| | Vice President |
| | Bluefield Holdings, Inc. |
| | 2505 Second Ave. |
| | Suite 602 |
| | Seattle, WA 98121 |
| | scottl@bluefieldholdings.com |

| If to the City: | Judith Noble |
| | Seattle Public Utilities |
| | 700 5th Ave. Suite 4900 |
| | PO Box 34018 |
| | Seattle WA 98124-4018 |
| | judith.noble@seattle.gov |

Each Party shall have the right, from time to time, to designate a different address by notice given in conformity with this Paragraph.

20. INDEPENDENT ACTIVITIES OF THE CITY AND BLUEFIELD. The Parties anticipate that Bluefield may sell NRD Restoration Credits to the City. The City acknowledges and agrees that Bluefield may make all decisions relating to any such sales of NRD Restoration Credits in a manner to protect the best interests of Bluefield in its capacity as seller of NRD Restoration Credits, without regard to the impact such decisions may have on the City, including, without limitation, the exercise of any rights and remedies available to Bluefield, at law, in equity or

11

under the documents evidencing any such sale of NRD Restoration Credits. The City further acknowledges and agrees that Bluefield would not have entered into the Master Lease, and would not sell any NRD Restoration Credits to the City, if this arrangement were not acceptable to the City.

21. DATA PUBLICATION. All data and information in hard copy, electronic, or any other format, disclosed to the City by Bluefield, developed by Bluefield or obtained by Bluefield from a party other than the City during the length of this Master Lease ("Data"), shall be and remain the sole Property of Bluefield. The City shall not assert, or allow persons performing under the City's control to assert, any rights to the Data or establish any claim under design, patent or copyright laws. It is expressly agreed that all copyrightable or patentable Data produced by Bluefield under the Master Lease are solely owned by Bluefield and that all copyrightable and other proprietary rights therein shall vest solely in Bluefield. Bluefield has the right to inform the general public about the Projects and the Work in the form of press releases, article in journals and/or other media outlets. Prior to the release of any such information, Bluefield shall provide the City with the opportunity to review all material intended for publication. Bluefield will take the City's comments into consideration in the final publication of the material. The Parties recognize that this Master Lease is a public record that is subject to disclosure under state law and that it will be published when it is submitted to the City Council for approval. Except in response to a request for public records and in provision of this Master Lease to the City Council, the City shall not publish any material that falls under the terms of this Master Lease and shall not provide information about Bluefield and the Projects, without the prior written approval of Bluefield.

22. TITLE AND AUTHORITY.

22.1. The City's Covenant. The City covenants and warrants that (i) it has the authority to execute this Master Lease and has the power to grant the rights hereunder; (ii) the person signing this Master Lease in its behalf has the authority to bind the City; (iii) and, to its knowledge, the execution and performance of this Master Lease will not violate the provisions of any mortgage, easement, license or other agreement binding upon the City.

22.2 Bluefield's Covenants. Bluefield covenants and warrants that (i) it has the authority to execute this Master Lease; (ii) the person signing this Master Lease in its behalf has the authority to bind Bluefield; and (iii) to its knowledge, the execution and performance of this Master Lease will not violate the provisions of any agreement binding on Bluefield.

23. TAXES AND ASSESSMENTS. Nothing contained in this Master Lease requires Bluefield to pay any taxes, assessments, rates, charges, license fees, municipal liens, levies, excises, or imposts, whether general or specific, or ordinary or extraordinary, of every name, nature and kind whatsoever, including all governmental charges of whatsoever name, nature or kind, which may be levied, assessed, charged or imposed, or which may become a lien or charge on or against each Project Area.

24. MISCELLANEOUS AND GENERAL PROVISIONS.

24.1. Recording. Bluefield shall file for record with the County Recorder of the county or counties in which each Project Area is located either this Master Lease or a recordable notice

or memorandum of this Master Lease. The parties shall take such actions and execute such additional documents, including copies of this Master Lease or a short form of this Master Lease as may be required to record evidence of this Master Lease for each Approved Project.

24.2. Entire Agreement. This Master Lease, inclusive of all Exhibits, contains the entire agreement between the parties as to the subject matter hereof and supersedes all previous written and oral negotiations, commitments, proposals and writings. All Exhibits attached hereto are hereby incorporated into this Master Lease.

24.3. Amendments. No amendments to this Master Lease may be made except by a writing signed by both Parties.

24.4. Counterparts. This Master Lease may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Master Lease may also be executed in multiple duplicate originals, each of which shall be fully effective and enforceable.

24.5. Successors and Assigns. This Master Lease shall be binding upon the successors, assigns, heirs, executors and administrators of each of the Parties hereto.

24.6. Governing Law. This Master Lease shall be governed by the laws of, and all actions in connection with this Agreement shall be brought and heard in, the State of Washington.

24.7. Interpretation. The terms and provisions of this Master Lease are not to be construed more liberally in favor of, or more strictly against, either Party. To the extent the mutual covenants of the Parties under this Master Lease create obligations that extend beyond the termination or expiration of this Master Lease, the applicable provisions of this Master Lease shall be deemed to survive such termination or expiration for the limited purpose of enforcing such covenants and obligations in accordance with the terms of this Master Lease. All article, paragraph or other headings appearing in this Master Lease are for convenience of reference only and shall be disregarded in construing this Master Lease.

24.8. Severability. If any provision of this Master Lease is unenforceable, the remaining provisions shall not be affected thereby but shall remain in full force and effect; provided, that the Parties shall attempt to amend this Master Lease to attempt to return the Parties to materially the same position had no such provision been found unenforceable.

24.9. No Partnership. Nothing contained in this Master Lease shall be construed to create any association, trust, partnership, or joint venture or impose a trust or partnership, duty, obligation, or liability or an agency relationship on, or with regard to, either Party. Neither Party hereto shall have the right to bind or obligate the other in any way or manner unless otherwise provided for herein.

24.10. Waiver. No failure or delay of any Party to exercise any power or right under this Master Lease shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power.

24.11. Quitclaim. At the expiration or earlier termination of this Master Lease, Bluefield shall execute, acknowledge and deliver to the City, within ten (10) days after written demand from the City to Bluefield, any quitclaim deed or other document that the City, in its sole discretion, deems necessary to remove the encumbrances created by this Master Lease from each Project Area. The provisions of this Paragraph shall survive the termination of this Master Lease.

24.12. Confidential Information. The proposed Conceptual Designs and Project Payments shall be treated as confidential information until approved under this Master Lease. Either Party may designate any other data, information, reports, or documents provided to the other as "Confidential Information." Except as required by law, neither Party shall, without the prior written consent of the other Party, disclose any Confidential Information obtained from the other Party to any third parties other than to any lender, professional advisers, or to employees each of whom have agreed to keep such information confidential as contemplated by this Master Lease and who need the information to assist either Party with the rights and obligations contemplated herein.

- IN WITNESS WHEREOF, the City and Bluefield have executed and delivered this Master Lease as of the latest date set forth below.

**THE CITY OF SEATTLE:**                    **BLUEFIELD, LLC:**

By: _____          By: _____
Name: _____          Name: _Shawn R T Severn_
Title: _____          Title: _President_
Date: _23 February 2009_               Date: _Feb 12, 2009_

**Notary**                              **Notary** _Glenda J. Croft_ Feb. 12, 2009
                                        exp. 9/21/12

14

Properties Subject to Master Lease or Street Use Permit

**West Side West Waterway: Spokane Street Bridge**

PID:                         7666703295
Address:                     SW KLICKITAT WY & S SPOKANE ST
Legal Description:           POR OF SD LOTS DAF - BEG AT NXN OF S MGN OF SW SPOKANE
                             ST WITH SWLY MGN OF DUWAMISH W WATERWAY TH S 41-06-
                             02 E ALG SD SWLY MGN 83.93 FT TH S 01-08-43 W 27.80 FT TH N
                             88-51-17 W 53 FT TH N 59-03-00 W 167.91 FT TH N 89-29-14 W 40 FT
                             TH N 00-30-46 E 6.91 FT TO S MGN OF SW SPOKANE ST TH ELY
                             ALG SD S MGN 182.35 FT TO TPOB

**Southwest Spokane Street:**

                             THAT PORTION OF SOUTHWEST SPOKANE STREET BETWEEN
                             THE WEST MARGIN OF THE WEST DUWAMISH WATERWAY
                             AND A LINE EXTENDING BETWEEN NORTHWEST CORNER OF
                             KING COUNTY PARCEL 7666703290 AND NORTHWEST CORNER
                             OF LOT 11, BLOCK 424 SEATTLE TIDELANDS EX 01 B 377-491.

**East Side West Waterway: Spokane St. Bridge**

PID:                         7666703000
Address:                     W MARGINAL WY & S SPOKANE ST
Legal Description:           SEATTLE TIDE LDS EXT #1 POR SD LOTS DAF - BEG NXN OF S
                             LN OF SW SPOKANE ST & NE MGN OF DUWAMISH WEST WW
                             TH S41-06-02E ALG SD NELY MGN 270.08 FT TH S88-51-58E PLW
                             SD S LN 168.92 FT TO NWLY MGN OF BN R/R R/W TH NELY ALG
                             SD R/W MGN 25.74 FT TO SWLY MGN OF KLIKITAT AVE SW TH
                             NLY ALG WLY MGN SD KLIKITAT AVE SW TO SLY LN SW
                             SPOKANE ST TH W TO POB LESS ST PER REC #8007140324

**West Waterway north of Spokane, south of Fisher Mill**

PID:                         7666703051
Address:                     3441 KLICKITAT AVE SW
Legal Description            SEATTLE TIDE LDS EXT #1

**Southwest Spokane Street, Southwest Klickitat Way and Parcel 7666703000:**

> THAT PORTION OF SOUTHWEST SPOKANE STREET ABUTTING LOT 15, BLOCK 408 SEATTLE TIDELANDS EX 01 B 377-491, KING COUNTY PARCEL 7666703000 AND THAT PORTION OF SOUTHWEST KLICKITAT WAY AS ESTABLISHED THROUGH ORDINANCES 95570, 99714, 114562 AND 115212; TOGETHER WITH THAT PORTION OF SOUTHWEST KLICKITAT WAY AS ESTABLISHED THROUGH ORDINANCES 95570, 99714, 114562 AND 115212; TOGETHER WITH KING COUNTY PARCEL 7666703000; AND TOGETHER WITH ANY PORTION OF LAND LYING BETWEEN THE WEST MARGIN OF SAID PARCEL AND THE EAST MARGIN OF THE WEST DUWAMISH WATERWAY.

**West Side East Waterway**

PID:                7666701030
Address:            S SPOKANE ST
Legal Description   SEATTLE TIDE LDS EXT # 1 LESS R/W

**SW Klickitat Way**

PID:                7666701160
Address:            SW Klickitat Way and 11th Ave SW
Legal Description:  SEATTLE TIDE LDS EXT #1 POR LOTS 1 THRU 3 NLY OF O W RR R/W LESS NP RR R/W & LESS ST

**SW Spokane Street**

PID:                7666701156
Legal Description:  SEATTLE TIDE LDS EXT # 1 POR LOTS 1 THRU 3 LY W OF OW RR R/W LESS ST & LESS BN R/W

**Georgetown Steamplant Pump Station**

PID:                2136200666
Address:            7551 8TH AV S
Legal Description:  DUWAMISH INDUSTRIAL ADD LESS BEG AT NE COR TH S ALG E LN 245 FT TH SWLY TO SW COR TH N ALG W LN 316.01 FT M/L TO NE COR TH E 70 FT TO BEG

**Duwamish-Delridge Transmission Line R/W No 1**

| | |
|---|---|
| PID: | 0423049130 |
| Address: | 11100 E MARGINAL WY S |
| Legal Description: | C OF S TRANS LN R/W OVER GL 4 & 5 TGW SE 1/4 LESS ST HWY TGW 250 FT R/W OVER TRACT 55 OF MOORES FIVE-ACRE TRACTS & VAC G FRAIEGER RD LESS ST HWY |


**Duwamish Waterway Park**

| | |
|---|---|
| PID: | 7327902355 |
| Address | 10TH AV S |
| Legal Description | RIVER PARK ADP LOTS 43-44-45 & 46 TGW POR VAC ST ADJ LESS CWW DIST NO 1 |


**North of 1st Ave South Bridge**

| | |
|---|---|
| PID: | 5367202410 |
| Address: | 6501 1ST AV S |
| Legal Description | MC LAUGHLINS WATER FRONT ADD LESS COML W WAY #1 |


**South of 1st Ave South Bridge**

| | |
|---|---|
| PID: | 5367202510 |
| Address: | Peninsula Place |
| Legal Description | MCLAUGHLINS WATER FRONT ADD PORTION OF BLKS 31 & 32 TGW VAC STREETS ADJ LY SW OF CWW #1 DAF - BAAP OPP HES 406+74.66 ON LS LINE SURVEY OF SR 99 - DUWAMISH WATERWAY VICINITY AND 40.00 FT NWLY THEREFROM TH NELY PLW SD LS LINE SURVEY TAP OPP HES LS 409+27.81 THEREON TH NWLY TAP OPP HES LS 409+73.72 ON SD LS LINE SURVEY AND 80.00 FT NWLY THEREFROM TH SWLY PLW SD LS LINE SURVEY TAP OPP HES LS 406+71.31 THEREON TH ELY TO THE POB - ACCORDING TO Q.C.D. FILED UNDER REC NO 20051129002581 |

**South of 1st Ave South Bridge**

| | |
|---|---|
| PID: | 5367202518 |
| Address: | Near Peninsula Place |

Legal Description  MCLAUGHLINS WATER FRONT ADD TGW VAC FIRST AVE SOUTH AS PROVIDED BY C.O.S. ORD NO 94862 LESS POR ACQUIRED BY C.W.W. DIST NO 1 FOR DUWAMISH WATERWAY DAF - BAAP OPP HES LS 410+55.12 ON LS LINE SURVEY OF SR 99 DUWAMISH WATERWAY VICINITY AND 139.47 FT NWLY THEREFROM SD PT BEING ON SWLY MGN OF DUWAMISH WATERWAY TH SWLY TAP OPP HES LS 410+51.69 ON SD LS LINE SURVEY AND 141.51 FT NWLY THEREFROM TH SELY TAP OPP HES LS 410+20.98 ON SD LS LINE SURVEY AND 99.30 FT NWLY THEREFROM TH SWLY TAP OPP HES LS 410+03.93 ON SD LS LINE SURVEY AND 106.32 FT NWLY THEREFROM TH SELY TAP OPP HES LS 409+73.72 ON SD LS LINE SURVEY AND 80.00 FT NWLY THEREFROM TH SELY TAP OPP HES LS 409+27.81 ON SD LS LINE SURVEY AND 40.00 FT NWLY THEREFROM TH NELY PLW SD LS LINE SURVEY TAP OPP HES LS 409+82.75 THEREON SD PT BEING ON SWLY MGN OF DUWAMISH WATERWAY TH NWLY ALG SD SWLY MGN TO POB AKA - SEAVIEW PARK

**Cambridge Corridor Transmission Line R/W**

| | |
|---|---|
| PID: | 5624200992 |
| Address: | 9401 E MARGINAL WY S |

Legal Description:  MOORES FIVE-ACRE TRS POR & POR VAC ST ADJ DAF-BEG AT INTRSN OF NLY LN OF 64 & WLY MGN OF E MARGINAL WAY TH SELY 60.16 FT TH S 62 DEG 01 MIN 41 SEC W TO ELY MGN OF DUWAMISH WATERWY TH N 15 DEG 00 MIN 00 SEC W TO NLY LN OF 56 TH NELY ALG SD NLY LN & SD LN PROD TO C/L OF VAC FRANCIS AVE TH SLY ALG C/L TO NLY LN OF 64 PROD SWLY TH NELY ALG NLY LN SD 64 TO BEG

**2nd Ave S**

Legal Description  THAT PORTION OF 2ND AVENUE SOUTH BETWEEN THE WEST MARGIN OF THE DUWAMISH WATERWAY AND A LINE EXTENDED BETWEEN THE SOUTH MARGINS OF LOT 13, BLOCK 6 PORTLAND AND PUGET SOUND RAILWAY ADDITION AND LOT 57, BLOCK 5 PORTLAND AND PUGET SOUND RAILWAY ADDITION.

**S. Orchard St**

Legal Description  THAT PORTION OF SOUTH ORCHARD STREET BETWEEN THE WEST MARGIN OF THE DUWAMISH WATERWAY AND A LINE

EXTENDED BETWEEN THE SOUTHWESTERLY MARGINS OF LOT 1, BLOCK 1 PORTLAND AND PUGET SOUND RAILWAY ADDITION AND LOT 1, BLOCK 7 PORTLAND AND PUGET SOUND RAILWAY ADDITION.

**8th Ave S**

Legal Description

THAT PORTION OF 8TH AVENUE SOUTH BETWEEN THE EAST MARGIN OF THE DUWAMISH WATERWAY AND A LINE EXTENDING PERPENDICULAR BETWEEN THE MARGINS OF 8TH AVENUE SOUTH, ORIGINATING FROM THE POINT OF INTERSECTION OF THE EAST AND NORTHWEST MARGINS OF KING COUNTY PARCEL 2136200666.

**10th Ave S**

Legal Description:

THAT PORTION OF 10TH AVENUE SOUTHWEST BETWEEN THE SOUTH MARGIN OF SOUTHWEST SPOKANE STREET AND A LINE EXTENDING BETWEEN THE SOUTH MARGINS OF KING COUNTY PARCEL 7666701046 AND KING COUNTY PARCEL 7666701221; TOGETHER WITH KING COUNTY PARCEL 7666701030; TOGETHER WITH ANY PORTION OF LAND LYING BETWEEN THE EASTERLY MARGIN OF KING COUNTY PARCEL 7666701030 AND THE WEST MARGIN OF THE EAST DUWAMISH WATERWAY.

**APPENDIX D**



20110330000737
CITY OF SEATTL COV        121.00
PAGE-001 OF 060
03/30/2011 13:35
KING COUNTY, WA

**Return Address:**

LAURA WISHIK
SEATTLE CITY ATTORNEYS OFFICE
PO BOX 94769
SEATTLE, WA 98124-476

---

Please print or type information **WASHINGTON STATE RECORDER'S Cover Sheet** (RCW 65.04)

**Document Title(s)** (or transactions contained therein): (all areas applicable to your document **must** be filled in)

1. ENVIRONMENTAL COVENANT AND ACCESS AGREEMENT

3. _____  4. _____

---

**Reference Number(s) of Documents assigned or released:**  N/A

Additional reference #'s on page _____ of document

---

**Grantor(s)** Exactly as name(s) appear on document

1. CITY OF SEATTLE, WA, a municipal CORPORATION

2. _____

Additional names on page N/A of document.

---

**Grantee(s)** Exactly as name(s) appear on document

1. NATIONAL OCEANAGRAPHIC AND ATMOSPHERIC ADMIN., DEPT OF COMMERCE

2. US FISH + WILDLIFE SERVICE, US Dept of Interior

Additional names on page 1 of document.

---

**Legal description** (abbreviated: i.e. lot, block, plat or section, township, range)

THAT PORTION OF THE SW SPOKANE STREET BETWEEN THE WEST MARGIN
OF THE WEST DUWAMISH WATERWAY AND LINE EXTENDING BETWEEN NW

Additional legal is on page 1 of document.        CORNER OF KING COUNTY PARCEL
7666703295

---

**Assessor's Property Tax Parcel/Account Number** ☐ Assessor Tax # not yet
assigned          7666703295

The Auditor/Recorder will rely on the information provided on this form. The staff will not read the document
to verify the accuracy or completeness of the indexing information provided herein.

---

"**I am signing below and paying an additional $50 recording fee** (as provided in RCW 36.18.010 and
referred to as an emergency nonstandard document), because this document does not meet margin and
formatting requirements. Furthermore, I hereby understand that the recording process may cover up or
otherwise obscure some part of the text of the original document as a result of this request."

_____ Signature of Requesting Party

**Note to submitter:** Do not sign above nor pay additional $50 fee if the document meets margin/formatting requirements

AFTER RECORDING RETURN TO:

Laura Wishik, Esq.
Director, Environmental Protection Section
P. O. Box 94769
Seattle, WA 98124-476

# ENVIRONMENTAL COVENANT AND ACCESS AGREEMENT

| | |
|---|---|
| Grantor(s): | City of Seattle, Washington, a municipal corporation |
| Holders(s): | National Oceanic and Atmospheric Administration, on behalf of the Department of Commerce |
| | U.S. Fish and Wildlife Service, on behalf of the United States Department of the Interior |
| | Washington Department of Ecology, on behalf of the State of Washington |
| | The Muckleshoot Indian Tribe |
| | The Suquamish Tribe |
| Short Legal Description: | That portion of the Southwest Spokane Street between the West Margin of the West Duwamish Waterway and a line extending between the northwest corner of King County parcel 7666703290 and the northwest corner of lot 11 [Complete legal description in Attachment A.] |
| Assessor's Property Tax Parcel/Account Number(s): | 7666703295 [as designated on the map attached to this covenant (Attachment B)] |

## I.    Purpose and Background

This Environmental Covenant and Access Agreement (Covenant and Agreement) is made and entered into by the individual natural resource trustees who are members of the Elliott Bay Trustee Council, which is comprised of the National Oceanic and Atmospheric Administration ("NOAA"), through the Department of Commerce; the United States Department of the Interior, on behalf of the U.S. Fish and Wildlife Service; the Washington Department of Ecology, on behalf of the state of Washington; the Muckleshoot Indian Tribe; and the Suquamish Tribe (collectively, "the Elliott Bay Trustees" or "Trustees") and the City of Seattle, Washington ("City," "Grantor" or "Owner") (together "the Parties" and individually as a "Party").

The Trustees, under the authority of Section 107(f) of the Comprehensive Environmental Response, Cleanup and Liability Act ("CERCLA"), 42 U.S.C. § 9607(f); Section 1006(b) of the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. 2706(b); and, 40 C.F.R. Part 300, subpart G, serve as trustees for natural resources for the assessment and recovery of damages for injury to, destruction of, or loss of natural resources under their trusteeship located in or proximate to the Lower Duwamish River, including the Lower Duwamish Waterway, Harbor Island Waterway and Lockheed West Site (hereinafter all three will be referred to as LDR).

The Lower Duwamish Waterway, which is part of LDR, is listed on the National Priorities List as a federal Superfund site, pursuant to Section 105 of CERCLA, 42 U.S.C. § 9601 et seq. and as amended.  Harbor Island and Lockheed West and its associated waterways are immediately downstream from the Lower Duwamish Waterway and these are also federal Superfund sites pursuant to CERCLA.  The Trustees have carried out and/or are carrying out damage assessments for the LDR and anticipate bringing claims for damage to natural resources under CERCLA.

The Grantor owns the property described in Attachments A and B located in or proximate to the LDR in Seattle, Washington (hereinafter referred to as "the Property").

Bluefield Holdings, Inc. ("Bluefield") is a business entity that designs, builds, and maintains natural resource restoration and enhancement projects on behalf of persons that are liable for natural resource damages at properties that have been identified as Superfund sites and/or otherwise suffer a loss of natural resources pursuant to CERCLA. Such Projects may be assigned ecological credit to be sold to potentially responsible parties liable for natural resource damages along the LDR.

The City of Seattle is working collaboratively with Bluefield to generate natural resource restoration and enhancement projects on properties owned by the City and located in or proximate to the LDR. Such collaboration is documented through the Master Lease Agreement executed between Bluefield and the City of Seattle on February 23, 2009, and approved by the City Council on June 30, 2008 (hereinafter Lease and attached hereto as Attachment C). Ordinance Number 122729 (Attachment D) authorized the Lease and issued a ten year Street Use Permit, (Use Permit and set forth in Attachment D) to Bluefield to facilitate Bluefield's of design, construction, and maintenance of the natural resource habitat restoration project described in Attachment E and which is to be constructed on the Grantor's Property.

The project term under the Lease between Bluefield and the City for each of the Candidate Parcels is for 24 months or completion of the construction of each Project, whichever is sooner, and continues for an additional ten years after completion of construction of the Project as authorized by the Use Permit. Upon expiration of the Lease, the City will maintain the Project in perpetuity consistent with the rights, obligations and terms set forth below.

NOW, THEREFORE, in consideration of the foregoing recitals the Parties mutually agree as follows:

## II.  Conveyance and Covenant

This instrument grants a valid and enforceable environmental covenant pursuant to the Washington State Uniform Environmental Covenant Act, RCW Chapter 64.70 *et seq.*, (the Act) imposing certain conditions and restrictions on real property located in King County, Washington. The covenants and access rights granted in this instrument are required conditions as a result of the Project being established along the LDR by

3

Bluefield pursuant to the procedures set out in the Natural Resource Restoration and Enhancement Credit Protocol (Protocol) attached as Attachment F.

Grantor covenants to the Holder and its assigns, that Grantor holds a fee simple or other real property interest in the Property that allows Grantor to enter into and comply with this Covenant and Agreement.

With this Covenant and Agreement, Grantor hereby binds Grantor, its successors, and assigns, to the restrictions and conditions set forth herein, and conveys to the Holder full rights provided by RCW Chapter 64.70 to enforce the restrictions, conditions, or other rights set forth herein.

Grantor makes the following covenant as to limitations, restrictions, and uses to which the Property may be put and specifies that such covenants shall run with the land, as provided by law, shall be perpetual, and shall be binding on all parties and all persons claiming under them, including the Owner of any portion of or interest in the Property:

1. The Property is designated to be used for the Project as set forth in Attachment E, and any authorized uses of the Property cannot be inconsistent with the habitat restoration requirements described therein.

2. The Property or portion thereof is identified as the location the Project as set forth in Attachment E and, except as provided in Paragraph II.3 below, any authorized use of the Property cannot be inconsistent with the habitat restoration requirements described therein.

3. The Property or a portion of the Property subject to this covenant is legally designated as a City Right of Way ("ROW") whose primary use is for transportation purposes. The habitat project will be complementary to and will coexist with the ROW use. Further, by making this covenant, the City does not abrogate its obligation, duty or authority to use the Property for transportation purposes, and to that end, nothing in the covenant shall be construed to limit the City's right and authority to add new transportation improvements or structures, and/or conduct maintenance and repair, reconstruction and/or replacement work on any improvements and/or structures currently existing on or adjacent to the Property so long as upon completion of the work, the City causes to be restored or replaced the ecological value and function that was impacted by such work.

4. Except as provided in Paragraph II.3 above, all of the following activities are strictly prohibited: any activity that interferes, damages or disturbs the integrity or maintenance of the Project; any activity that would degrade or diminish the ecological values of the habitat or its function as a habitat; any activity that causes the release or exposure to the environment of any hazardous substances at the Project; or any activity that would otherwise interfere with the Project such that it would adversely affect the likelihood of success of the Project located on the Property. Some non-exclusive examples of activities that may be prohibited in the habitat restoration projects based on the foregoing criteria include the following: dredging, or excavating, logging, land clearing, residential development, commercial development. Nothing in this section is to be construed to prohibit public access to the habitat restoration projects so long as such public access is accomplished in a manner that does not interfere with, damage or diminish the ecological value or function of the projects.

3. The Grantor must restrict leases to uses and activities consistent with this Covenant and Agreement and notify all lessees of the restrictions on the use of the Property.

4. No major maintenance or construction project shall be permitted on the Property without prior written notice to each of the Holders.

5. The Grantor shall allow authorized representatives of the Holders the right to enter the Property at reasonable times to undertake the following activities:

a. Evaluation or inspection of the Project, including but not limited to the monitoring and assessing progress on the construction, operation, maintenance and performance of the Project;

b. Verification of any data or information submitted to the Trustees;

c. Inspection and duplication of records, operation logs, contracts or other documents maintained or generated by the Grantor or its contractors hereafter retained to perform work undertaken pursuant to the Project; and

d. Conducting such tests, investigations or sample collections as deemed necessary to monitor compliance with the Project, investigate or assess contamination at or near the Property, or to assist in further identifying and quantifying natural resource injuries requiring restoration actions and in planning and carrying out further restoration

actions. Such access includes reasonable access to adjacent properties owned and/or controlled by the Grantor where access may be necessary to effectuate the rights to access the Project and/or Property on which the Project is located, unless access to adjacent properties will create undue risk of physical injury or harm and/or will interfere with essential operations on the adjacent properties.

       e. To the extent the Property is not open to public access, the Trustees shall provide 72 hour notice of the Trustees' desire to access the Property. Trustees have authority to enter freely and move about such Property at all reasonable times and for purposes of overseeing requirements of the Project.

      6. The Grantor covenants that it will not sell the Property or its legal interest in a Property to any person or otherwise utilize the Property for purposes other than as a ROW as provided in Paragraph II.2., above, and the Project.

## III.   Reservation of Rights

Grantor hereby reserves unto itself, its representatives, heirs, assigns, and successors all rights accruing from ownership of the Property that are not conditioned, restricted or prohibited by Section II.

## IV.   Enforcement

Compliance with this Covenant and Agreement may be enforced pursuant to the Washington State Uniform Environmental Covenant Act. The Holders shall have full enforcement rights. Failure by any party to enforce compliance with this Covenant and Agreement in a timely manner shall not be deemed a waiver of the party's right to take subsequent enforcement actions.

## V.   Recordation

Grantor shall record this instrument in the official records of King County, Washington or other such County in which the Property may be located and shall pay the costs associated with recording. The Parties shall take such actions and execute such additional documents, including copies of this Covenant and Agreement or a short form

of such document as may be required to record evidence of this Covenant and Agreement for the Property.


## VI. Bluefield Leasehold and Permit

The Grantor and the Trustees agree that there is a mutual interest in ensuring that the Project is completed. In the event that Bluefield has sold any Interim Natural Resource Damage Credits, as that term is defined under Paragraphs 1.7.1, 3.1 and 3.2 of the Protocol, but is unable to fulfill its obligation to complete the Project, the Grantor agrees that the Trustees may, in the Trustees' sole discretion, assume the same rights that Bluefield holds under the Lease and Permit issued for the habitat project on the Property. All rights held by Bluefield under the Lease that are necessary to complete the construction, operation, maintenance and stewardship of the Project on the Property, and only such rights, shall be the rights that the Trustees' may elect to assume.

Upon the expiration of the Lease with Bluefield, the Grantor will be responsible for maintaining vegetation and other habitat attributes, for controlling invasive vegetation and debris removal, and for undertaking corrective actions for any perturbation that affects the ecological integrity of the Project. The Parties' intention is that the Grantor will, as required by this Covenant and Agreement, maintain the ecological function provided by the Project by the Grantor in perpetuity.


## VII.    Termination and Modification

This Covenant and Agreement may only be amended or terminated in accordance with the procedures and process contained in the amendment and termination provisions of the Washington State Uniform Environmental Covenant Act, RCW 64.70.100 and as set forth herein. Pursuant to Section 64.70.100 of the Act, the Trustees reserve the right to revise the Project as described in Attachment E. In the event that the Project is significantly altered, revised or otherwise changed, the Grantor will record a description of the modified Project along with an amended Covenant and Agreement.

## VIII. Miscellaneous

1. _Covenant Limitations._ This Covenant and Agreement shall not be used as evidence of the Grantor's alleged liability in any action or proceeding other than an action or proceeding to enforce the terms of this Covenant and Agreement.

2. _Failure by the City to Comply with this Covenant and Agreement._ If the Grantor fails to comply with any of the terms and conditions of this Covenant and Agreement, the Holders have the right to enforce the environmental covenants noted herein pursuant to the Washington State Uniform Environmental Covenant Act, RCW 64.70 _et seq_ to enforce the environmental covenants noted therein.

3. _Sale or Conveyance of a Candidate Parcel/Project Site by the City._ Pursuant to the terms and conditions of this Covenant and Agreement, the Grantor agrees that it will not sell or otherwise relinquish its interest in the Property, but will hold its interest in the Property and preserve the Property so as to maintain the integrity of the Project in perpetuity.

4. _Notices._ Whenever notice is required to be given or a document is required to be sent by one Party to another under the terms of this Covenant and Agreement, it will be directed to the individuals at the addresses specified below, unless those individuals or their successors give notice of a change to the other Parties in writing. Written notice as specified constitutes complete satisfaction of any written notice requirement of the Covenant and Agreement for the Parties:

As to the United States and as to the Trustees:

Craig O'Conner
Special Counsel
General Counsel of Natural Resources
National Oceanic and Atmospheric Administration
7600 Sand Point Way
Seattle, WA

As to the City:

Judith Noble
Strategic Advisor
Corporate Policy and Performance

Seattle Public Utilities
700 5th Ave. Suite 4900
PO Box 34018
Seattle WA 98124-4018
e-mail: judith.noble@seattle.gov
Phone: 206-684-8078

and to:

Laura Wishik
Director, Environmental Protection Section
Seattle City Attorney's Office
P.O. Box 94769
Seattle, WA 98124-4769
e-mail: laura.wishik@seattle.gov
Phone: 206-684-8199

5. Entire Covenant and Agreement. This Covenant and Agreement, inclusive of all Attachments, contains the entire agreement between the Parties as to the subject matter hereof and supersedes all other agreements.

6. Obligations. To the extent there are any conflicts between the terms and obligations of the Lease and those of the Covenant and Agreement, the terms and conditions of the Covenant and Agreement control.

7. Limitation. Nothing in this Covenant and Agreement shall be construed as obligating the United States, the state of Washington, the Tribes, or any of their officers, agents or employees, to expend any funds in excess of appropriations authorized by law.

IX.     Agreement By The City To Add Restrictive Covenants, Conservation Easements, or Other Limitations On Use or Development Upon Request.

If the Trustees determine that the Property covered by this Agreement require protections in addition to those afforded under this Agreement by the Washington State Uniform Environmental Covenant Act, then the City shall implement such protections requested by the Trustees, so long as the scope of those protections are reasonable and conform to the rights retained by the City in Section II.2. of this Agreement and the City has legal authority to implement such additional protections. The Trustees may request

9

such additional protections based on any legal authority available to the City, including but not limited to common law authorities.

## X.    Signature and Acknowledgements

Grantor covenants that it is authorized to grant this Covenant and Agreement and shall warrant and defend the same against all claims and demands challenging such authority. The undersigned parties represent and certify that they are authorized to execute this Covenant and Agreement.

IN WITNESS WHEREOF, the City of Seattle, Grantor has executed this Environmental Covenant and Access Agreement on this 29th day of March, 2011.

Signatory's printed name _PETER HAHN_

Signature _[signature]_
City of Seattle

STATE OF _Wa_ )
COUNTY OF _King_ )

The foregoing instrument was acknowledged and signed in my presence on the 29th day of _March_, in the year _2011_, by the person(s) who appeared before me and who acknowledged it to be his/her/their free and voluntary act.

Name (signature) _Gretchen M. Haydel_

Notary Public for the state of _Washington_

My Commission expires on _July 9, 2012_

Printed Name _Gretchen M. Haydel_

GRETCHEN M. HAYDEL
COMMISSION EXPIRES
NOTARY
PUBLIC
JULY 9, 2012
STATE OF WASHINGTON

The foregoing Environmental Covenant and Access Agreement for the property owned by the City of Seattle, and on which Bluefield Holdings, Inc. will construct a restoration project, is hereby approved and certified.

National Oceanic and Atmospheric Administration, on behalf of the Dept. of Commerce and United States Fish and Wildlife Service

By: _____

    On behalf of NOAA and USFWS
    Craig O'Connor, Special Counsel
    General Counsel for Natural Resources

The foregoing Environmental Covenant and Access Agreement for the property owned by the City of Seattle, and on which Bluefield Holdings, Inc. will construct a restoration project, is hereby approved and certified.

The Muckleshoot Indian Tribe:

By: _____     11-5-10
     Virginia Cross,  Chairman                    Date

The forgoing Environmental Covenant and Access Agreement for the property owned by the City of Seattle, and on which Bluefield Holdings, Inc. will construct a restoration project, is hereby approved and certified.

The Suquamish Tribe:

By: _____    9/7/10
       Leonard Forsman, Chairman       Date

The foregoing Environmental Covenant and Access Agreement for the property owned by the City of Seattle, and on which Bluefield Holdings, Inc. will construct a restoration project, is hereby approved and certified.

Washington State Department of Ecology:

By: JAMES J. PONDOWSKI by Kale          9/20/10

James J. Pendowski
Manager, Toxics Cleanup Program          Date

Attachment A
Legal Description

## Site 01 – Legal Description

West Side West Waterway: Spokane Street Bridge

PID:                    7666703295

Address:                SW KLICKITAT WY & S SPOKANE ST

Lat/Long:               47° 34.295'N, 122° 21.347'W

Legal Description:      POR OF SD LOTS DAF - BEG AT NXN OF S MGN OF SW SPOKANE ST WITH SWLY
                        MGN OF DUWAMISH W WATERWAY TH S 41-06-02 E ALG SD SWLY MGN 83.93
                        FT TH S 01-08-43 W 27.80 FT TH N 88-51-17 W 53 FT TH N 59-03-00 W 167.91 FT
                        TH N 89-29-14 W 40 FT TH N 00-30-46 E 6.91 FT TO S MGN OF SW SPOKANE ST
                        TH ELY ALG SD S MGN 182.35 FT TO TPOB

Southwest Spokane Street:

                        THAT PORTION OF SOUTHWEST SPOKANE STREET BETWEEN THE WEST MARGIN
                        OF THE WEST DUWAMISH WATERWAY AND A LINE EXTENDING BETWEEN
                        NORTHWEST CORNER OF KING COUNTY PARCEL 7666703290 AND NORTHWEST
                        CORNER OF LOT 11, BLOCK 424 SEATTLE TIDELANDS EX 01 B 377-491.

Attachment B
Vicinity Map

# Vicinity Map





1. West Side West Waterway

Attachment C
Duwamish River Corridor
Master Agreement

# Duwamish River Corridor Master Agreement
## Relating to a Lease and Permits for Habitat Construction and Maintenance

This Master Lease for Habitat Construction and Maintenance for the construction and maintenance of habitat along the Duwamish River in Seattle, Washington (the "Master Lease"), is made and entered into as of the Effective Date below by and between a Washington LLC formed by Bluefield Holdings Inc. ("Bluefield") and the City of Seattle (the "City") (sometimes referred to collectively as the "Parties" and individually as a "Party").

## RECITALS

The Duwamish River is a vital economic and natural resource to the City and its citizens.

The Duwamish River has been the site of more than 150 years of industrial development.

The Duwamish River is habitat for threatened and endangered species, including salmon, and other species of environmental, economic, and cultural importance.

The Duwamish River is an important natural and cultural resource for Tribal nations and other public trustees in the south Seattle area.

The Lower Duwamish River is a federal Superfund site and is being assessed by Tribal nations and other public trustees for damages to natural resources.

Resolution of claims for natural resource damages will enhance habitat restoration, increase certainty for continued commerce and economic development along the Duwamish and enhance public access to the Lower Duwamish River.

The City manages Street Right-of-way and owns Property along the Duwamish River in Seattle, Washington, that is operated by various City agencies including the Department of Parks and Recreation, Seattle City Light, and the Department of Transportation. Bluefield is in the business of designing, building, and maintaining natural resource damage restoration projects that generate Natural Resource Damage Restoration Credits (defined below). Bluefield is also in the business of selling Natural Resource Damage Restoration Credits to parties that desire to settle their potential liability to Trustee Agencies (defined below).

The City wishes to lease certain properties to Bluefield for the purpose of design, construction and maintenance of natural resource habitat restoration projects.

The City wishes to consider term permits issued by the City Council for the use of for certain street rights-of-way as described in the Attachments, subject to providing for

transportation and utility needs, for the purpose of design, construction and maintenance of natural resource habitat restoration projects.

The City wishes that Bluefield's restoration on City land serves as a starting point for further habitat restoration by Bluefield on private lands in the Duwamish Superfund site.

Bluefield wishes to design, construct, and maintain natural resource habitat restoration projects on the City's properties in order to generate Natural Resource Damage Restoration Credits that it may sell to third parties.

In consideration of the mutual promises and covenants set forth below, the adequacy of which is hereby acknowledged, the Parties agree as follows:

## 1. DEFINITIONS.

As used herein the following capitalized terms have the respective meanings ascribed to them below. Additional definitions are also contained within the text of this Master Lease.

"Approved Project" means a Project for which the City, in its sole discretion, has approved the Conceptual Design or for which Bluefield, in its sole discretion, has accepted the Requested Modifications thereto.

"Candidate Parcel" means parcels of real property owned and operated by the City, located along or near the Duwamish River, and listed on Exhibit A attached.

"Conceptual Design" means a preliminary design that Bluefield may, in its sole discretion prepare for a project

"Deductions" means any reductions in the Project Payment that Bluefield may, at its sole discretion, propose to cover costs not related to habitat restoration on a Candidate Parcel, including (without limitation) cleanup of environmental contamination, removal of structures, capital improvements, etc.

"Effective Date" means the latest date this Master Lease has been executed by both Parties as set forth on the signature page hereto.

"Independent Appraiser" means a licensed real estate appraiser agreed upon by both Parties. The Parties have agreed that Greenleaf shall be the initial Independent Appraiser.

"Legal Requirements" means any and all covenants, conditions, restrictions, easements and rights-of way on, against or otherwise encumbering a Project Area and all applicable laws, orders, permits, ordinances, statutes, rules, requirements and regulations of federal, state, county and municipal authorities now or hereafter in effect and applicable to a Project Area.

"Long Term Maintenance Payment" means the one-time payment Bluefield will make to the City for the post-Project Term long term maintenance of each Approved Project and will be calculated as follows: Bluefield, at its sole cost and expense, shall have an independent consultant prepare a scope of work and cost estimate for long term maintenance of each Project Area. A discount rate of five percent (5.00%) shall be applied to the cost estimate to determine the amount of the one-time payment.

"NRD Restoration Credits" means the metric used by Trustee Agencies to measure the value of the Project in terms of restoration of natural resources. NRD Restoration Credits may consist of discounted service acre years using habitat equivalency analysis or resource equivalency analysis, or any other metric used by Trustee Agencies to value the natural resource damage restoration potential of an Approved Project.

"Project" means the natural resource habitat restoration project designed to obtain NRD Restoration Credits that Bluefield may propose to construct at a Candidate Parcel

"Project Approval Date" means the date a Conceptual Design or Requested Modifications thereto is approved.

"Project Area" means that certain portion of a Candidate Parcel where Bluefield may propose to locate a Project.

"Project Payment" means the annual payments Bluefield will make to the City for a particular Approved Project and shall be calculated as follows: Bluefield, at its sole cost and expense, shall have the Independent Appraiser conduct an appraisal to determine the fair market value of the Project Area as defined in the legal description included with the Conceptual Design. An annual percentage rate of return of ten percent (10.00%) shall be applied to the appraised value of each Project Area that is located on a street end to determine the annual payment amount. An annual percentage rate of eight (8.00%) shall be applied to the appraised value of all other Project Areas to determine the annual payment amount.

"Project Term" means the time period commencing on the Project Approval Date and continuing for twenty-four (24) months or completion of construction of each Approved Project, whichever is sooner, and then continuing for a period of ten (10) years after completion of construction of each Approved Project, unless sooner terminated as provided herein. Construction shall be deemed to be complete when the habitat improvements have been installed according to the Conceptual Design approved by the City, including any changes to that Conceptual Design that have been approved by the City.

"Requested Modifications" means the modifications, if any, that the City, in its sole discretion, may request to a Conceptual Design, a Project Payment and/or proposed Deductions.

"Trustee Agencies" means any one or more of federal, state, tribal and/or local agencies designated as trustees for natural resources pursuant to the federal Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9622, the federal Oil Pollution Act, 33 U.S.C. 2701, the Washington Model Toxics Control Act, RCW 70.105D, and/or other similar laws, and shall include without limitation agencies such as the U.S. Department of Interior, the National Oceanic and Atmospheric Administration, the Washington State Department of

Ecology, the Washington State Department of Fish and Wildlife, the Washington State Department of Natural Resources and federally recognized Tribal Nations.

"Work" means all activities of Bluefield, its employees, agents and subcontractors to design, construct, operate, monitor, repair, maintain and otherwise complete a particular Approved Project.

## 2. PROJECT REVIEW AND DEVELOPMENT.

2.1 <u>Candidate Parcel Review</u>. No more than thirty (30) days after the Effective Date, the City will make the Candidate Parcels available for inspection during normal business hours by Bluefield and its agents and subcontractors at Bluefield's sole risk and expense. Bluefield shall make such inspections and reviews as it deems appropriate to determine if any or all of the Candidate Parcels or portions thereof are suitable for natural resource habitat restoration. Bluefield may make requests of the City for documents and other information regarding the Candidate Parcels and the City shall not unreasonably refuse such requests and shall provide the documents and information promptly, provided that, Bluefield shall reimburse the City for the costs, if any, incurred by the City for identification, collection, reproduction, or provision of the documents and information. The City shall also make available City personnel familiar with the Candidate Parcels to assist with Bluefield's inspections and reviews as reasonably requested by Bluefield.

2.2 <u>Project Proposal.</u> No more than one hundred and eighty (180) days after the Effective Date (or such longer period as may be agreed upon in writing by the Parties), Bluefield shall determine in its sole discretion whether or not natural resource habitat restoration sufficient to gain NRD Restoration Credit appears to be feasible on a Candidate Parcel or portion thereof. If Bluefield determines in its sole discretion that natural resource habitat restoration is not feasible on a particular Candidate Parcel, then Bluefield shall notify the City in writing of its determination and Bluefield shall have no further obligations under this Master Lease for such Candidate Parcel. If Bluefield determines that natural resource habitat restoration is feasible, then, no more than two hundred and ten (210) days after the Effective Date (or such longer period as may be agreed upon in writing by the Parties), Bluefield may in its sole discretion provide to the City for its review a Conceptual Design for a Project on the Candidate Parcel. The Conceptual Design shall include a legal description prepared by a licensed surveyor of the boundaries of the proposed Project Area, a statement of the amount of the calculated Project Payment and a statement of the amount of the Long Term Maintenance Payment.

2.3 <u>Project Approval.</u>

A. Upon receipt of a Conceptual Design including the legal description, the proposed amount of the Project Payment and the proposed amount of the Long Term Maintenance Payment, less any Proposed Deductions, the City shall have sixty (60) days (or such longer period as may be agreed upon in writing by the Parties) to approve in writing the Conceptual Design and the Project Payment less any Proposed Deductions or provide written Requested Modifications to Bluefield.

B. Before approval of a conceptual design, the City department responsible for the Candidate Parcel will conduct public outreach to inform the community and take input on the design. Public input from that outreach will be incorporated into the project approval decision. At least ten (10) business days before approval of a conceptual design, the responsible City department will provide the City Council with a written summary of the design, the public comments received and how public comments were addressed in the approved project.

C. If the City approves in writing the Conceptual Design, the amount of the Project Payment and the amount of the Long Term Maintenance Payment, less any proposed Deductions or Bluefield approves in writing the Requested Modifications, the Project shall become an Approved Project subject to the remaining terms of this Master Lease. If the City does not approve the Conceptual Design, the amount of the Project Payment and/or the amount of the Long Term Maintenance Payment, or if Bluefield does not approve any Requested Modifications, Bluefield shall have no further obligation under this Master Lease for such Candidate Parcel.

## 3. BLUEFIELD'S OBLIGATIONS.

3.1. Payment. Within thirty (30) days of each Project Approval Date, Bluefield shall make the first annual payment to the City of the Project Payment for the Approved Project less any proposed Deductions.

3.2. Performance. No more than eighteen (18) months after the Project Approval Date, Bluefield shall design and complete construction of the Approved Project. Bluefield shall provide the City with written notice when construction is complete. Bluefield shall monitor and maintain the habitat on each Project Area for ten (10) years from the date construction is completed on each Approved Project.

3.3. Long Term Maintenance Fund. At least six months prior to the expiration of the Project Term for each Approved Project, Bluefield shall make the Long term Maintenance Payment to the City. The City shall place the Longterm Maintenance Payment in a dedicated account to provide for the post-Project Term long term maintenance of each Approved Project.

## 4. THE CITY'S OBLIGATIONS.

4.1. Transfer of NRD Restoration Credits. The City hereby sells and assigns free and clear to Bluefield all rights, credits, and interests in the NRD Restoration Credits that are or may be generated by each Approved Project. The City acknowledges that Bluefield intends to attempt to sell these NRD Restoration Credits to third parties.

4.2. Leases. The City hereby grants to Bluefield leases for the Project Term of each Approved Project for access, ingress, egress, construction staging and lay-down, construction, operation, monitoring, repair, maintenance, and all other activities reasonably necessary for Bluefield to complete the Work.

5

## 5. LIMITATIONS ON LEASES.

**5.1. Leases Limited to Work.** Bluefield's leases do not extend to any activities other than the Work.

**5.2. Compliance.** In conducting the Work, Bluefield shall exercise due care and diligence, shall perform all aspects of the Work in a proper and workmanlike manner and shall comply with all Legal Requirements. Bluefield shall cause its employees, agents and subcontractors to comply with all Legal Requirements while performing the Work.

## 6. COORDINATION.

**6.1 Non-Interference.** The City and Bluefield hereby acknowledge the important purposes that the other Party will conduct at or from each Project Area. Each of the Parties agrees that its employees, agents and subcontractors shall coordinate with the management of the other Party to avoid, to the maximum extent feasible, interfering with the activities of the other Party at each Project Area.

**6.2. Cooperation.** The City shall cooperate with Bluefield's efforts to obtain approval of each Approved Project from the Trustee Agencies, Bluefield's efforts to obtain the maximum NRD Restoration Credits from each Approved Project, Bluefield's efforts to market and sell NRD Restoration Credits to potential purchasers, and Bluefield efforts to obtain federal, state, or local permits necessary for each Approved Project. The City shall sign any reasonable applications or requests which are required to be signed or recorded by the land owner in order to obtain necessary approvals.

**6.3. Construction Timing.** Bluefield shall give the City a minimum of five (5) business days notice prior to any activity on a Project Area that could cause temporary interruption of the City's business and business activities. Bluefield agrees to limit construction and maintenance of each Approved Project to times during normal business hours when it will least affect the activities and business at such Project Area.

## 7. CONSTRUCTION.

**7.1. Construction Work Performed by Bluefield.** All construction work conducted by Bluefield shall be performed by a licensed contractor in a proper and workmanlike manner. All construction work shall be performed in compliance with all applicable Legal Requirements. Bluefield shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Bluefield for the Work at each Project Area, which claims are or may be secured by any mechanic's liens. Upon completion of the Work for a particular Approved Project, Bluefield shall immediately deliver to the City "as-built" plans and specifications for the Approved Project.

**7.2. Notice.** Bluefield shall give the City notice of the date of commencement of the Work on each Project Area not less than ten (10) business days prior thereto.

## 8. INSURANCE.

8.1. Builder's Risk Insurance. Bluefield shall obtain and keep in force during the period of construction of each Approved Project, until completion of construction of each Approved Project, a policy of builder's completed value risk insurance against all risks of physical loss to any physical improvements on each Project Area in the amount of the guaranteed replacement cost of such physical improvements.

8.2. Bluefield's Liability Insurance. Bluefield shall obtain prior to commencement of construction of each Approved Project and keep in force thereafter throughout the remainder of the Project Term a policy of commercial general liability insurance on an occurrence policy form covering liability for personal injury occurring in, on or about such Project Area, with limits in the amount of at least One Million Dollars ($1,000,000) per occurrence combined single limit for injuries to or death of persons, and with a contractual liability endorsement insuring Bluefield's performance of Bluefield's obligation to indemnify the City contained in Paragraph 11.1. Bluefield also shall, at Bluefield's sole cost, obtain prior to commencement of construction of each Approved Project and keep in force thereafter throughout the remainder of each Project Term pollution legal liability and contractor's pollution legal liability insurance (as appropriate) on a claims made policy form covering Project Area damage and other pollution-related loss claims occurring in, on or about each Project Area, with limits in the amount of at least One Million Dollars ($1,000,000) on a claims made basis for a period of five to ten years (depending on availability) for Project Area damage and other pollution-related losses, and make commercially reasonable efforts to include a contractual liability endorsement insuring Bluefield's performance of Bluefield's obligation to indemnify the City contained in this Master Lease. Bluefield may provide such insurance coverage under blanket policies of insurance

8.3. Project Area Insurance. Bluefield shall obtain prior to commencement of construction of each Approved Project and keep in force thereafter throughout the remainder of the Project Term a policy or policies of insurance for the benefit of The City and Bluefield covering loss or damage to such Approved Project, in the amount of the full replacement value thereof, providing protection against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, special extended perils (all risk) and an inflation endorsement, but excluding earthquake coverage. Throughout the Project Term, Bluefield shall be responsible for paying any and all insurance deductibles and premiums. Bluefield may provide such insurance under blanket policies of insurance provided that such insurance is on an occurrence basis.

8.4. Workers' Compensation, Employer's Liability and Automobile Liability Insurance. Bluefield shall obtain and keep in force during the Project Term policies of insurance as follows:

A.    Workers' Compensation Insurance in an amount not less than that prescribed by law and covering employees of Bluefield engaged in the performance of activities under this Master Lease;

B.    Employers' Liability Insurance protecting Bluefield against common law liability in the absence of statutory liability, for employee bodily injury arising out of the master-servant relationship with a limit of not less than One Million Dollars ($1,000,000);

C.	Automobile Liability Insurance (owned, non-owned and hired), including personal injury and Project Area damage, with a limit of One Million Dollars ($1,000,000) combined single limit.

D.	Statutory United States Longshore & Harbor Workers Insurance. In the event that the placement is subject to a deductible, the amount and terms of the program will be detailed to the City.

8.5. Form, Additional Insureds and Certificates. Each policy of insurance required to be carried by Bluefield pursuant to this Master Lease shall be with a company rated A:IX or better in "Best's Insurance Guide" and shall name the City as an additional insured. Bluefield's insurance policies shall also be primary insurance, without right of contribution from any policy carried by the City, and shall contain a cross-liability and severability endorsement. A certificate of insurance (ACCORD form) and a copy of each policy shall be provided to the City, which indicates that the coverage required hereunder is in effect.

8.6. Payment. Bluefield shall pay all of the premiums and deductibles for any insurance obtained pursuant to this Master Lease.

8.7. Waiver of Subrogation. Bluefield and The City each hereby waives any and all rights of recovery against the other, and against the officers, employees, agents and representatives of the other, for loss of or damage to each Project Area of the waiving Party or each Project Area of others under its control, to the extent such loss or damage is covered by proceeds received under any insurance policy carried by the City or Bluefield and in force at the time of such loss or damage. Each of Bluefield and the City shall, upon obtaining the policies of insurance required hereunder or otherwise carried by such Party, give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Master Lease.

8.8. No Limitation of Liability. The City makes no representation that the limits of liability specified to be carried by Bluefield under the terms of this Master Lease are adequate to protect any Party. If Bluefield believes that the insurance coverage required under this Master Lease is insufficient to adequately protect Bluefield, Bluefield shall provide such additional insurance as Bluefield deems adequate.

8.9. Liability for Contamination. The City acknowledges that Bluefield is in no way liable or responsible for environmental contamination that may be present or discovered on each Project Area, except and only to the extent such contamination is exacerbated by the misconduct or negligence of Bluefield. If, during the course of the Work, Bluefield discovers evidence of environmental contamination that threatens human health or the environment, Bluefield will promptly notify the City so that the City may comply with Legal Requirements applicable to the discovery of such contamination. The City waives any argument that Bluefield is a potentially responsible or potentially liable party under Legal Requirements as an owner or operator of a Project Area or Approved Project.

9. UTILITIES. The City shall provide power and water to each Project Area as reasonably needed by Bluefield for completion of the Work. Bluefield shall pay the City for the cost of any such services it uses as reasonably determined by the City.

## 10. MAINTENANCE AND REPAIRS.

**10.1. Bluefield's Obligations.** Following Bluefield's construction of each Approved Project, Bluefield shall keep such Approved Project in good and safe condition, order and repair for the remaining Project Term.

**10.2. No Obligations or Liability for The City.** The City shall not be obligated to make any repairs or replacements of any kind, nature or description whatsoever to each Approved Project or any portion thereof. The City shall not be liable for any loss, damage or injury of any kind, nature or character to any person or Project Area arising from Bluefield's Work, or caused by any defect in an Approved Project, or caused by or arising from any act or omission of Bluefield or any of its agents, employees, or subcontractors, or by or from any accident on each Project Area, or any fire or other casualty thereon, or occasioned by the failure of Bluefield to maintain each Approved Project in a safe condition, unless such loss, damage or injury is caused by the City's intentional misconduct, negligence or violation of law.

## 11. INDEMNIFICATION.

**11.1. Indemnification by Bluefield.** Bluefield shall indemnify, defend and hold harmless the City, its officers, directors, partners, employees, agents, representatives, affiliates, successors, assigns, and attorneys (collectively, "the City Indemnified Parties") from and against any and all claims, damages, demands, liens, claims of lien, losses, fines, penalties, judgments, actions, suits, injuries, costs, expenses or liability of any kind or nature which may be imposed on them, including, without limitation, reasonable attorney fees, expert fees and consultant fees, and other costs of legal defense actually incurred (collectively, "Liabilities"), whether direct or indirect, that the City Indemnified Parties, or any of them, may sustain or incur, or that may be imposed on or directed against any of them, arising out of or resulting from Bluefield's or its officers', directors', partners', employees', agents', representatives', affiliates', successors', assigns', and attorneys' negligence or violation of law during the Project Term.

**11.2. Indemnification by The City.** The City shall indemnify, defend and hold harmless Bluefield, its officers, directors, partners, employees, agents, representatives, affiliates, successors, assigns, and attorneys (collectively, the "Bluefield Indemnified Parties") from and against any and all claims, damages, demands, liens, claims of lien, losses, fines, penalties, judgments, actions, suits, injuries, costs, expenses or liability of any kind or nature which may be imposed on them , including, without limitation, reasonable attorney fees, expert fees and consultant fees, and other costs of legal defense actually incurred (collectively, "Liabilities"), whether direct or indirect, that the Bluefield Indemnified Parties, or any of them, may sustain or incur, or that may be imposed on or directed against any of them, to the extent arising out of or resulting from the city's or its officers', directors', partners', employees', agents', representatives', affiliates', successors', assigns', and attorneys' negligence or violation of law during the Project Term.

**11.3. Limitation.** Neither the City nor Bluefield shall be liable to each other for any consequential, exemplary, or punitive damages of any kind.

## 12. LIENS. Bluefield shall keep each Project Area free from any liens arising out of any work performed, materials furnished or obligations incurred by Bluefield. In the event that Bluefield

9

shall not, within ten (10) days following notice of the imposition of any such lien, cause the same to be released of record, the City shall have, in addition to all other remedies provided herein and by law, the right, but not the obligation, to cause the same to be released by such means as it shall deem proper, including payment of the claim giving rise to such lien or the posting of a bond. All sums paid by the City for such purpose, and all expenses incurred by it in connection therewith, shall be payable to the City by Bluefield on demand.

13. ASSIGNMENT. Bluefield may assign this Master Lease and its rights hereunder to an LLC or corporation formed to perform the obligations under this Master Lease without the prior consent of the City, but with notice to the City. Bluefield may not otherwise assign this Master Lease without the prior written consent of the City, which consent shall not be unreasonably withheld. Any purported assignment not in accordance with the terms hereof shall at the City's option, to be exercised at any time after the City becomes aware of any such purported assignment, be void, and may at the City's option be treated as an Event of Default hereunder.

14. TERMINATION AND DEFAULT. A Party shall not be in default unless it fails to perform obligations required of it within the time set forth in this agreement, unless such time is extended by mutual written agreement of the parties, or, if no time frame is specified in this agreement, within a reasonable time, but in no event earlier than (30) days after written notice by the other Party, specifying wherein the Party has failed to perform such obligations; provided, however, that if the nature of Party's obligations is such that more than thirty (30) days is required for performance, then the Party shall not be in default if it commences performance within such thirty (30) day period and thereafter diligently prosecutes the same to completion.

15. CONDEMNATION. Should title to or possession of the whole of a Project Area be taken by a duly constituted authority in condemnation proceedings or should a partial taking render the remaining portions of a Project Area unfit for the Project, then either Party may at its election terminate such Approved Project by notice to the other Party given within sixty (60) days from the date of such taking. All damages for condemnation of all or part of each Project Area shall be equitably divided, *pro rata*, between the City and Bluefield in accordance with their respective interests at the time of such condemnation based upon the findings of the condemnation court.

16. DAMAGE AND DESTRUCTION. This Master Lease shall continue in full force and effect in the event of any damage to or destruction of a Project or a Project Area that is caused by an entity unrelated to Bluefield or an event unrelated to the Work, unless Bluefield elects, in its sole discretion, to terminate the Approved Project prior to completion of construction. If Bluefield does elect to terminate an Approved Project prior to completion of construction, Bluefield shall make commercially reasonable efforts to restore the Project Area, if possible, to a condition that is as good or better than it had before Project construction began. The insurance proceeds relating to any damage or destruction to such Project shall be equitably divided, *pro rata*, between the City and Bluefield in accordance with their respective interests at the time of damage or destruction to the Project based upon the findings of a consultant mutually agreed upon by the City and Bluefield.

17. SALE OR CONVEYANCE BY THE CITY. In the event of a sale or conveyance of a Project Area or any interest therein by the City, upon written assumption by the successor in interest of the City's obligations and liabilities under this Master Lease, the City shall thereby be released from any then current and any further liability upon any of the terms, covenants or

10

conditions (express or implied) herein contained in favor of Bluefield, and in such event, insofar as such transfer is concerned, Bluefield agrees to look solely to the responsibility of the successor in interest of the City in and to each Project Area and this Master Lease. This Master Lease shall not be affected by any such sale or conveyance, and Bluefield agrees to attorn to the successor in interest of such transferor.

18. COSTS, ATTORNEYS' FEES. In the event that either the City or Bluefield should bring suit for the recovery of any sum due under this Master Lease, or because of the breach of any provision of this Master Lease, or for any other relief against the other Party hereunder, then all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing Party therein shall be paid by the other Party, which obligation on the part of the other Party shall be deemed to have accrued on the date of the commencement of such action and shall be enforceable whether or not the action is prosecuted to judgment.

19. NOTICES. All notices herein required or permitted to be given or furnished under this Master Lease given by either Party to the other shall be in writing, and shall be deemed sufficiently given and served upon the other Party if sent by confirmed facsimile, hand delivery, reputable overnight courier or certified or registered mail, return receipt requested, postage prepaid. Notices shall be deemed delivered upon actual receipt by the addressee (or upon failure of the addressee to accept delivery). Notices shall be sent to the following addresses:

If to Bluefield:  Scott Lockert
       Vice President
       Bluefield Holdings, Inc.
       2505 Second Ave.
       Suite 602
       Seattle, WA 98121
       scottl@bluefieldholdings.com

If to the City:   Judith Noble
       Seattle Public Utilities
       700 5th Ave. Suite 4900
       PO Box 34018
       Seattle WA 98124-4018
       judith.noble@seattle.gov

Each Party shall have the right, from time to time, to designate a different address by notice given in conformity with this Paragraph.

20. INDEPENDENT ACTIVITIES OF THE CITY AND BLUEFIELD. The Parties anticipate that Bluefield may sell NRD Restoration Credits to the City. The City acknowledges and agrees that Bluefield may make all decisions relating to any such sales of NRD Restoration Credits in a manner to protect the best interests of Bluefield in its capacity as seller of NRD Restoration Credits, without regard to the impact such decisions may have on the City, including, without limitation, the exercise of any rights and remedies available to Bluefield, at law, in equity or

11

under the documents evidencing any such sale of NRD Restoration Credits. The City further acknowledges and agrees that Bluefield would not have entered into the Master Lease, and would not sell any NRD Restoration Credits to the City, if this arrangement were not acceptable to the City.

21. DATA PUBLICATION. All data and information in hard copy, electronic, or any other format, disclosed to the City by Bluefield, developed by Bluefield or obtained by Bluefield from a party other than the City during the length of this Master Lease ("Data"), shall be and remain the sole Property of Bluefield. The City shall not assert, or allow persons performing under the City's control to assert, any rights to the Data or establish any claim under design, patent or copyright laws. It is expressly agreed that all copyrightable or patentable Data produced by Bluefield under the Master Lease are solely owned by Bluefield and that all copyrightable and other proprietary rights therein shall vest solely in Bluefield. Bluefield has the right to inform the general public about the Projects and the Work in the form of press releases, article in journals and/or other media outlets. Prior to the release of any such information, Bluefield shall provide the City with the opportunity to review all material intended for publication. Bluefield will take the City's comments into consideration in the final publication of the material. The Parties recognize that this Master Lease is a public record that is subject to disclosure under state law and that it will be published when it is submitted to the City Council for approval. Except in response to a request for public records and in provision of this Master Lease to the City Council, the City shall not publish any material that falls under the terms of this Master Lease and shall not provide information about Bluefield and the Projects, without the prior written approval of Bluefield.

22. TITLE AND AUTHORITY.

22.1. The City's Covenant. The City covenants and warrants that (i) it has the authority to execute this Master Lease and has the power to grant the rights hereunder; (ii) the person signing this Master Lease in its behalf has the authority to bind the City; (iii) and, to its knowledge, the execution and performance of this Master Lease will not violate the provisions of any mortgage, easement, license or other agreement binding upon the City.

22.2 Bluefield's Covenants. Bluefield covenants and warrants that (i) it has the authority to execute this Master Lease; (ii) the person signing this Master Lease in its behalf has the authority to bind Bluefield; and (iii) to its knowledge, the execution and performance of this Master Lease will not violate the provisions of any agreement binding on Bluefield.

23. TAXES AND ASSESSMENTS. Nothing contained in this Master Lease requires Bluefield to pay any taxes, assessments, rates, charges, license fees, municipal liens, levies, excises, or imposts, whether general or specific, or ordinary or extraordinary, of every name, nature and kind whatsoever, including all governmental charges of whatsoever name, nature or kind, which may be levied, assessed, charged or imposed, or which may become a lien or charge on or against each Project Area.

24. MISCELLANEOUS AND GENERAL PROVISIONS.

24.1. Recording. Bluefield shall file for record with the County Recorder of the county or counties in which each Project Area is located either this Master Lease or a recordable notice

or memorandum of this Master Lease. The parties shall take such actions and execute such additional documents, including copies of this Master Lease or a short form of this Master Lease as may be required to record evidence of this Master Lease for each Approved Project.

24.2. Entire Agreement. This Master Lease, inclusive of all Exhibits, contains the entire agreement between the parties as to the subject matter hereof and supersedes all previous written and oral negotiations, commitments, proposals and writings. All Exhibits attached hereto are hereby incorporated into this Master Lease.

24.3. Amendments. No amendments to this Master Lease may be made except by a writing signed by both Parties.

24.4. Counterparts. This Master Lease may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Master Lease may also be executed in multiple duplicate originals, each of which shall be fully effective and enforceable.

24.5. Successors and Assigns. This Master Lease shall be binding upon the successors, assigns, heirs, executors and administrators of each of the Parties hereto.

24.6. Governing Law. This Master Lease shall be governed by the laws of, and all actions in connection with this Agreement shall be brought and heard in, the State of Washington.

24.7. Interpretation. The terms and provisions of this Master Lease are not to be construed more liberally in favor of, or more strictly against, either Party. To the extent the mutual covenants of the Parties under this Master Lease create obligations that extend beyond the termination or expiration of this Master Lease, the applicable provisions of this Master Lease shall be deemed to survive such termination or expiration for the limited purpose of enforcing such covenants and obligations in accordance with the terms of this Master Lease. All article, paragraph or other headings appearing in this Master Lease are for convenience of reference only and shall be disregarded in construing this Master Lease.

24.8. Severability. If any provision of this Master Lease is unenforceable, the remaining provisions shall not be affected thereby but shall remain in full force and effect; provided, that the Parties shall attempt to amend this Master Lease to attempt to return the Parties to materially the same position had no such provision been found unenforceable.

24.9. No Partnership. Nothing contained in this Master Lease shall be construed to create any association, trust, partnership, or joint venture or impose a trust or partnership, duty, obligation, or liability or an agency relationship on, or with regard to, either Party. Neither Party hereto shall have the right to bind or obligate the other in any way or manner unless otherwise provided for herein.

24.10. Waiver. No failure or delay of any Party to exercise any power or right under this Master Lease shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power.

24.11.  Quitclaim.  At the expiration or earlier termination of this Master Lease, Bluefield shall execute, acknowledge and deliver to the City, within ten (10) days after written demand from the City to Bluefield, any quitclaim deed or other document that the City, in its sole discretion, deems necessary to remove the encumbrances created by this Master Lease from each Project Area.  The provisions of this Paragraph shall survive the termination of this Master Lease.

24.12.  Confidential Information.  The proposed Conceptual Designs and Project Payments shall be treated as confidential information until approved under this Master Lease. Either Party may designate any other data, information, reports, or documents provided to the other as "Confidential Information."  Except as required by law, neither Party shall, without the prior written consent of the other Party, disclose any Confidential Information obtained from the other Party to any third parties other than to any lender, professional advisers, or to employees each of whom have agreed to keep such information confidential as contemplated by this Master Lease and who need the information to assist either Party with the rights and obligations contemplated herein.

- IN WITNESS WHEREOF, the City and Bluefield have executed and delivered this Master Lease as of the latest date set forth below.

**THE CITY OF SEATTLE:**            **BLUEFIELD, LLC:**

By: _____        By: _____
Name: _____        Name: _Shawn R T Severn_____
Title: _____        Title: _President_____
Date: _23 February 2009_____        Date: _Feb 12, 2009_____

**Notary**                          **Notary** *Glenda J. Cross*  Feb. 12, 2009
                                    *exp. 9/21/12*

14

Properties Subject to Master Lease or Street Use Permit

**West Side West Waterway: Spokane Street Bridge**
PID:                7666703295
Address:            SW KLICKITAT WY & S SPOKANE ST
Legal Description:  POR OF SD LOTS DAF - BEG AT NXN OF S MGN OF SW SPOKANE
                    ST WITH SWLY MGN OF DUWAMISH W WATERWAY TH S 41-06-
                    02 E ALG SD SWLY MGN 83.93 FT TH S 01-08-43 W 27.80 FT TH N
                    88-51-17 W 53 FT TH N 59-03-00 W 167.91 FT TH N 89-29-14 W 40 FT
                    TH N 00-30-46 E 6.91 FT TO S MGN OF SW SPOKANE ST TH ELY
                    ALG SD S MGN 182.35 FT TO TPOB

**Southwest Spokane Street:**
                    THAT PORTION OF SOUTHWEST SPOKANE STREET BETWEEN
                    THE WEST MARGIN OF THE WEST DUWAMISH WATERWAY
                    AND A LINE EXTENDING BETWEEN NORTHWEST CORNER OF
                    KING COUNTY PARCEL 7666703290 AND NORTHWEST CORNER
                    OF LOT 11, BLOCK 424 SEATTLE TIDELANDS EX 01 B 377-491.

**East Side West Waterway: Spokane St. Bridge**
PID:                7666703000
Address:            W MARGINAL WY & S SPOKANE ST
Legal Description:  SEATTLE TIDE LDS EXT #1 POR SD LOTS DAF - BEG NXN OF S
                    LN OF SW SPOKANE ST & NE MGN OF DUWAMISH WEST WW
                    TH S41-06-02E ALG SD NELY MGN 270.08 FT TH S88-51-58E PLW
                    SD S LN 168.92 FT TO NWLY MGN OF BN R/R R/W TH NELY ALG
                    SD R/W MGN 25.74 FT TO SWLY MGN OF KLIKITAT AVE SW TH
                    NLY ALG WLY MGN SD KLIKITAT AVE SW TO SLY LN SW
                    SPOKANE ST TH W TO POB LESS ST PER REC #8007140324

**West Waterway north of Spokane, south of Fisher Mill**
PID:                7666703051
Address:            3441 KLICKITAT AVE SW
Legal Description   SEATTLE TIDE LDS EXT #1

**Southwest Spokane Street, Southwest Klickitat Way and Parcel 7666703000:**

> THAT PORTION OF SOUTHWEST SPOKANE STREET ABUTTING LOT 15, BLOCK 408 SEATTLE TIDELANDS EX 01 B 377-491, KING COUNTY PARCEL 7666703000 AND THAT PORTION OF SOUTHWEST KLICKITAT WAY AS ESTABLISHED THROUGH ORDINANCES 95570, 99714, 114562 AND 115212; TOGETHER WITH THAT PORTION OF SOUTHWEST KLICKITAT WAY AS ESTABLISHED THROUGH ORDINANCES 95570, 99714, 114562 AND 115212; TOGETHER WITH KING COUNTY PARCEL 7666703000; AND TOGETHER WITH ANY PORTION OF LAND LYING BETWEEN THE WEST MARGIN OF SAID PARCEL AND THE EAST MARGIN OF THE WEST DUWAMISH WATERWAY.

**West Side East Waterway**
PID: 7666701030
Address: S SPOKANE ST
Legal Description: SEATTLE TIDE LDS EXT # 1 LESS R/W

**SW Klickitat Way**
PID: 7666701160
Address: SW Klickitat Way and 11th Ave SW
Legal Description: SEATTLE TIDE LDS EXT #1 POR LOTS 1 THRU 3 NLY OF O W RR R/W LESS NP RR R/W & LESS ST

**SW Spokane Street**
PID: 7666701156
Legal Description: SEATTLE TIDE LDS EXT # 1 POR LOTS 1 THRU 3 LY W OF OW RR R/W LESS ST & LESS BN R/W

**Georgetown Steamplant Pump Station**
PID: 2136200666
Address: 7551 8TH AV S
Legal Description: DUWAMISH INDUSTRIAL ADD LESS BEG AT NE COR TH S ALG E LN 245 FT TH SWLY TO SW COR TH N ALG W LN 316.01 FT M/L TO NE COR TH E 70 FT TO BEG

**Duwamish-Delridge Transmission Line R/W No 1**
PID:                 0423049130
Address:             11100 E MARGINAL WY S
Legal Description:   C OF S TRANS LN R/W OVER GL 4 & 5 TGW SE 1/4 LESS ST HWY
                     TGW 250 FT R/W OVER TRACT 55 OF MOORES FIVE-ACRE
                     TRACTS & VAC G FRAIEGER RD LESS ST HWY


**Duwamish Waterway Park**
PID:                 7327902355
Address              10TH AV S
Legal Description    RIVER PARK ADP LOTS 43-44-45 & 46 TGW POR VAC ST ADJ
                     LESS CWW DIST NO 1


**North of 1st Ave South Bridge**
PID:                 5367202410
Address:             6501 1ST AV S
Legal Description    MC LAUGHLINS WATER FRONT ADD LESS COML W WAY #1


**South of 1st Ave South Bridge**
PID:                 5367202510
Address:             Peninsula Place
Legal Description    MCLAUGHLINS WATER FRONT ADD PORTION OF BLKS 31 & 32
                     TGW VAC STREETS ADJ LY SW OF CWW #1 DAF - BAAP OPP
                     HES 406+74.66 ON LS LINE SURVEY OF SR 99 - DUWAMISH
                     WATERWAY VICINITY AND 40.00 FT NWLY THEREFROM TH
                     NELY PLW SD LS LINE SURVEY TAP OPP HES LS 409+27.81
                     THEREON TH NWLY TAP OPP HES LS 409+73.72 ON SD LS LINE
                     SURVEY AND 80.00 FT NWLY THEREFROM TH SWLY PLW SD LS
                     LINE SURVEY TAP OPP HES LS 406+71.31 THEREON TH ELY TO
                     THE POB - ACCORDING TO Q.C.D. FILED UNDER REC NO
                     20051129002581

**South of 1st Ave South Bridge**

PID:                    5367202518
Address:                Near Peninsula Place
Legal Description       MCLAUGHLINS WATER FRONT ADD TGW VAC FIRST AVE
                        SOUTH AS PROVIDED BY C.O.S. ORD NO 94862 LESS POR
                        ACQUIRED BY C.W.W. DIST NO 1 FOR DUWAMISH WATERWAY
                        DAF - BAAP OPP HES LS 410+55.12 ON LS LINE SURVEY OF SR 99
                        DUWAMISH WATERWAY VICINITY AND 139.47 FT NWLY
                        THEREFROM SD PT BEING ON SWLY MGN OF DUWAMISH
                        WATERWAY TH SWLY TAP OPP HES LS 410+51.69 ON SD LS
                        LINE SURVEY AND 141.51 FT NWLY THEREFROM TH SELY TAP
                        OPP HES LS 410+20.98 ON SD LS LINE SURVEY AND 99.30 FT
                        NWLY THEREFROM TH SWLY TAP OPP HES LS 410+03.93 ON SD
                        LS LINE SURVEY AND 106.32 FT NWLY THEREFROM TH SELY
                        TAP OPP HES LS 409+73.72 ON SD LS LINE SURVEY AND 80.00 FT
                        NWLY THEREFROM TH SELY TAP OPP HES LS 409+27.81 ON SD
                        LS LINE SURVEY AND 40.00 FT NWLY THEREFROM TH NELY
                        PLW SD LS LINE SURVEY TAP OPP HES LS 409+82.75 THEREON
                        SD PT BEING ON SWLY MGN OF DUWAMISH WATERWAY TH
                        NWLY ALG SD SWLY MGN TO POB AKA - SEAVIEW PARK


**Cambridge Corridor Transmission Line R/W**

PID:                    5624200992
Address:                9401 E MARGINAL WY S
Legal Description:      MOORES FIVE-ACRE TRS POR & POR VAC ST ADJ DAF-BEG AT
                        INTRSN OF NLY LN OF 64 & WLY MGN OF E MARGINAL WAY
                        TH SELY 60.16 FT TH S 62 DEG 01 MIN 41 SEC W TO ELY MGN OF
                        DUWAMISH WATERWY TH N 15 DEG 00 MIN 00 SEC W TO NLY
                        LN OF 56 TH NELY ALG SD NLY LN & SD LN PROD TO C/L OF
                        VAC FRANCIS AVE TH SLY ALG C/L TO NLY LN OF 64 PROD
                        SWLY TH NELY ALG NLY LN SD 64 TO BEG


**2nd Ave S**

Legal Description       THAT PORTION OF 2ND AVENUE SOUTH BETWEEN THE WEST
                        MARGIN OF THE DUWAMISH WATERWAY AND A LINE
                        EXTENDED BETWEEN THE SOUTH MARGINS OF LOT 13, BLOCK
                        6 PORTLAND AND PUGET SOUND RAILWAY ADDITION AND
                        LOT 57, BLOCK 5 PORTLAND AND PUGET SOUND RAILWAY
                        ADDITION.


**S. Orchard St**

Legal Description       THAT PORTION OF SOUTH ORCHARD STREET BETWEEN THE
                        WEST MARGIN OF THE DUWAMISH WATERWAY AND A LINE

EXTENDED BETWEEN THE SOUTHWESTERLY MARGINS OF LOT 1, BLOCK 1 PORTLAND AND PUGET SOUND RAILWAY ADDITION AND LOT 1, BLOCK 7 PORTLAND AND PUGET SOUND RAILWAY ADDITION.

**8th Ave S**
Legal Description

THAT PORTION OF 8TH AVENUE SOUTH BETWEEN THE EAST MARGIN OF THE DUWAMISH WATERWAY AND A LINE EXTENDING PERPENDICULAR BETWEEN THE MARGINS OF 8TH AVENUE SOUTH, ORIGINATING FROM THE POINT OF INTERSECTION OF THE EAST AND NORTHWEST MARGINS OF KING COUNTY PARCEL 2136200666.

**10th Ave S**
Legal Description:

THAT PORTION OF 10TH AVENUE SOUTHWEST BETWEEN THE SOUTH MARGIN OF SOUTHWEST SPOKANE STREET AND A LINE EXTENDING BETWEEN THE SOUTH MARGINS OF KING COUNTY PARCEL 7666701046 AND KING COUNTY PARCEL 7666701221; TOGETHER WITH KING COUNTY PARCEL 7666701030; TOGETHER WITH ANY PORTION OF LAND LYING BETWEEN THE EASTERLY MARGIN OF KING COUNTY PARCEL 7666701030 AND THE WEST MARGIN OF THE EAST DUWAMISH WATERWAY.

Attachment D
Ordinance 122729

# ORDINANCE 122729

AN ORDINANCE authorizing a Master Lease Agreement with Bluefield Holdings, Inc. for development and enhancement of habitat on City property along the Duwamish River, including tax parcel numbers: 7666703295, 7666703000, 7666701030, 7666701160, 2136200666, 0423049130, 7327902355, 5367202410, 5367202510, 5367202518, 5624200992, 766670156, and 7666703051; and authorizing a term Street Use Permit for development and enhancement of habitat on portions of the following street ends and right-of-way areas: 2nd Ave. S., 8th Ave S. (Georgetown Side of Duwamish River), 10th Ave. S.W., S.W. Spokane Street, S.W. Klickitat Way, and S. Orchard St.

WHEREAS, the Duwamish River is a vital economic and natural resource to the City and its citizens; and

WHEREAS, the Duwamish River is habitat for threatened and endangered species, including salmon, and other species of environmental, economic, and cultural importance; and

WHEREAS, the Duwamish River is an important natural and cultural resource for Tribal Nations; and

WHEREAS, the lower Duwamish River is a federal Superfund site and is being assessed by Tribal Nations and state and federal resource trustees for damages to natural resources; and

WHEREAS, resolving claims for natural resource damages by creating and enhancing habitat will increase certainty for continued commerce and economic activity along the Duwamish, benefit species, and potentially enhance public access to the Lower Duwamish River; NOW, THEREFORE,

**BE IT ORDAINED BY THE CITY OF SEATTLE AS FOLLOWS:**

Section 1. The Mayor or his designee is authorized to execute a Master Lease Agreement, substantially in the form attached to this ordinance, with Bluefield Holdings, Inc. (hereafter "Bluefield") for the properties whose legal descriptions are listed in Exhibit A to the Master Lease.

Section 2. The Mayor or his designee is also authorized to execute a Street Use Permit for a term of years, substantially in the form attached to this ordinance, with Bluefield for the

1



right-of-way areas and street ends whose legal descriptions are listed in Exhibit A to the Master Lease.

Section 3.  Both the Master Lease and the Street Use Permit will allow Bluefield to propose conceptual designs for development or enhancement of habitat on the subject properties. If the City approves any of the conceptual designs, then, under the Master Lease and under the Street Use Permit, Bluefield will be allowed to implement the approved projects.

Section 4.  The Master Lease and the Street Use Permit shall each have a ten year term from completion of the implementation of an approved site plan.  Bluefield will maintain the habitat during the applicable term and provide the City with funds for continued maintenance after the term expires.

Section 5.  Bluefield's restoration on City lands will be designed to provide habitat that helps liable parties meet their Superfund natural resources damage allocations. Businesses and entities that are liable under federal law for damaging natural resources in and along the Duwamish River will be able to purchase credits from Bluefield to compensate for such damages if approved by the Natural Resource Trustees.

Section 6.  Bluefield will pay the City rent for use of the properties subject to the Master Lease.  The amount of rent will be determined by an appraiser jointly selected by Bluefield and the City.

Section 7.  Bluefield will pay a term permit fee in an amount determined by the Seattle Department of Transportation for the Street Use Permit.

Section 8.  The Street Use Permit authorized hereby is subject to primary and secondary use by the public of the street ends for shoreline public access and utility purposes, and, for the other right-of-way areas, for general travel and utility purposes.  The City expressly reserves the

2



right to require the Permittee to cease use and remove its materials and other property at the

Permittee's sole cost and expense in the event that:

a) The City Council determines, by ordinance, that the space occupied by the

Permittee's use is necessary for any primary or secondary public use or benefit, or that the

Permittee's use interferes with any primary or secondary public use or benefit; or

b) The Director of the Seattle Department of Transportation determines that any term

or condition of this ordinance has been violated, and such violation has not been corrected by the

Permittee after Notice of Violation has been given by the City.

A City Council determination that the space is necessary for a primary or secondary

public use or benefit shall be conclusive and final.

Section 9. The City Council directs that:

A. Before approval of a conceptual design, the City department responsible for the land

upon which the design is proposed will conduct public outreach to inform the community and

take input on the design. The departments may use their established outreach procedures. If a

department has no outreach procedures for this type of activity, they will establish and

implement such procedures. Public input from the outreach will be incorporated into the project

approval decision.

B. At least ten (10) business days before approval of a conceptual design, the responsible

City department will provide the City Council with a written summary of the design, the public

comments received and how public comments were addressed in the approved project.

Section 10. Bluefield is encouraged to pursue habitat restoration on private lands in the

Duwamish Superfund site. A report regarding Bluefield's restoration progress on City lands and

3



lbw:lbw/mm/pml
6/20/08
(Ver. 7)

other lands in the Duwamish Superfund site will be submitted to the City Council on an annual

basis.

Section 11.  This ordinance shall take effect and be in force thirty (30) days from and

after its approval by the Mayor, but if not approved and returned by the Mayor within ten (10)

days after presentation, it shall take effect as provided by Municipal Code Section 1.04.020.

Passed by the City Council the 30th day of June, 2008, and signed by me in open

session in authentication of its passage this 30th day of June, 2008.

_____
President _____ of the City Council

Approved by me this 7th day of July, 2008.

_____
Gregory J. Nickels, Mayor

Filed by me this 7th day of July, 2008.

_____
City Clerk

(Seal)
Attachment – Duwamish River Corridor Master Agreement relating to a Lease and Permits for
Habitat Construction and Maintenance

4



Attachment E
Site-01 Description

## Site 01 - Description

The planned project will create approximately 0.88 acres of habitat from lands currently occupied by riprap and unvegetated upland, and create an off-channel inlet approximately 225 feet in length. The completed project will include approximately 0.24 acres of forested upland, approximately 0.25 acres of vegetated buffer, approximately 0.19 acres of intertidal marsh, and approximately 0.21 acres of intertidal mudflat.

Attachment F
Natural Resource Restoration &
Enhancement Credit Protocol

# NATURAL RESOURCE RESTORATION AND ENHANCEMENT
# CREDIT PROTOCOL

This Natural Resource Restoration and Enhancement Credit Protocol (Protocol) is made and entered into by the National Oceanic and Atmospheric Administration ("NOAA"), on behalf of the Department of Commerce and the Elliott Bay Trustee Council, and Bluefield Holdings, Inc. ("Bluefield") (together "the Parties").

## RECITALS

For purposes of this Protocol, NOAA is acting on behalf of the Elliott Bay Trustee Council, which consists of NOAA, the United States Department of the Interior; the Washington Department of Ecology, on behalf of the state of Washington; the Muckleshoot Indian Tribe; and the Suquamish Tribe (hereinafter "Trustees"). All final determinations regarding Projects and the associated NRD Credits must be approved by all Trustees.

The Lower Duwamish Waterway is listed on the National Priorities List as a federal Superfund site, pursuant to Section 105 of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. and as amended ("CERCLA").

Harbor Island and Lockheed West and its associated waterways are immediately downstream from the Lower Duwamish Waterway and these are also federal Superfund sites pursuant to CERCLA.

Hazardous substances have been or are being released at or to the Lower Duwamish Waterway, the Harbor Island waterways and into Elliott Bay through various avenues, including, but not limited to direct discharge, surface water runoff, groundwater and seeps. Those hazardous substances have caused injury to, destruction and/or loss of natural resources at the Site, including, but not limited to, fish, shellfish, invertebrates, birds and marine sediments, as well as the destruction and/or loss of natural resource services such as ecological services, and direct and passive human losses located in these areas.

The Trustees, under the authority of Section 107(f) of CERCLA, 42 U.S.C. 9607(f); Section 1006(b) of the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. 2706(b); and, 40 C.F.R. Part 300, subpart G, serve as trustees for natural resources for the assessment and recovery of damages for injury to, destruction of, or loss of natural resources under their trusteeship in, around and at the Site.

The Trustees have carried out and/or are carrying out damage assessments for the Site and anticipate bringing claims for damage to natural resources under CERCLA.

Bluefield is a business entity that designs, builds, and maintains natural resource restoration and enhancement projects on behalf of persons that are liable for natural resource damages at properties that have been identified as Superfund sites and/or otherwise suffer a loss of natural resources pursuant to CERCLA.

The Parties desire to work collaboratively to facilitate natural resource restoration and enhancement projects, including the creation of habitat in or proximate to the Site.

The Parties agree that, if a natural resource restoration and enhancement project developed pursuant to this Protocol is included in or otherwise a part of a natural resource damage settlement agreement, it is appropriate to credit the ecological value produced by the project prior to entering into the settlement agreement against the liability of any settling potentially responsible party.

Any and all natural resource damage credits generated by the creation of a natural resource restoration and enhancement project at the Site may be one alternative available to all Potentially Responsible Parties to address liabilities for natural resource injuries at the Site.

Pursuant to this Protocol, Bluefield represents that the City of Seattle is working collaboratively with them to generate natural resource restoration and enhancement projects on properties owned by the City of Seattle. Such collaboration is documented through the lease executed between Bluefield and the City of Seattle on February 23, 2009, the purpose of which lease is to give Bluefield access to such property to implement Habitat Restoration Projects with associated Natural Resource Damages Credit as defined herein projects.

The Trustees may provide the same degree of cooperation with any and all other commercial enterprises or other persons that may intend to generate natural resource damage credits through the implementation of natural resource restoration and enhancement projects.

NOW, THEREFORE, in consideration of the foregoing recitals the Parties mutually agree as follows:

## AGREEMENT

### 1. Definitions

1.1     Adaptive Management Plan.  The Adaptive Management Plan means the evaluation of a Habitat Restoration Project's original goals, after a Project's construction, when the monitoring results indicate that such project will not meet its original goals. The Adaptive Management Plan will provide for additional actions to achieve a Habitat Restoration Project's original goals or will provide modified goals should the original goals prove infeasible.  An Adaptive Management Plan may include a change in the NRD Credit established by the Trustees for the Project.

2

1.2    Candidate Parcels.  Candidate Parcels are the locations on which some of the natural resource restoration and enhancement projects shall be implemented and which are located in or proximate to the Site, including, but not limited to those properties identified in the lease between Bluefield and the City of Seattle or such other agreements as may be entered into by other parties.

1.3    Corrective Action Plan.  A Corrective Action Plan is a plan prepared by Bluefield and approved by the Trustees, during the conceptual design through the completion of construction, that identifies the steps Bluefield will take to implement the corrective action strategy the Parties determine is needed to address problems that prevent a Conditional Project from being constructed as designed.  A Corrective Action Plan may include a change in the NRD Credit established by the Trustees for the Project.

1.4    Discount Service-Acre Years (DSAYs).  DSAYs means the amount of a specific suite of ecological services determined to be produced per acre of a given type of habitat over a period years, the total of which are discounted to a present value.

1.5    Effective Date.  Effective date means the latest date this Protocol has been executed by all of the Parties as set forth on the signature page(s) of this Protocol.

1.6    Habitat Restoration Projects ("Habitat Restoration Project" or "Project"). Habitat Restoration Project or Project shall refer to the natural resource restoration and enhancement projects on which the Parties collaborate and agree upon project design, construction, location, operation and maintenance.  Such Projects may be assigned a NRD Credit by the Trustees that the Trustees may recognize as one alternative to address responsibility by potentially responsible parties at the Site.  Each Project will be maintained in perpetuity and have the required financial assurances set forth in paragraph 4.1, below, and shall be classified in one of the following ways:

1.6.1    Conditional Projects.  Conditional Projects shall refer to the Habitat Restoration Projects, prior to construction completion, on which the Parties collaborate on project design, planned construction, location, planned operation, performance criteria, maintenance, and, if applicable, corrective action.  In order for a project to be considered a Conditional Project for purposes of this Protocol, it must have an assigned Interim NRD Credit (as approved in writing by the Trustees), the required financial assurances as set forth in paragraph 4.1, and a provision that it be maintained in perpetuity.

1.6.2    Constructed Projects.  Constructed Projects shall refer to the Habitat Restoration Projects after construction is completed and where a notice of completion of construction has been submitted and accepted by the Trustees. Constructed Projects will include those Projects in which monitoring indicates an Adaptive Management Plan is necessary.  In order for a Project to be considered a Constructed Project for purposes of this Protocol, it must have assigned an As-Built or Adjusted NRD Credit (as approved in writing by the Trustees), the required financial assurances, and a provision that it be maintained in perpetuity.

3

1.7     Natural Resource Damages Credit ("NRD Credit").  Natural Resource Damages Credit shall be a determination of the ecological value of a Habitat Restoration Project and is the ecological value such Project is expected to generate taking into account such Project's anticipated habitat benefits beyond the Project Baseline Condition. NRD Credit will be estimated based on DSAYs or such other measurement of ecological value that the Trustees employ for determining damages to natural resources at the Site and shall be classified in one of the following three ways:

      1.7.1     Interim Natural Resource Damage Credit ("Interim NRD Credit"). Interim NRD Credit shall be a determination of the ecological value of a habitat restoration project as designed prior to its construction completion.

      1.7.2     As-Built Natural Resource Damage Credit ("As-Built NRD Credit").  As-Built NRD Credit shall be a determination of the ecological value of a habitat restoration project as it is actually constructed, prior to monitoring and subsequent to Bluefield's notice of construction completion.

      1.7.3     Adjusted NRD Credit.  Adjusted NRD Credit shall be a determination of the ecological value of a habitat restoration project as it is actually performing after it has been operated and maintained for three years and every three years thereafter up to and including the end of the ninth year.  Adjusted NRD Credit will also include any adjustments made to any NRD Credit assigned pursuant to this Protocol as necessitated from public comment or as required by the United States Attorney General or the court.

1.8     Potentially Responsible Party ("PRP").  A Potentially Responsible Party shall be covered persons as that term is defined in CERCLA and as identified by the Trustees for this Site.

1.9     Project Baseline Condition.  Solely for the purposes of this Protocol, the Project Baseline Condition shall be the habitat conditions at the location of a Habitat Restoration Project prior to construction taking into account remedial measures that are or will be required by the U.S. Environmental Protection Agency under CERCLA.

1.10    Proximate.  For purposes of this Protocol, proximate to the Site means at a location that has a demonstrably reasonable nexus to the natural resources and resource services impacted by releases of hazardous substances from the Site.

1.11    Site.  Site shall refer to that area known as the Lower Duwamish River and the Harbor Island Waterways, in the State of Washington, collectively, including the shoreline, intertidal areas, tributaries, drainage areas, estuaries and bottom sediments. This area includes but is not limited to the Lower Duwamish Waterway, the Harbor Island Waterway and Lockheed West Superfund Sites, as identified or amended by the EPA, and all areas affected by releases of hazardous substances within or from the Lower Duwamish Waterway, Harbor Island, and Lockheed West Superfund Sites.  This also includes but is not limited to all slips in, associated with, or near the Lower Duwamish Waterway, the East and West Waterways of Harbor Island, and Elliott Bay.

1.12   Technical Assistance.  Technical Assistance shall mean the provision by the Trustees of assistance to Bluefield in the evaluation, design, planning, and oversight of the Site's Projects completed pursuant to this Protocol and the evaluation required for determining any NRD Credit for such Projects.  Technical Assistance shall include the assistance of legal counsel acting on behalf of and/or at the request of the Trustees.

## 2.  Collaboration on Habitat Project Design and Construction Assessment

2.1.  Site Habitat Project Evaluations.  The Trustees may collaborate with Bluefield in evaluating options for potential habitat restoration projects located in or proximate to the Site.  All Projects to be constructed by Bluefield must be approved in writing by the Trustees before the Trustees will assign any NRD Credit to the Project pursuant to paragraph 3, below.  As a condition of the Trustee approval of a Project, Bluefield will ensure that the required financial assurances have been obtained, and the Project will be maintained in perpetuity.  Technical Assistance may be provided in an effort to maximize the ecological services of Habitat Restoration Projects.

2.2.  Site Allocation.  The evaluation of PRPs' potential liability and initiation of settlement discussions are anticipated to be conducted by the Trustees.  Nothing in this Protocol authorizes Bluefield to participate in either the evaluation of PRPs' liability or settlement negotiations between the Trustees and PRPs.  To facilitate resolving natural resource damage claims against PRPs, the Trustees may develop a variety of tools, including a proposed allocation of the Site's natural resource damages liability among the PRPs.  Nothing in the this Protocol authorizes Bluefield to obtain any such tools developed by the Trustees, nor does this agreement require that the Trustees employ any particular tool or approach in negotiating settlements with PRPs.  In addition, any such tools or methodologies developed by the Trustees are for settlement purposes only, and do not alter the joint and several liability of PRPs under CERCLA or otherwise create any rights in Bluefield or PRPs.

2.3.  Establishment of Conditional Projects.  The Parties shall jointly identify one or more proposed Habitat Restoration Projects under the terms of this Protocol, including proposed design, Candidate Parcel, construction, operation, performance criteria, maintenance, corrective action (if applicable), and Interim NRD Credit for a proposed Project.  Each Conditional Project must be maintained in perpetuity.  After the Parties have agreed upon a project, within 60 days, or other such period of time as agreed to by the Parties, Bluefield shall submit a scope of work delineating the actual work to be undertaken, schedule to be followed, and specifics relating to the Project, including but not limited to the operation, maintenance, performance monitoring, and, if applicable, the corrective action strategy of any Project.  Any such scope of work must be approved in writing by the Trustees prior to its release.  Once the Project has a completed scope of work, the Trustees may assign the Project an Interim NRD Credit as set forth in paragraph 3.

2.4.   Inability to Construct Conditional Project as Designed.  In the event that there is a significant problem that would prevent a Conditional Project from being constructed as designed, the Parties will discuss and attempt to formulate a corrective

5

management strategy that will allow the Parties to determine what attributes are not on target for Project success and what actions need to be taken to achieve Project success. Within 60 days of the Trustees' notification to Bluefield that a corrective management strategy is necessary, or other such period of time as agreed to by the Parties, a Corrective Action Plan shall be drafted by Bluefield and presented to the Trustees for their written approval. Such Corrective Action Plan may result in a change of the Interim NRD Credit established by the Trustees. Trustees may withdraw its approval of a Conditional Project if the Parties cannot agree to a Corrective Action Plan and/or revision to the associated Interim NRD Credit. In the event of the Trustees' withdrawal from a Conditional Project due to the absence of an agreement between the Parties on a Corrective Action Plan and/or the associated Interim NRD Credit, the Trustees shall have no obligation to refund any monies that have been paid or expended by Bluefield pursuant to this Protocol.

2.5. Commencement of Constructed Projects. Within 90 days of establishing a Conditional Project's scope of work and the Trustee determination of Interim NRD Credit, or such other period of time as the Parties shall agree, Bluefield shall commence construction of the Conditional Project. If Bluefield has not commenced construction of a Conditional Project within the agreed time, the Trustees may withdraw its recognition and/or approval of any such Conditional Project, including any associated Interim NRD Credit. In the event of the Trustees' withdrawal from a Conditional Project for Bluefield's failure to timely commence and complete construction, the Trustees shall have no obligation to refund any monies that have been paid or expended by Bluefield pursuant to this Protocol.

2.6. Establishment of a Constructed Project. Within 60 days upon completion of construction, or other such period of time as agreed to by the Parties, Bluefield shall submit a written notice of completion to the Trustees. Upon the Trustees review of the notice of completion and providing written approval of the project as-built, the Trustees may assign the Project an As-Built NRD Credit as set forth in paragraph 3. Once the Trustees have determined an As-Built NRD Credit, it shall be a Constructed Project. If Bluefield has not provided a written notice of completion within 60 days or if the Trustees' review of the notice of completion indicates that the Project is not constructed as agreed, including, but not limited to, failure to complete the Project in accordance with the scope of work and/or any Corrective Action Plan, the Trustees may withdraw its recognition and/or approval of any such Project, including any associated NRD Credit. In the event of the Trustees' withdrawal from a Constructed Project for Bluefield's failure to timely submit an approvable notice of completion, the Trustees shall have no obligation to refund any monies that have been paid or expended by Bluefield pursuant to this Protocol.

2.7. Adjustments to Constructed Projects. Every three years of operation and maintenance of a Constructed Project for up to nine years, the Trustees and Bluefield shall in good faith meet and review the results of performance monitoring for each Constructed Project. In the event that the performance monitoring indicates the Project is not performing as expected, the Parties will discuss and attempt to formulate an adaptive management strategy that will allow the Parties to determine what changes, if any, need to be made to the Project to achieve success. Within 60 days of the Trustees'

6

notification to Bluefield that an adaptive management strategy is necessary, or other such period of time as agreed to by the Parties, an Adaptive Management Plan shall be drafted by Bluefield and presented to the Trustees for their written approval. Such Adaptive Management Plan may result in a change of the As-Built NRD Credit established by the Trustees, resulting in an Adjusted NRD Credit. Trustees may withdraw its approval of a Constructed Project if the Parties cannot agree to an Adaptive Management Plan and/or any Adjusted NRD Credit. In the event of the Trustees' withdrawal from a Constructed Project due to the absence of an agreement between the Parties on an Adaptive Management Plan and/or the associated Adjusted NRD Credit, the Trustees shall have no obligation to refund any monies that have been paid or expended by Bluefield pursuant to this Protocol.

## 3. Establishment and Use of Settlement Credits with Ecological Value

3.1. Establishment of Interim NRD Credit. Upon the Parties jointly identifying one or more proposed Habitat Restoration Projects, the Parties shall in good faith meet and discuss the Interim NRD Credit for each such Project. The Trustees may determine the Interim NRD Credit of a Project as designed, and that ecological value may be documented in written form by the Trustees and conveyed to Bluefield. All Conditional Projects to be constructed by Bluefield for Interim NRD Credit must be approved in writing by the Trustees and must have the financial assurances required under paragraph 4.1 prior to selling any Interim NRD Credits. Upon meeting all of the requirements for a Conditional Project, the Project will become a Conditional Project with available Interim NRD Credit, and the Interim NRD Credits generated may be sold as provided under this Protocol.

3.2. Sale of Interim NRD Credit. The Trustees will not recognize more than 50 percent of any Interim NRD Credit until the project is established as a Constructed Project with its associated As-Built NRD Credit approved by the Trustees. If for any reason a Conditional Project is not constructed, the Trustees will not recognize any Interim NRD credit associated with that Conditional Project irrespective of whether a PRP purchased such Interim NRD Credit.

3.3. Establishment of As-Built NRD Credit. Upon receipt and Trustee approval of Bluefield's notice of completion, the Parties shall meet in good faith and discuss the As-Built NRD Credit for the Project, the Parties shall in good faith meet and discuss the As-Built NRD Credit for the Project. The Trustees may determine the As-Built NRD Credit of a Project after receiving and approving a written notice of completion and that ecological value may be documented in written form by the Trustees and conveyed to Bluefield. The Conditional Project will then become a Constructed Project with available As-Built NRD Credit. If for any reason, the Trustees cannot approve the notice of completion, the Trustees may withdraw its recognition of any associated NRD Credit.

3.4. Adjustments to NRD Credit. Pursuant to Paragraph 2.7, the Trustees and Bluefield shall in good faith meet and review the results of performance monitoring for each Constructed Project and determine what actions, if any, need to be taken pursuant to the Project's Adaptive Management Plan to ensure the Project is meeting its performance

goals. At such time the Parties may also determine whether an adjustment needs to be made to the As-Built NRD Credit. Any unsold NRD Credit after the third, sixth and ninth year may be subject to adjustment under the following circumstances:

3.4.1 <u>Future Adjustments Upward to Credit Amounts</u>. The Trustees may allow for an upward adjustment from the Constructed Project's As-Built NRD Credit that has previously been established under this Protocol, in the following circumstances: 1) The results of performance monitoring for the affected Project demonstrate the project has produced or is expected to produce greater ecological benefits than were originally estimated in developing the As-Built Credit, and 2) the Trustees' protocols for the evaluation of habitat restoration projects change such that a greater natural resource damages credit would be available under the new protocols.

3.4.2 <u>Future Adjustments Downward to Credit Amounts</u>. The Trustees may require a downward adjustment from the Constructed Project's As-Built NRD Credit that has previously been established under this Protocol in the following circumstances: 1) The results of performance monitoring for the Constructed Project demonstrate that, notwithstanding the actions taken or to be taken under the Project's Adaptive Management Plan, the Constructive Project has produced or is expected to produce lower ecological benefits than were estimated in developing the As-Built NRD Credit for the Constructed Project; 2) remedial actions, development actions or other activities are planned or have occurred in the vicinity of a Constructed Project that have a negative impact on the functioning of the Constructed Project such that a lower natural resource damages credit should be available under the Trustees' protocols; 3) a PRP or any other party has previously received credit for all or a portion of a Constructed Project against environmental or habitat mitigation requirements under federal, state or local laws or ordinances or against natural resource damages liability in another settlement agreement or 4) the Trustees' protocols for the evaluation of habitat restoration projects change such that a lesser natural resource damages credit would be available under the new protocols.

3.5. <u>Applicability of Credits to PRP Settlements</u>. At the time of entering into any settlement of NRD claims against PRPs at the Site, the Trustees may include NRD Credits established pursuant to this Protocol among the alternatives the Trustees are considering for settling such claims. If the Trustees select the use of NRD Credits as a viable settlement alternative for a particular PRP, the Trustees may recognize the available NRD Credits as documented pursuant to Section 3 of this Protocol, for the purpose of settling NRD claims against PRPs at the Site; provided, that no NRD Credit established under this Protocol may be sold by Bluefield or otherwise be used to resolve liability more than once for the purpose of settling such NRD claims.

3.6. <u>Public Review and Comment</u>. Notwithstanding anything in this Protocol, the terms of any settlement of NRD claims with respect to the Site, including the applicability of any or all NRD Credits to a claim made by the Trustees at the Site, shall remain subject to the approval of the United States Attorney General and may, in the discretion of the United States, be made subject to public review and comment and court approval. The Trustees can make no final determination to accept a natural resource restoration and enhancement project, or its associated NRD Credit, prior to entering into

a settlement agreement. Consequently, any NRD Credit established pursuant to this Protocol may be adjusted based on such public review and comment and/or as required by the United States Attorney General and/or the court.

3.7. Effect of Protocol in Subsequent Litigation. In the event the Trustees bring an action for NRD claims against any PRP relating to the Site or any other site or in the event there is any other litigation relating to the Site, neither the terms of this Protocol nor any determinations of the site allocation, Project Baseline Condition, NRD Credit, the determination of a Project or any other factual determination made or agreed to by the Trustees pursuant to this Protocol shall be used against the Trustees or the United States in such proceedings.

## 4. Financial and Access Assurances

4.1. Financial Assurances. As a condition of Trustee approval of a Project, Bluefield must provide financial assurance for construction completion, performance monitoring, corrective action and adaptive management (if applicable), operation and maintenance in perpetuity, by funding a trust fund, providing a letter of credit, purchasing an insurance policy, or providing a similar financial assurance mechanism covering the cost of completing construction, performance monitoring, corrective action, and adaptive management and performing the operation and maintenance in perpetuity. Any such financial assurance must be in a form satisfactory to the Trustees and must provide the Trustees with direct rights of enforcement of the obligations. Absent special circumstances, as agreed by the Trustees in writing, Bluefield will provide any such financial assurance after a Project has become a Conditional Project but prior to the sale of any Interim NRD Credit to a PRP. Such financial assurances will be maintained through the initiation, completion, and monitoring phases of construction for each Project. Moreover, Bluefield will establish one or more trust funds or other financial assurance to guarantee maintenance in perpetuity for all Projects, naming the Trustees as beneficiary, and having terms and conditions acceptable in all respects to the Trustees.

4.2. Indemnification. Bluefield and its contractors and subcontractors shall indemnify and hold harmless the Trustees and/or their agents, employees and representatives from any and all damage claims or causes of action arising from negligent or other wrongful acts or omissions of Bluefield and/or its officers, employees, agents, contractors, subcontractors, representatives and any persons acting on its behalf of or under its control in carrying out the requirements of this Protocol. Further, Bluefield agrees to pay the Trustees all reasonable costs they incur, including but not limited to attorneys fees and other expenses of litigation and settlement, arising from or on account of damage claims made against the Trustees based on negligent or other wrongful acts or omissions of Bluefield or its officers, employees, agent, contractors, subcontractors, representatives and any person acting on its behalf of or under its control, in carrying out the requirements of this Protocol. None of the Trustees shall be held out as a party to any contract entered into by or on behalf of Bluefield in carrying out the requirements of this Protocol. Neither Bluefield nor any such contractor or representative of Bluefield shall be considered an agent of any Trustee and Bluefield shall require any contractor hereafter

retained by Bluefield who performs work for Bluefield in carrying out the requirement of the Protocol to affirmatively acknowledge that it is not acting as an agent of any Trustee.

4.3. Selection of a Contractor. The selection of any contractor or subcontractor retained by Bluefield to perform any of the work required under this Protocol shall be subject to the Trustees' approval. Bluefield will require that all contractors and subcontractors are bonded and insured.

4.4. Access and Lease Assignment. As a condition of the Trustee approval of a Project, Bluefield will ensure that the Trustees will have reasonable access to any documents relating to a Project and the land on which that Project is located in order to review and monitor its construction, performance, operation and maintenance. Moreover, any leasehold rights held by Bluefield to the land shall be the same rights the Trustees will have to access the land on which a Project is to be or is being constructed. The Trustees will also have the right to require the completion of a Project's construction and to require that such Project will be maintained in perpetuity.

4.5. Repayment of Past Costs. Within 60 days of the Effective Date of this Protocol, Bluefield will provide the Trustees $100,000 for past costs expended on Technical Assistance related to this Protocol and its associated Projects. These funds will cover past costs for the Technical Assistance from June 1, 2008 through the time of the Effective Date of this Protocol. Any funds received that exceed the costs expended by the Trustees through the Effective Date will be credited against any future billings for . Technical Assistance by the Trustees to Bluefield.

4.6. Bluefield Payment of Trustee Technical Assistance Costs. Bluefield will reimburse the Trustees for the cost of Technical Assistance provided by the Trustees. The Trustees will provide Bluefield with quarterly invoices detailing the Technical Assistance work performed and the charges for such work. Bluefield shall pay all such invoices within 60 days of receipt.

## 5. Miscellaneous

5.1. Bluefield's Completion of a Project. Bluefield retains the right to decide whether to proceed with any Project for NRD credit until such time as financial assurances have been attained and the Trustees have identified a Project as having an established NRD Credit and where Bluefield has sold NRD Credit to a PRP. Upon having attained the financial assurances and having sold any NRD Credit, Bluefield must not cease work on a Project unless otherwise agreed to in writing by the Trustees and Bluefield.

5.2. Permits. Where any Habitat Restoration Project pursuant to this Protocol requires a federal, state or local permit or approval, Bluefield is responsible for obtaining such permit(s). The Trustees may support Bluefield's efforts to obtain such permits that may be necessary for construction and maintenance of each Project.

5.3. Repairs and/or Replacements of Projects. The Trustees will not be obligated to make any repairs or replacements of any kind, nature or description whatsoever to any Project or any portion thereof.

5.4. Modifications. The Parties may modify the terms of this Protocol by mutual written agreement signed by authorized representatives of the Parties. The Trustees reserve the right to terminate this agreement at any time.

5.5. Counterparts. This Protocol may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

5.6. Bluefield's Assignment of Rights. Bluefield may, upon written notice to the Trustees, assign its rights and obligations under this Protocol to any person or business entity which is an affiliate of Bluefield, or a trust, insurance company, or similar entity that performs the long-term maintenance of the Project. Bluefield may also, upon written notice to the Trustees, assign its rights and obligations under this Protocol to a Trustee or Trustees upon written acceptance by such Trustee or Trustees.

5.7. Retention of Records. Bluefield must retain and instruct its contractors and agents to preserve, for a period of ten years all non-identical copies of the last draft or final version of any documents or records (including documents or records in electronic form) now in its possession or control or which come into its possession or control that relate in any manner to the performance of a Project pursuant to this Protocol, provided, however that Bluefield (and its contractors and agents) must retain in addition, copies of all data generated during the performance of the work and not contained in the aforementioned documents required to be retained. Each of the above record retention requirements shall apply regardless of any corporate retention policy to the contrary.

5.8. Failure by Bluefield to Comply with this Agreement. If Bluefield fails to comply with any of the terms and conditions of this Protocol, the Trustees may refuse to recognize any or all NRD Credits established pursuant to this Protocol. This right may be exercised in lieu of or in addition to any direct rights of enforcement the Trustees may have in any financial assurances provided pursuant to this Protocol. Refusal by the Trustees to recognize any or all NRD Credits pursuant to this Paragraph will not be unreasonable.

**THE TRUSTEES:**

**BLUEFIELD HOLDINGS, INC.:**

By: _____
Name: _____
Title: _____
Date: _____

By: _____
Name: Shawn R T Severn
Title: President
Date: Friday May 15, 2009

**APPENDIX E1**

## ESCROW AGREEMENT

This Escrow Agreement ("Agreement") is made and entered into this 29th day of March, 2011, by Bluefield Holdings, Inc. ("Bluefield"); the National Oceanic and Atmospheric Administration (NOAA), on behalf of the Department of Commerce and Bay Area Escrow ("Escrow Agent").

**WHEREAS**, Bluefield and the Elliott Bay Trustee Council, comprised of the United States Department of the Interior (DOI), the State of Washington, Department of Ecology (Ecology), the Muckleshoot Indian Tribe, and the Suquamish Tribe and NOAA developed a document entitled "Final Natural Resource Restoration and Enhancement Credit Protocol", dated May 24, 2009, hereinafter called the "Protocol". Under the guidelines set forth in the Protocol, the Principal must provide financial assurance to guarantee the operation and maintenance of the Natural Resource Restoration Project in accordance with a Statement of Work (SOW) developed pursuant to the Protocol. The operation and maintenance of the habitat restoration to be guaranteed through the establishment of this Escrow Account is detailed in the SOW entitled "Statement of Work for Duwamish River Habitat Restoration Program, West Side West Waterway - Site 01 in Seattle, Washington," hereinafter called the "Guaranteed Work".

**NOW, THEREFORE,** in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned parties hereto agree as follows:

### SECTION 1. Appointment of Escrow Agent.

Bluefield and NOAA hereby appoint Bay Area Escrow to serve as Escrow Agent under the Escrow Agreement on the terms and conditions set forth herein.

### SECTION 2. The Escrow Fund, Release of Funds and Termination.

(a) On the Effective Date of this Agreement, and at the time of the execution of this Agreement by Bluefield, Bluefield shall tender $250,000 to the Escrow Agent for deposit in a separate bank account maintained by Escrow Agent for purposes of the Agreement.

(b) All funds received by the Escrow Agent pursuant to the terms of these Escrow Instructions shall be held and disbursed in accordance with the terms and conditions of the Agreement. Escrow Agent shall invest the Escrow Deposit in an interest bearing account at a financial institution to be selected by Bluefield and to be identified in writing to NOAA.

(c) All interest earned on such funds shall be available for purposes of this Agreement. In the event the funds in the Agreement exceed the amounts needed to complete the operation and maintenance of the Guaranteed Work, any balance and interest accrued shall be released to Bluefield at the end of the term of this Escrow Agreement.

(d) The Escrow Agent shall disburse funds as NOAA shall direct and on the following conditions:

(i) Commencing one year from the Effective Date of this Agreement and on an annual basis, NOAA will direct in writing that the Escrow Agent shall disburse an amount from the Escrow Account to Bluefield in payment for Bluefield's annual expenditures for the operation and maintenance associated with the Guaranteed Work. The disbursement shall be made to [identify Bluefield's bank account].

(ii) Thirty (30) days prior to the scheduled annual disbursement noted in paragraph 2(d)(i), Bluefield shall notify NOAA in writing of the amount of its expenditures for the prior year spent on the operation and maintenance of the Guaranteed Work. Such notification shall specify the costs and the underlying documentation that supports the disbursement request.

iii) If NOAA objects to an annual disbursement for any reason, NOAA will

-2-

notify the Escrow Agent and Bluefield of their objections and the specifics of the deficiency in writing five working days before the date of the scheduled annual disbursement. NOAA will provide Bluefield fifteen working days to cure the deficiency.

(iv) If after fifteen working days, Bluefield is not able to cure the deficiency in a manner satisfactory to NOAA, or there is otherwise a dispute related to the annual disbursement, the Escrow Agent will disburse the scheduled annual amount of the operation and maintenance to NOAA into an account to be determined by NOAA.

(v) If Bluefield does cure the deficiency to the satisfaction of NOAA, NOAA will notify Bluefield and Escrow Agent that there are no further objections to the annual disbursement, and Escrow Agent shall release the scheduled amount to the Bluefield bank account identified in Section 2, paragraph (d)(i).

(c) Overall Failure to Complete Operation and Maintenance of Guaranteed Work. Irrespective of the annual disbursements noted in Section 2(d), in the event NOAA determines that Bluefield has failed to meet its operation and maintenance obligations as described in the Guaranteed Work, within thirty days of determining there is such a failure, NOAA shall notify Bluefield and the Escrow Agent in writing and shall specify the nature of the deficiency. Bluefield shall have fifteen working days from the date of notice to cure and to perform the operations and maintenance as required by NOAA. In the event Bluefield fails or is unable to cure the deficiencies specified by NOAA, NOAA will notify the Escrow Agent of such failure and the Escrow Agent shall release the remainder of the funds in the Escrow Account to NOAA into an account to be determined by NOAA. In the event Bluefield is able to cure the deficiency within the time frame allowed and to the satisfaction of NOAA, NOAA will notify the Escrow Agent in writing, will withdraw its request for full disbursement of the Escrow account, and the Escrow Agent shall disburse the funds to Bluefield.

-3-

(f) Escrow Agent Performance. Escrow Agent shall only perform such duties as are expressly set forth in this in this Agreement. Escrow Agent may resign from its duties or obligations hereunder by giving written notice 30 days in advance of such resignation to Bluefield and NOAA. Advanced written notice shall specify a date when such resignation shall take effect, but no such resignation shall be effective until at least 30 days following the date on which Escrow Agent provided notice. In the event that Bluefield and NOAA have not appointed a new escrow agent under this Agreement and provision has not been made to transfer the Escrow Account to such new escrow agent prior to the effective date of the resignation of Escrow Agent, then the Escrow Agent may appoint a second escrow agent which shall be a commercial bank organized under the laws of the United States or the State of California and having a combined capital and surplus of at least \$50 million.

(g) Effective Date. The Effective Date of this Agreement is the date by which it is executed by Bluefield and the funds are deposited with the Escrow Agent.

(h) Notices. Any written notices required in this Escrow Agreement shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, return receipt requested or (b) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, to the addresses noted below:

> National Oceanic and Atmospheric Administration
> Attn: Rebecca Hoff
> 7600 Sand Point Way NE
> Seattle, WA 98115

> Bluefield Holdings, Inc.
> Scott Lockert, VP
> 2505 Second Avenue, Suite 602
> Seattle, WA 98121

> Bay Area Escrow
> 2817 Crow Canyon Road
> Suite 102

-4-

San Ramon, CA 94583

NOAA, Bluefield and/or Escrow Agent may change the contact to which notices or other written communications to them are to be given by giving notice as required under this section.

(i) <u>Jurisdiction</u>. Any action, lawsuit or proceeding that may arise pursuant to this Agreement, unless otherwise specified in this Agreement, must be instituted in the US District Court for the Western District of Washington in which any Consent Decree or other type of settlement was reached and in which a potentially responsible party (PRP) funded implementation of the project described in the Guaranteed Work, whether in whole or in part, to resolve alleged natural resource damage liability in or proximate to the Lower Duwamish River. However, NOAA has sole discretion to determine whether Bluefield has met its requirements regarding the operation and maintenance to be conducted pursuant to the Guaranteed Work.

(j) <u>Modifications of Guaranteed Work</u>. Both Bluefield and NOAA recognize that the Guaranteed Work or in the work to be done there under may be modified, revised, or amended and such changes will not affect the terms and conditions of this Agreement.

(k) <u>Term</u>. The term of this Escrow Agreement is from the Effective Date for ten years. The term may be extended upon the written agreement of Bluefield, NOAA, and the Escrow Agent.

-5-

IN WITNESS WHEREOF, this Escrow Agreement has been executed by the parties with the

Effective Date as defined in the Escrow Agreement.

Bluefield Holdings, Inc.

By: _____

Name: Shawn RT Severn

Title: President

Date: March 29, 2011

5154731

IN WITNESS WHEREOF, this Escrow Agreement has been executed by the parties with the

Effective Date as defined in the Escrow Agreement.

By:_ National Oceanic and Atmospheric Administration

Craig O'Connor, Special Counsel
General Counsel for Natural Resources_____

Date:_____

-7-

5154731

IN WITNESS WHEREOF, this Escrow Agreement has been executed by the parties with the

Effective Date as defined in the Escrow Agreement.

ESCROW AGENT:

By: _Anna M Luce_
Name: _Anna M Luce_
Title: _Escrow Officer_
Date: _3-30-11_

-8-

## AMENDMENT TO ESCROW AGREEMENT

This Amendment to that certain Escrow Agreement by and between Bluefield Holdings, Inc. ("BFH"), the National Oceanic and Atmospheric Administration ("NOAA") on behalf of the Department of Commerce and Bay Area Escrow ("Escrow Agent") recites and states as follows:

WHEREAS, the Parties, BFH, NOAA and Bay Area Escrow entered into an Escrow Agreement dated March 29, 2011; and

WHEREAS, banking instructions for disbursements to BFH pursuant to the Escrow Agreement were inadvertently omitted from the original document; and

WHEREAS, the Parties now desire to amend the Escrow Agreement to include banking instructions for disbursements to BFH.

NOW THEREFORE, the Parties agree to amend the final sentence in Section 2(d)(i) of the Escrow Agreement to state:

"The disbursement shall be made to:

Bluefield Holdings, Inc.
c/o Bank of America, N.A.
100 West 33rd Street
New York, New York 10001
ABA No.: █████████
Credit to: Meryl Lynch Acct No.: ████████

IN WITNESS WHEREOF, the undersigned authorized signatories have executed this Amendment to Escrow Agreement as of the date ascribed below.

Bluefield Holdings, Inc.

By its: President / CEO
Date: Jan 27, 2016

Bay Area Escrow    P. Mercado

By its: Escrow Officer
Date: 02-19-16

National Oceanic and Atmospheric Administration

By its: Special Counsel
Date: 2 1 2016

**APPENDIX E2**



APPLICANT                        BENEFICIARY
BLUEFIELD HOLDINGS, INC          NATIONAL OCEANIC & ATMOSPHERIC
1880 W OAK PKWY                  ADMINISTRATION (NOAA)
BLDG 1, STE 106                  7600 SANDPOINT WAY NE,
MARIETTA GA 30062                BUILDING 1 (DARC)

                                 SEATTLE, WA 98115
                                 ATTN: MARLA STEINHOFF,
                                 REGIONAL RESOURCE COORDINATOR


                                 ISSUING BANK
                                 BANK OF AMERICA, N.A.
                                 ONE FLEET WAY
                                 PA6-580-02-30
                                 SCRANTON, PA 18507-1999

AMOUNT
NOT EXCEEDING USD 46,000.00
NOT EXCEEDING FORTY SIX THOUSAND AND 00/100'S US DOLLARS

EXPIRATION
APRIL 20, 2021 AT OUR COUNTERS



ISSUER HEREBY ESTABLISHES THIS IRREVOCABLE LETTER OF CREDIT NO.
68171702 IN FAVOR OF THE NATIONAL OCEANIC AND ATMOSPHERIC
ADMINISTRATION ("NOAA") ("BENEFICIARY") ON BEHALF OF THE NATIONAL
OCEANIC AND ATMOSPHERIC ADMINISTRATION AND THE DEPARTMENT OF THE
INTERIOR, THE STATE OF WASHINGTON DEPARTMENT OF ECOLOGY, THE
MUCKLESHOOT INDIAN TRIBE, AND THE SUQUAMISH TRIBE (THE "TRUSTEES") AT
THE REQUEST AND FOR THE ACCOUNT OF BLUEFIELD HOLDINGS, INC., A NEVADA
CORPORATION, WHOSE PRINCIPAL PLACE OF BUSINESS IS LOCATED AT 1880
WEST OAK PARKWAY, SUITE 106, MARIETTA GA 30062 ("APPLICANT") UP TO
THE MAXIMUM AMOUNT OF FORTY-SIX THOUSAND U.S. DOLLARS ($46,000)
("MAXIMUM AMOUNT"), AVAILABLE UPON PRESENTATION OF:

1. BENEFICIARY'S SIGHT DRAFT, BEARING REFERENCE TO THIS LETTER OF
CREDIT NO. 68171702 , TOGETHER WITH

2. BENEFICIARY'S SIGNED STATEMENT DECLARING THAT THE AMOUNT OF THE
SIGHT DRAFT IS PAYABLE PURSUANT TO A DETERMINATION MADE BY THE
TRUSTEES PURSUANT TO THAT CERTAIN CONSENT DECREE IN CASE NO.
CV-16-1486 (W.D. WA.), BETWEEN THE UNITED STATES, ON BEHALF OF THE
NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION AND THE DEPARTMENT OF
THE INTERIOR, THE STATE OF WASHINGTON THROUGH THE DEPARTMENT OF
ECOLOGY, THE MUCKLESHOOT INDIAN TRIBE, AND THE SUQUAMISH TRIBE AS
PLAINTIFFS, THE CITY OF SEATTLE AS DEFENDANT, AND BLUEFIELD HOLDINGS,

ORIGINAL

THIS IS AN INTEGRAL PART OF LETTER OF CREDIT NUMBER: 68171702

INC. AS A PERFORMING PARTY.

WE ARE INFORMED BY THE APPLICANT THAT:
THE MAXIMUM AMOUNT IS BASED UPON FINANCIAL ASSURANCE REQUIREMENTS FOR
ADAPTIVE MANAGEMENT ACTIVITIES TO BE PERFORMED BY APPLICANT ON A
RESTORATION PROJECT DEVELOPED BY APPLICANT PURSUANT TO THAT CONSENT
DECREE. THE MAXIMUM AMOUNT HAS BEEN MUTUALLY AGREED UPON BY THE
APPLICANT, AND THE TRUSTEES, OF WHICH NOAA IS ACTING AS
REPRESENTATIVE MEMBER FOR PURPOSES OF THIS LETTER. THE MAXIMUM AMOUNT
HELPS ENSURE THAT FUNDING FOR ADAPTIVE MANAGEMENT ACTIONS TO BE TAKEN
DURING THE PROJECT'S PERFORMANCE PERIOD IS AVAILABLE.

THIS IRREVOCABLE LETTER OF CREDIT IS EFFECTIVE AS OF APRIL 24,2020
AND WILL EXPIRE ONE YEAR FROM THE DATE OF ISSUANCE (THE "INITIAL
EXPIRATION DATE"), BUT SUCH EXPIRATION DATE WILL BE AUTOMATICALLY
EXTENDED FOR A PERIOD OF ONE YEAR FROM THE INITIAL EXPIRATION DATE
AND ON EACH SUCCESSIVE EXPIRATION DATE, UNLESS, AT LEAST 120 DAYS
BEFORE THE CURRENT EXPIRATION DATE, ISSUER NOTIFIES NOAA AT THE
ADDRESS IDENTIFIED ABOVE, WITH A COPY OF SUCH NOTICE SENT TO
APPLICANT AT THE ADDRESS IDENTIFIED ABOVE BY CERTIFIED MAIL OR
RECEIPTED COURIER THAT ISSUER ELECTS NOT TO EXTEND THE LETTER OF
CREDIT BEYOND THE CURRENT EXPIRATION DATE. IN THE EVENT BENEFICIARY
IS SO NOTIFIED, ANY UNUSED PORTION OF THE CREDIT WILL BE AVAILABLE
UPON PRESENTATION OF BENEFICIARY'S SIGHT DRAFT FOR 120 DAYS AFTER THE
DATE OF RECEIPT BY NOAA AS SHOWN ON THE SIGNED RETURN RECEIPT OR
UNTIL THE EXPIRATION DATE OF THIS LETTER OF CREDIT, WHICHEVER IS
LATER.

WHENEVER THIS LETTER OF CREDIT IS DRAWN ON, UNDER, AND IN COMPLIANCE
WITH THE TERMS OF THIS CREDIT, ISSUER WILL DULY HONOR SUCH DRAFT UPON
PRESENTATION TO US, AND ISSUER WILL PAY TO AN ACCOUNT IDENTIFIED BY
NOAA TO BE USED SOLELY FOR ADAPTIVE MANAGEMENT.

ALL NOTIFICATIONS, REQUESTS, AND DEMANDS REQUIRED OR PERMITTED
HEREUNDER FROM THE BENEFICIARY SHALL BE GIVEN IN WRITING, IDENTIFY
THE SITE, AND PROVIDE A CONTACT PERSON (AND CONTACT INFORMATION).

MULTIPLE AND PARTIAL DRAWS ON THIS LETTER OF CREDIT ARE EXPRESSLY
PERMITTED, UP TO AN AGGREGATE AMOUNT NOT TO EXCEED THE MAXIMUM
AMOUNT. WHENEVER THIS LETTER OF CREDIT IS DRAWN ON, UNDER, AND IN
COMPLIANCE WITH THE TERMS HEREOF, ISSUER SHALL DULY HONOR SUCH DRAFT
UPON PRESENTATION TO ISSUER, AND ISSUER SHALL DEPOSIT THE AMOUNT OF
THE DRAFT IN IMMEDIATELY AVAILABLE FUNDS DIRECTLY INTO SUCH ACCOUNT
OR ACCOUNTS AS MAY BE SPECIFIED IN ACCORDANCE WITH BENEFICIARY'S
INSTRUCTIONS.

ALL BANKING AND OTHER CHARGES UNDER THIS LETTER OF CREDIT ARE FOR THE
ACCOUNT OF THE APPLICANT.

THIS LETTER OF CREDIT IS SUBJECT TO THE UNIFORM CUSTOMS AND PRACTICE
FOR DOCUMENTARY CREDITS PUBLICATION 600, PUBLISHED BY THE

ORIGINAL



THIS IS AN INTEGRAL PART OF LETTER OF CREDIT NUMBER: 68171702

INTERNATIONAL CHAMBER OF COMMERCE.

I HEREBY CERTIFY THAT I AM AUTHORIZED TO EXECUTE THIS LETTER OF CREDIT ON BEHALF OF BANK OF AMERICA, N.A.

IF YOU REQUIRE ANY ASSISTANCE OR HAVE ANY QUESTIONS REGARDING THIS TRANSACTION, PLEASE CALL 800-370-7519 .

_Vincent Leonardo_____

AUTHORIZED SIGNATURE
        THIS DOCUMENT CONSISTS OF 3 PAGE(S).

ORIGINAL

**APPENDIX F**

# Appendix F:  City of Seattle Released Facilities

## See attached Figure F-1

1. SW Florida SD (36")
2. SW Graham SD (aka SW Kenny St. SD)
3. SW Idaho SD
4. 7th Ave S. SD
5. 11th SW & SW Massachusetts NPDES #77
6. Chelan Ave. SE at 16th SW (104)
7. Diagonal (111) CSO
8. Lander CSO/SD (W030)
9. S Fox St SD (116) (Brighton) (Former CSO)
10. S River St, SD
11. SW Spokane St. at 13th Ave NPDES #103 (Former CSO)
12. SW Florida CSO/SD (098)
13. SW Florida at 16th SW CSO/SD (106)
14. SW Hinds CSO/SD (099)
15. SW Lander at 16th SW CSO/SD (105)
16. SW Michigan (Highland Park Way) SD
17. SW Spokane at 13th CSO/SD (NPDES #102)
18. 16th Ave S SD A-South
19. 16th Ave S SD B-North
20. Duwamish substation #1 SD
21. Duwamish substation #2 SD
22. Flume
23. S Garden St, SD
24. S Hinds St. CSO/SD (NPDES107)
25. S Myrtle SD
26. S Nevada SD
27. Slip 4 SD (a.k.a. North Boeing Field SD)
28. SW Dakota SD
29. West Seattle Reservoir Overflow
30. Georgetown Steam Plant (see parcels on Figure F-1)
31. Herrings House Park (see parcels on Figure F-1)
32. SW Lander SD (15")
33. S Massachusetts SD


Key to Abbreviations

SD – "Storm drain"

NPDES – "National Pollutant Discharge Elimination System" (Clean Water Act permit) Refers to CSO permit outfall number

CSO – "Combined sewer overflow"

EOF – "Emergency Overflow" - Points in SPU's separated sanitary system where a sanitary sewer overflow occurs related to a sewage pump station power outage, mechanical breakdown, broken pipe, seawater intrusion, etc.

CSO/SD or EOF/SD - Shared outfall that serves as both a combined sewer overflow or emergency overflow and storm drain system.

March 11, 2021



Figure F-1
City of Seattle Released Facilities

March 2021

West Waterway

East Waterway

Duwamish Waterway

31 — 1824049094
31 — 7666703670
31 — 1924049104

7006700570

2136200666

See Appendix F list of Seattle Released Facilities

Legend

● NRDA Outfalls

▬ Parcels (PIN)

- - - City Limits